

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, Et Al., | § § § | |
| **Plaintiffs** | § § | |
| vs. | § § | Civil Action No. 3-01CV2247-N |
| RECEIVABLE FINANCE COMPANY, L.L.C, Et. Al. | § § § | |
| **Defendants** | § | |

**APPENDIX TO PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' DESIGNATED EXPERT, MICHAEL FREEMAN, D.C., AND BRIEF IN SUPPORT THEREOF**

COME NOW the Plaintiffs and file this Appendix to their *Plaintiff's Motion to Strike Defendants' Designated Expert, Michael Freeman, D.C., and Brief in Support Thereof.*

| Exhibit | Document | Page Numbers |
|---|---|---|
| A | January 9, 2004 Report of Michael D. Freeman, Ph.D, D.C. | 1-38 |
| B | November 20, 2003 Report of Bill Timberlake, D.C. (excluding worksheets, which contain patient identification information) | 39-53 |

Respectfully submitted;



**DAVID KASSABIAN**
**TEXAS STATE BAR NO. 11105600**
**BRET WEATHERFORD**
**TEXAS STATE BAR NO. 20998800**

**KASSABIAN, DOYLE &**
**    WEATHERFORD, P.C.**
1521 North Cooper Street
Suite 650, LB 21
Arlington, TX 76011
(817) 460-5099 (Local)
(817) 461-8855 (Metro)
(817) 274-9863 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing Appendix has been served on the following by certified mail, return receipt requested, this ____ day of June, 2004.

DAVID KASSABIAN

Mr. Rick Disney
Douglas, Wuester & Disney, P.C.
Fort Worth Club Tower, Penthouse I-C
777 Taylor Street
Fort Worth, TX 76102-4919

Mr. Lindy Jones
Jones, Allen & Fuquay, L.L.P
8828 Greenville Avenue
Dallas, TX 75243

Mr. Michael Mears
Andrews & Kurth, L.L.P.
1717 Main Street, Suite 3700
Dallas, TX 75201

Mr. Robert Renneker
1412 Main Street
Suite 210
Dallas, TX 75202

Mr. James D. Shields
Shields, Britton & Fraser
5401 Village Creek Drive
Plano, TX 75093

Mr. Chris Weil
Weil & Petrocchi, P.C.
1601 Elm Street, Suite 1900
Dallas, Texas 75201-2846

Mr. Richard Young
Glast, Phillips & Murrey, P.C.
2200 One Galleria Tower
13355 Noel Rd., LB 48
Dallas, TX 75240-6657

**APPENDIX TO PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' DESIGNATED EXPERT, MICHAEL FREEMAN, D.C., AND BRIEF IN SUPPORT THEREOF      Page 3**

## Michael D. Freeman, Ph.D., D.C., M.P.H.
### Forensic Trauma Epidemiologist
Clinical Assistant Professor
Department of Public Health and Preventive Medicine
Oregon Health Sciences University School of Medicine
Mailing address: 1165 Liberty Street, N.E., Suite 300 • Salem, Oregon 97301
phone 503 586-0127 • fax 503 763-3582 • e-mail: drmfreeman@earthlink.net

January 9, 2004

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201
Phone: (214) 659-4400
Fax: (214) 659-4401

RE:   Allstate Insurance Company, et al. v. Receivable Finance Company, LLC
      Civil Action No. 3-01-CV2247-N; U.S. District Court, Northern District

Dear Mr. Mears,

I am in receipt of your January 7th, 2004 correspondence and have reviewed the enclosed materials concerning the above-named action. Specifically, I have reviewed the November 26th, 2002 First Amended Complaint in this matter, a November 20th, 2003 report from plaintiff's chiropractic expert Dr. Bill Timberlake, a group of forms used by Dr. Timberlake for evaluating A&I case files numbered 34-100, an undated and unsigned report entitled "Summary of findings of review in 100 randomly selected A&I cases" that you have represented as a document from Dr. Timberlake, three reports of errata pertaining the summary report dated November 24, 2003, November 25, 2003, and December 1, 2003, respectively, and Dr. Timberlake's curriculum vitae, partial testimony list, and a note with his hourly charges dated November 20, 2003. I have not reviewed any case files from A&I nor do I intend to at the present time. I understand that you have retained other experts for that task.

The purpose of this report, per my understanding of what you have asked of me both in writing and verbally, is the following:





MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

1. To describe, in general terms, the epidemiology of crash-related spinal injuries and their sequelae as well as the role of chiropractic care, multidisciplinary referrals, and the use of MRI imaging as a diagnostic tool in the management of such injuries;

2. To comment on the scientific validity of the methods and opinions employed by plaintiff's chiropractic expert Dr. Bill Timberlake;

3. To comment generally on Minor Impact Soft Tissue (MIST) segmentation, a fraudulent claims management practice universally employed by Allstate claims adjustors.

My qualifications to perform such an analysis are as follows:

I hold a Ph.D. in trauma epidemiology from Oregon State University, as well as a Master's degree in biostatistics and epidemiology from that school. My thesis was on chronic pain following motor vehicle crash injuries. I serve as a clinical assistant professor at Oregon Health Sciences University School of Medicine, Department of Public Health and Preventive Medicine, as a trauma epidemiologist, where I teach a course in injury and trauma epidemiology (with a focus on motor vehicle crash injuries) to graduate medical students, M.P.H. and Ph.D. candidates, and medical specialists such as emergency medicine doctors, neurosurgeons, and orthopedic surgeons. I am originally trained as a chiropractic physician, and in that capacity have evaluated, treated, and followed well over 3000 cases of crash-related injuries. I am certified as a crash reconstructionist with Northwestern University in Evanston, Illinois, and am a member of a vehicular homicide law enforcement team in Marion County, serving as a trauma scientist. I serve as a Deputy Medical Examiner in Marion County as well as a Consultant Forensic Trauma Epidemiologist to the Medical

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

Examiner Division of the Oregon State Police, analyzing fatal collisions and the resulting injuries. I

have designed and conducted human volunteer crash testing

experiments, the results of which are published in the Journal of Accident Analysis and Prevention, a

peer reviewed journal. I am the co-editor in chief of the *Journal of Whiplash and Related Disorders*, a

peer-reviewed journal from Haworth Press, served as the scientific chair of the North American

Whiplash Trauma Congress and co-chair of the International Whiplash Trauma Congress, as well as the

co-chair of the section on Forensic Aspects of Traffic Crashes for the International Traffic Medicine

Association. I have written and published widely in the field of motor vehicle crash injuries and

accident reconstruction, as well as the prevalence of junk science in these areas. Please see my CV for

further details. My billing for my services is reflected in the attached fee schedule.


**Opinions:**

1. Motor vehicle crash-related injuries affect approximately 6 million people in the US

    annually, with approximately 250,000 seriously injured, 60,000 compelling injuries (injuries

    resulting in death without prompt medical attention), and 42,000 deaths. The most common

    type of crash related trauma is a spine injury resulting from a rear-impact collision,

    accounting for approximately half of all injuries.

    More serious injuries typically result from frontal and angled frontal collisions and side

    impacts rather than rear impact collisions. Non-catastrophic injuries to the spine (without

    unstable fracture or dislocation) typically occur as a result of inertial forces. This means that

    the inertial force acting on the occupant (typically keeping the body stationary relative to the

3

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

vehicle interior) is overcome by the sudden acceleration of the vehicle causing in impact

between the occupant and the vehicle interior. In a rear impact collision this results in the

seat back striking the occupant in the lower and middle back while the head lags behind,

resulting in shear, rotation, compression and distraction forces all acting upon the spine to

various degrees, and potentially resulting in injury.

In a frontal collision the sudden stopping of the vehicle results in the occupant

continuing to move forward relative to the vehicle interior until stopped or slowed by

contact with a seat belt, steering wheel, or other structure. While one part of the body may

be stopped, other parts continue to move forward (the head, for example) resulting in a

differential acceleration between the torso and head and injury forces thus transmitted

through the neck. Similar principles govern other types of crashes.

The most common sequelae of such injuries are spinal injuries, commonly referred to as

"whiplash" injuries. While the term whiplash can have a pejorative connotation among

some lay people, it is considered an appropriate term for use in the scientific arena, and

thus I will use it throughout this report to indicate a specific type of crash-related injury.

A whiplash injury of the spine can involve the muscles, joints, discs, nerves, and can

even include small fractures of the vertebrae. Whiplash is the most frequently studied

cause of acute and chronic neck pain seen in the biomedical literature, with more than 50

case series and controlled cohort studies (both epidemiologic study types) devoted to the

injury. Recent publications estimate that nearly half of chronic neck pain in North

4

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

America stems from a whiplash injury. The term whiplash was first introduced in 1928.
It was originally used to describe the indirect traumatic force to the cervical spine that
resulted from motor vehicle crashes, but not the actual injury. The term was later
reintroduced in the 1960's and included the injury as well as the injury mechanism. In
1995 the Quebec Task Force on Whiplash Associated Disorders defined whiplash as
follows: "Whiplash is an acceleration/deceleration mechanism of energy transfer to the
neck. It may result from rear-end or side impact motor vehicle collisions, but can also
occur during diving or other mishaps." The term has generally come to be accepted as
representing both the injury and the manner in which it was sustained. Whiplash injuries
are not just neck or spinal injuries but any crash-related injury that results more from
inertial forces rather than a direct impact with the vehicle interior.

The reasons that one person may sustain an injury and another may not in an
identical crash or even when in the same vehicle are complex and varied, as noted in the
following quote from a peer-reviewed paper published in Spine in 1999:

> *"Variables intrinsic to the injured occupant that have been identified as risk factors for*
> *injury presence, severity, and duration following whiplash trauma are female gender,*
> *increased age, preexisting degenerative changes in the spine, out of position occupant*
> *in the vehicle during impact, rotation of the head during impact, lack of preparation*
> *prior to impact, and a slender physique, collectively referred to as Intrinsic Injury Risk*

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

> *Factors (IIRF) for the purposes of this literature review. Risk factors for injury extrinsic*
>
> *to the occupant are direction of impact, presence and position of a head restraint, and*
>
> *presence of a shoulder restraint, referred to as Extrinsic Injury Risk Factors (EIRF).*
>
> *Acceleration forces interact with the above mentioned risk factors, as well as*
>
> *Unconfirmed Probable Risk Factors (UPRF) such as car seat construction and bumper*
>
> *dynamics, to produce injury. The number of meaningful permutations of the IIRFs,*
>
> *EIRFs, and UPRFs is conceivably in the thousands or tens of thousands..."*

The epidemiology of chronic or "late" whiplash has been reported widely in the

literature, with estimates of the risk of permanent injury among those with acute

whiplash injury ranging widely from 12% to 86%, depending on the population studied.

A soon to be published text on chiropractic practice (Principles and Practice of

Chiropractic, 2nd edition) gives the details of a meta-analysis of approximately 50 studies

of chronic whiplash, indicating that there is an approximately one in four risk of

permanent pain from acute whiplash injury

While the risk of chronic whiplash among whiplash-injured individuals has been the

subject of numerous studies, the contribution of late whiplash to chronic neck pain in the

general population has only been estimated recently, with two studies, one in the US and

one in Canada, indicating an estimated 45% of the population with chronic neck pain

attributing their pain to a whiplash injury.

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

Chiropractic treatment is one of the most common modalities of care for crash-related spinal injuries, and one of the few treatments that have been demonstrated to be effective for such injuries in the biomedical literature. This is not particularly surprising as whiplash injuries typically affect the joints, muscles, and discs of the spine and chiropractic treatment is directed at improving the function of these structures through non-surgical and non-medicinal means. The pain caused by whiplash injuries can vary greatly for any given individual, and pain can be an indication for referral for medical evaluation and treatment for a prudent chiropractor.

Magnetic Resonance Imaging (MRI) has been recently hailed as the greatest medical advance in the past 25 years because of its ability to show the inside of a patient's body. MRI is a very important tool for a chiropractor who is managing a whiplash injury, since such injuries may involve damage to the intervertebral disc, something that can only be definitively evaluated with MRI. There have been numerous articles written about the use of MRI for whiplash injury, and it is generally accepted that in selected cases it is a valuable diagnostic tool.

2. Dr. Timberlake's opinions and conclusions are laid out in an 8 page report dated November 20, 2003, detailing 9 areas in which he states his specific criticisms of A&I, as well as the bases for the criticisms. Dr. Timberlake's opinions of the A&I care are based on his review of 100 files sampled from a group of 1700 files, a subgroup of an approximately 50% larger group of files. Dr. Timberlake apparently constructed a form with 18 questions that he used to evaluate the files, with many of the questions consisting of basic descriptions of the file

⑦

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

(first date of services, whether or not an MRI was performed, etc.). The remainder of the

questions are best described as "loaded," in that they allow for wholly subjective

determinations made by Dr. Timberlake with no description for the rationale or basis for his

determination. These questions are as follows (the numbers are taken from Dr. Timberlake's

form):

*3. Treatment Optional?* (89 Yes, 10 No, 1 NA)

Dr. Timberlake's question begs another, and that is, optional to whom? The pain control

afforded by effective chiropractic can be dramatic to a patient with acute or chronic

symptoms, making the need for the care not an option but a necessity. The question is

designed to cast doubt on the need for the treatment, and the complexity of an honest

answer to the question is belied by the fact that Dr. Timberlake found that in 89 of the

100 cases the treatment was "optional" or not necessary with no further elaboration as to

what this term is intended to mean and to whom it is intended to apply.

In his November 20, 2003 report Dr. Timberlake uses "optional" to mean that

the injuries would have resolved without treatment. Thus the intended meaning of

"optional" is "unnecessary." This claim is false on two levels; since approximately one

out of four crash-related spine injuries leave the patient with some degree of permanent

pain it is incorrect to claim that all such injuries resolve without treatment. Additionally,

since all of the patients were treated, there is no information from which Dr. Timberlake

can deduce how they would have done without treatment. On the other hand, there is

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

scientific literature that indicates that patients with chronic spine pain from whiplash

that has not resolved with other treatment do better with chiropractic care.

*4. Documentation justify all services?* (95 No, 4 Yes)

Without an explanation as to what criteria is required in order to justify all services in

Dr. Timberlake's mind, the basis for the criteria, and what percentage of services are

justified by the documentation versus those that are unjustified, this question raises more

questions that it answers and does not provide an adequate basis for forensic testimony.

*7. Was MRI justified as reasonable and necessary?* (2 Yes, 70 No, 28 NA)

*18. Does final billing give a disc herniation diagnosis?* (51 Yes, 47 No, 2 NA)

The answer to Question 18 invalidates the findings of Question 7, since an MRI is most

certainly justified with such a high rate of disc pathology present. Clinical indications

for MRI for a suspected disc injury are rather broad, but if a patient has pain that could

be coming from a disc injury AND a positive MRI for a disc herniation then there is no

question that the MRI was justified. Dr. Timberlake's opinion that only 2 of the 72 MRI

examinations were reasonable and necessary in light of 51 uncontradicted diagnoses of

disc herniation (including 10 cases with more than 1 level affected) smacks of

dishonesty.

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

*8. Was referral to MD/DO for consultation of treatment, concurrently, justified as reasonable or necessary?* (6 Yes, 88 No, 6 NA)

Again, Dr. Timberlake gives no inkling of what he considers to be a reason or necessity to make a referral. This is a highly spurious question, in that reasonableness and necessity are parameters of treatment, not referral patterns, since presumably once the referral has been made the medical provider determines whether or not the referral was necessary. Referral to other practitioners is generally encouraged, rather than discouraged, in order to improve quality of patient care. The threshold for triggering a referral for a second opinion is quite low and interdisciplinary evaluation and treatment is generally a very positive thing for a patient. For Dr. Timberlake to validate his assertion that a referral was unnecessary he would have to show that there was no indication for the chiropractor to make the referral AND that the medical evaluation was unneeded by the patient, something that could only be found in the medical notes.

*9. Was the alleged trauma significant?* (12 Yes, 37 No, 51 Undetermined)

The term "significant" has no meaning in this context, as Dr. Timberlake has performed no reconstruction or biomechanical analysis of any of the crashes in order to determine the level of "significance" of the trauma, nor has he given any definition of the term. The significance of a trauma is highly individual and depends on the response of the occupant; a crash with a lot of damage may produce no injury in one individual, whereas a minimal damage crash can produce a mild head injury that may prevent another from

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

returning to work. Undefined and arbitrary terms like "significant" that may mean

virtually anything to anyone have no place in a forensic report, as there is no way to

determine how the expert arrived at his opinion.


*12. Was the frequency of treatment justified?* (2 Yes, 82 No, 16 NA)

The basis for the criteria used to judge this question is given in Dr. Timberlake's

November 20, 2003 report in section 5 (I have addressed this report in its entirety

below). Dr. Timberlake claims that the 2002 Official Disability Guidelines from the

Work Loss Data Institute supports his opinion that treatment frequency was justified in

only 2 of 100 cases.

A visit to the Work Loss Data Institute's webpage advertising their Official

Disability Guidelines reveals the following description of the text:

- *"Manage disability & workers' comp, reducing delayed recovery rates with evidence-based duration guidelines*

- *Locate upfront, clear targets for forecasting and reserving claims using the ODG Summary Guidelines*

- *Grade and measure return-to-work performance and compare with others to locate "best in class"*

- *Benchmark lost work time and cost data against national norms from OSHA and CDC*

- *Demonstrate the value of claims/case management, occupational and integrated health programs*

- *Identify early return-to-work opportunities with clear indications for appropriate activity modification*

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

- *Help good employees and good patients get back on their feet in good time, safely, easily and effectively".*

Nowhere is there any reference to appropriate treatment frequencies. This reference is entirely unrelated to chiropractic management of crash-related injuries, and it is either overtly deceptive or fatuous on Dr. Timberlake's part to cite it as such. The other stated basis for his opinion is what he calls "broadly accepted standards" in the chiropractic community, none of which are stated. Given the fact that Dr. Timberlake holds the unique and fallacious belief that a book on disability guidelines is a basis from which to judge the appropriate frequency of chiropractic treatment for a variety of diagnoses I think it is reasonable to question his awareness and knowledge of what standards the chiropractic community broadly accepts.

*15. Was there justification for clinical treatment beyond norm:* (sic) *for subjective musculo-skeletal injuries?* (0 Yes, 90 No, 1 Uncertain, 9 NA)
This question is quite literally nonsense, as it confuses terms and concepts, but this is apparently not an obstacle to Dr. Timberlake who uses it as another opportunity to show that A&I is not performing at some undisclosed standard which he alone understands. Dr. Timberlake has given no indication of what he considers to be a "normal" amount of chiropractic treatment for crash-related injuries, so there is no way to determine how 100% of the cases failed to meet his criteria.

12

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

Perhaps as an indication of an underlying lack of intellectual integrity in Dr. Timberlake's methods, he describes the injuries of all 100 patients with the expression "subjective musculo-skeletal injuries," a *non sequitur*. While a complaint is subjective in that it exists only in the mind of the patient, an *injury* cannot be subjective, inasmuch as it has been made a real entity by way of a physician's diagnosis. It may be that Dr. Timberlake was using the term in order to trivialize the injuries of the patients described in the 100 cases, however, by his own admission approximately half of the injuries were objectified by MRI findings, and, even though I have not seen the case files, it stretches credulity to believe that there would not have been a single objective finding reported by any A&I physician. Whatever his rationale, Dr. Timberlake has improperly used the term "subjective" with the result that question 15 reads as nonsense.

**November 20, 2003 Report**

This 9 point report is fabric of misstatements mixed with misinterpretation and logical fallacies; it is complete junk science and without basis in chiropractic or science. The following analysis supports this claim:

**Point 1:** Dr. Timberlake claims that the injuries treated by A&I "typically" self-resolve with no treatment. This is an openly false claim, and one that is contradicted by published literature that shows that patients who get chiropractic treatment for the kinds of injuries comprising the 100 case files reviewed by Dr. Timberlake do better than patients who do not get such treatment.

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

The claimed support for Dr. Timberlake's opinion is his 39 years of practice, the publication of the Quebec Task Force on Whiplash Associated Disorders, and again a reference to the Official Disability Guide. Dr. Timberlake's anecdotal practice experience is not likely to be a source for what happens to people who don't get treatment, since chiropractors treat patients rather than simply have them return time after time to talk about how they are feeling and to observe how they do without treatment. I believe that Dr. Timberlake is being disingenuous when he points to his practice experience as a basis for this claim.

Although the Quebec Task Force concluded that many whiplash injuries get better on their own, the authors and their publication have been widely excoriated for reaching a conclusion that was at odds with their literature review, which indicated that between 15 and 66% of patients have permanent symptoms following whiplash. The flaws of this publication were published 3 years after the original publication in the same journal that published the Quebec Task Force paper (Spine). I was the primary author of the paper.

I am aware of no studies of the natural history of crash-related injuries that have been published in Official Disability Guidelines, and am quite certain that the group who publishes this text have not evaluated the 100 patients in the case files that Dr. Timberlake evaluated.

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

**Point 2:** Dr. Timberlake claims that "95% of the cases contained services which were not documented as justified." He does not enumerate how many of the services were not justified, mentioning only intersegmental traction. Dr. Timberlake cites, as a basis for his opinion that there was insufficient documentation to justify intersegmental traction, not one but two medical dictionaries for the definition of "traction," as well as the operator's manuals for a variety of traction tables. This is an intellectually dishonest and frankly lackadaisical approach to determining whether intersegmental traction was justified for any of the patients seen at A&I, as none of the cited documentation could possible give any insight into the issue. Dr. Timberlake's subsequent claim that the treatment was not therapeutically required or reasonable or necessary in 95 of the 100 cases is given with no explanation as to why this was, and why he deigned to allow that 5 of the cases needed the treatment. The fact is that intersegmental traction is an overwhelmingly common form of therapy in use in thousands of chiropractic offices.

**Point 3:** Dr. Timberlake opines that only 2 of the 57 MRIs that were ordered by A&I physicians were reasonable or necessary, citing an Agency for Health Care Policy and Research publication on acute low back pain as the only basis for his opinion. The AHCPR publication does not support Dr. Timberlake's opinion that virtually none of the MRIs ordered by A&I were reasonable and necessary, and, as mentioned earlier, the fact that disc pathology was detected in such a high percentage of the cases is an irrefutable *post hoc* justification for the referral.

15

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

**Point 4:** Dr. Timberlake claims that the high number of referrals to medical physicians by A&I chiropractors is "routine and arbitrary and unnecessary," and I have already addressed this issue to some extent above. Dr. Timberlake claims that his own practice experience is a basis for his opinion, as well as a poll that indicates that only 9% of chiropractic patients are referred to a medical physician. Dr. Timberlake's personal experience is not a valid yardstick by which to measure other practitioner's referral habits since it is unknown how the A&I practices differ from his practice in other respects. Dr. Timberlake's reference to the polling result indicates a lack of understanding as to how such polls are conducted; the 9% referral rate is an average, as some chiropractors never refer to medical physicians and some refer significantly more than 9% of the cases. In a multidisciplinary practice where referrals are facilitated and the patient can be seen in the same facility it is only natural that the rate of referral is significantly higher than in other settings as natural barriers to DC to MD referrals are less likely to exist.

**Point 5:** Dr. Timberlake claims that the frequency of treatment provided the 100 patient sample was too high in nearly every case. I have addressed the fallacies of this claim above in response to Question 12 of Dr. Timberlake's form.

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

**Point 6:** Dr. Timberlake claims that the services rendered by A&I is essentially the same on all patients and that this leads him to the conclusion that they are designed to generate revenue for Bob Smith rather than provide reasonable and necessary service. This wildly speculative and completely unsupported ranting has no place in a forensic report. The fact that A&I provides similar services repetitively owes more to the fact that the injuries are primarily spinal (presumably) and the treatment is primarily chiropractic. Dr. Timberlake's claim in this respect would be similar to saying that surgeons always do the same thing; surgery. This is not an honest or even rational claim on Dr. Timberlake's part and there is not a shred of evidence presented by Dr. Timberlake to support his claim that the care is designed to do nothing more than provide revenue for the owner of the business.

**Point 7:** Dr. Timberlake states, without giving any factual basis for the statement, that the referrals for medical evaluation were to medical physicians working for the same financial entity as the chiropractors, and that this arrangement "prohibits uncontrolled [sic] opinion as to the status of patients." Dr. Timberlake does not elaborate on how a referral to a provider outside of A&I would allow for a "controlled" opinion, nor does he give any inkling as to what he means by "uncontrolled." This claim has no meaning to me as a chiropractor or scientist. If he is implying that clinicians should not refer to another clinician who is employed by the same entity then he is bound to be sorely

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

disappointed by every medical school hospital and outpatient clinic setting in the
country.

Dr. Timberlake makes the same claim for referral to "selected MRI readers"
claiming that the practice is not reasonable and prohibits independent opinion. I can
only wonder who Dr. Timberlake thinks the audience for his opinions is when I read this
sort of thing. Contrary to Dr. Timberlake's slanted view of the chiropractic and medical
world, most doctors make referrals to facilities based on prior positive experiences with
that facility, hoping to duplicate the experience. This does no prevent "independence"
but rather assures quality for the patients of the referring physician.

**Point 8:** Dr. Timberlake claims that few, if any of the disc herniations are related to the
subject crashes, and that the real injuries are "totally subjective, no greater than
sprain/strain problems" that are possible not present at all. The basis for this claim is
three papers on MRI and disc herniations, none of which support the underlying
allegation that the patients that A&I diagnosed with disc herniation did not have them.
One of the papers (#3) documents the rate of disc pathology in the asymptomatic
population, a curious choice given the fact that all of the patients in the A&I 100 case
sample were symptomatic.
The second paper showed that people who do a heavy physical job but have no
symptoms are more likely to have disc pathology than others, but less likely than those
with symptoms who also do heavy physical jobs. It's hard to imagine how Dr.

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

Timberlake can believe that this supports his contention that none of the patients treated at A&I have any crash-related disc injuries, and that they may not have been injured at all. These claims are irrational and baseless and have no place in a forensic report.

**Point 9:** Dr. Timberlake claims that the re-reading of radiographs (not x-rays, as Dr. Timberlake calls them, as this is the radiation used to make the radiographs) by a chiropractic radiologist is "inordinate, unreasonable and unnecessary." The basis for this opinion is Dr. Timberlake's unsupported claim that most chiropractors don't do this. In fact, many DCs do send their films out to be read by a chiropractic radiologist, but this typically occurs in places where such doctors practice, for example larger cities or around chiropractic colleges. Re-reading of radiographs is commonly done in medical practices (for example, every film read by an ER physician is re-read by a radiologist) and this practice assures better quality care and fewer missed diagnoses.

1.  Minor Impact Soft Tissue (MIST) is an acronym coined by Allstate to describe cases in which there is less than $1000 vehicle damage, a claim for injury, and the involvement of an attorney. I have been extensively involved with bad faith litigation on matters concerning MIST segmentation by Allstate and the lack of scientific validity behind their policy of denying compensation and treatment based on the dollar amount of property damage. There is no legitimate scientific or medical basis for Allstate's claims management practice of denying injury possibility based on an arbitrary monetary amount of vehicle damage. It is a false proposition to claim that vehicle damage is a reliable index of injury presence and

MICHAEL E. MEARS
Andrews & Kurth, LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

Re: Allstate Insurance Company, et al. v. Receivable Finance Company, LLC

severity in an individual case. It is a matter of scientific fact that this premise is incorrect;

significant injuries can and do occur in the presence of minimal and even no property

damage.

    I suspect that Dr. Timberlake's awkwardly worded claims regarding the "significance" of

trauma, the "subjectivity" of the injuries, and his claim that documented disc injuries are

really no more than sprains and strains is at least in part influenced by Allstate's MIST

policies.

    Very truly yours,

Michael D. Freeman, Ph.D., D.C., M.P.H.

MDF:lr

# Michael D. Freeman, Ph.D., D.C., M.P.H.

**Forensic Trauma Epidemiologist**
Clinical Assistant Professor
Department of Public Health and Preventive Medicine
Oregon Health Sciences University School of Medicine
Mailing address: 1165 Union Street NE, Ste. 300 Salem, Oregon 97301
503 586-0127 • fax 503 763-3581

## FEE SCHEDULE:          *revised 4/03*

### Retainer:
File review and initial phone consultation: a minimum of $1000* *non-refundable* retainer (due before file review begins)   *Depends on the size of the file.

### Report: $500 - $1000 (typically) to be paid upon receipt of report. (not included in retainer fee)

### Testimony:
$250 non-refundable deposit is <u>required to hold a trial or deposition date</u> on the calendar (due the month prior to the date scheduled).  In addition:
  1. Half day of testimony including travel time: $2500*
  2. Full day including travel time: $4000*
  3. Full day: $5000* (if overnight stay is required because of travel distance)
*½ of the total trial fee is due 5 business days in advance of the date (minus the $250 scheduling deposit) with the remaining balance due no later than 3 business days in advance of event.

### Deposition:
$1000 for the first hour, and $500 for each additional hour paid in advance for an in-office deposition*. Please note:  payment schedule is same as for testimonies.  *If a deposition takes place outside of the office, travel time will be an additional fee.

### Cancellation Policies:
<u>Cancellation of deposition date</u>- If cancellation is requested one month prior, no fee will be assessed.  If less than one month but more than 5 business days prior to deposition, ½ of the deposition fee will be charged. If deposition is cancelled less than five business days prior to the date, the full fee will be charged.

<u>Cancellation of trial date</u>
1 month to 5 business days in advance - $250 scheduling deposit will be used as the cancellation fee
Less than 5 business days in advance – ½ of the trial fee will be charged less the $250 scheduling deposit
Less than 3 business days (M-F) in advance – full fee

**Travel expenses will be billed separately, that is airline tickets, hotel, etc.**

**My signature is an acknowledgement that I have read the above fee schedule and agree to abide by same.**

_____          _____
                Signature                              Date

_____
                Printed Name

(21)

## CURRICULUM VITAE

### MICHAEL D. FREEMAN, Ph.D., D.C., M.P.H.
### DAAPM, FACFE, BCFE, BCFM, FICC

Address:      1165 Union Street NE, Ste. 300
             Salem, Oregon 97301

Date of Birth:   October 4, 1961

### EDUCATION

OREGON STATE UNIVERSITY - Ph.D. in epidemiology (spinal trauma associated with motor vehicle crashes). 10/97.

NORTHWESTERN UNIVERSITY - Evanstown, Illinois - Traffic Accident Reconstruction, basic and advanced training, including occupant dynamics - 1996.

OREGON STATE UNIVERSITY - Corvallis, OR - M.P.H. in epidemiology and biostatistics - 10/95.

WESTERN STATES CHIROPRACTIC COLLEGE, -  Portland, Oregon - 1983-1987 Graduated Magna Cum Laude - valedictorian - D.C. degree 6/87

UNIVERSITY OF OREGON - Eugene, Oregon - 1979-1983   General Science, B.S.

### CLINICAL EXPERIENCE

Licensed to practice chiropractic in Oregon since August 1987 - License # 2340

Willamette Spine Center – co-medical director - 1999 to present
Multidisciplinary Spinal Diagnostic and Treatment Facility
2480 Liberty Street, N.E., Salem, Oregon 97303

Medical executive committee member – Willamette Spine Center Ambulatory Surgery

Freeman Chiropractic Clinic - 1987-1999
4747 River Rd. N.  Keizer, Oregon 97303

Proyecto Chiropractic Clinic - Independence, Oregon
State funded nonprofit clinic, Clinic Director and Founder - 1990-1992.

Polk Chiropractic Clinic  - Independence, Oregon
Non-profit clinic - Founder and sole practitioner - 1992-1993

22

## ACADEMIC POSITIONS

Clinical Assistant Professor
Department of Public Health and Preventive Medicine
Oregon Health Sciences University School of Medicine
Portland, Oregon

## EDITORIAL ACTIVITIES

Co-Editor in Chief, Journal of Whiplash-Related Disorders

Manuscript reviewer, *Spine*

Manuscript reviewer, *The Lancet*

## COURSES TAUGHT

PHPM 507 Injury and Trauma Epidemiology
Department of Public Health and Preventive Medicine
Oregon Health Sciences University School of Medicine
Portland, Oregon

Primary instructor, Crash 1999, 2000, and 2001 Low Speed Crash Reconstruction
Conference sponsored by Spine Research Institute of San Diego and Texas A&M, Including
human volunteer crash testing, U.S. Naval Base, San Diego, California

## FORENSIC ACTIVITIES/COMMITTEE MEMBERSHIP

Deputy Medical Examiner, Marion County, Oregon.

Consultant Forensic Trauma Epidemiologist to the Medical Examiner Division of the Oregon
Department of State Police – Occupant Kinematics

Member, Marion-Polk County C.R.A.S.H. Team - Occupant Kinematics Consultant
This is a vehicular homicide investigation team of crash experts from Oregon State Police,
Marion County Sheriff's Department, and the City of Keizer Police Department.

Member Blue Ribbon Panel Congressional Task Force on roller coaster-induced brain injury

## BOARD CERTIFICATION AND ORGANIZATIONS

Fellow, American College of Forensic Examiners

23

Certified Accident Reconstructionist - Northwestern University

Board Certified in Forensic Medicine - specialty: spinal trauma

Board Certified Forensic Examiner

Diplomate, American Board of Forensic Examiners

Diplomate, American Academy of Pain Management

Member, Association for the Advancement of Automotive Medicine

Member, International Traffic Medicine Association

Member, North American Spine Society

Fellow, International College of Chiropractic

Member, Forensic Accident Reconstructionists of Oregon

Member, American Board of Medicolegal Death Investigators

## RESEARCH AND PUBLICATIONS

Freeman MD, Centeno C. Editorial for volume 1 number 1 issue of Journal of Whiplash and Related Disorders *JWRD* 2002;1(1):1-3.

Murphy D, Freeman MD. Management of neck pain and cervical disorders. In Chiropractic Principles Text, Haldeman S, Triano J, Editors

Freeman MD. Litigating Minor Impact Soft Tissue Cases; Forensic Medicine (volume 2 of Litigating Minor Impact Soft Tissue Cases, Koehler and Freeman). 2001 West Group Publishers.

Croft AC, Herring P, Freeman MD, Haneline MT: The neck injury criterion (NIC): future considerations. *Accid Anal Prev* 2002;34(2):247-55.

Freeman MD, Centeno C, Croft AC, Nicodemus CN: Significant spinal injury resulting from low-level accelerations: a comparison with whiplash. International Congress on Whiplash-Associated Disorders, Berne, Switzerland, March 9-10, 1, 2001.

Croft AC, Haneline MT, Freeman MD: Differential occupant kinematics and head linear acceleration between frontal and rear automobile impacts at low speed: evidence for a differential injury risk. International Congress on Whiplash-Associated Disorders, Berne, Switzerland, March 9-10, 28, 2001.

Croft AC, Haneline MT, Freeman MD: Automobile crash reconstruction in low speed rear impact crashes utilizing a momentum, energy, and restitution (MER) method. International Congress on Whiplash-Associated Disorders, Berne, Switzerland, March 9-10, 20, 2001.

24

Centeno C, Freeman MD, Croft AC: A comparison of the functional profile of an international cohort of whiplash injured patients and non-patients: an internet study. International Congress on Whiplash-Associated Disorders, Berne, Switzerland, March 9-10, 2, 2001.

Freeman MD, Sapir D, Boutselis A, Gorup J, Tuckman G, Croft AC, Centeno C, Phillips A: Whiplash injury and occult vertebral fracture: a case series of bone SPECT imaging of patients with persisting spine pain following a motor vehicle crash. Cervical Spine Research Society 29th Annual Meeting, Monterey, CA, Nov 29-Dec 1, 2001.

Croft AC, Herring P, Freeman MD, Centeno C, Haneline MT, Baric JJ: Late (chronic) whiplash injury. Public health perspectives amidst a controversial literature. Submitted.

Freeman MD, Croft AC, Rossignol AM, Haneline MT: Late whiplash risk factor analysis of a random sample of patients with chronic spine pain. Submitted.

Croft AC, Haneline MT, Freeman MD: Estimating velocity changes in low speed crashes using isolator stroking: momentum, energy, and restitutive methods. Submitted.

Croft AC, Haneline MT, Freeman MD: Forces in low speed frontal crashes and low speed rear crashes: is there a differential risk for injury? Submitted.

Freeman MD, Croft AC, Haneline MT,: Risk factor analysis in cervical acceleration/deceleration (whiplash) trauma: acute and late whiplash risk. Submitted.

Croft AC, Haneline MT, Freeman MD: Reconstruction of low speed rear impact automobile crashes utilizing bumper isolator travel. Submitted.

Johansson BH, Freeman MD. The prevalence of symptomatic cervical disc herniation in the Swedish population with asymptomatic degenerative disc disease (a cross-sectional study). Abstract of presentation from International Congress on Whiplash Associated Disorders, March, 2001. Berne, Switzerland.

Freeman MD, Nelson C. Injury pattern analysis as a means of driver identification in a vehicular homicide; a case study (in review)

Freeman MD, Olson D. Hemifacial tic following a low-speed motor vehicle crash (in review)

Seroussi R, Freeman MD. A review of original research by Brault et al. "Clinical response of human subjects to rear-end automobile collisions" *Injury Forum* 2000;2(5):49-50.

Freeman MD, Centeno C, Croft AC, Nicodemus C. Significant spinal injuries resulting from low-level accelerations: a case series of roller coaster injuries. Proceedings of Cervical Spine Research Society 28th Annual Meeting, November 30-December 2, 2000:110-1

Freeman MD. Don't fall for defense fallacies; logical fallacies employed in the defense of low speed crash cases and the scientific basis for exposing them. Trial 2000;November:88-93

Freeman MD. Are demolition derby drivers a valid proxy for the population at risk for whiplash injury? (commentary/letter) *Archives of Neurology* April 1, 2001

Freeman MD, Rossignol AM. Whiplash injuries in Saskatchewan, a case of mistaken recovery (commentary/letter). *NEJM* 2000;345(15).

Freeman MD. The epidemiology of acute and chronic whiplash injury in the U.S. Proceedings of HWS-Distorsion (Schleudetrauma) & Leichte Traumatische, Hirnverletzung. Invaliditat und Berufliche Reintegration. Basel, Switzerland. June 29-30, 2000.

Freeman MD. Meta-analysis of whiplash prognosis studies. Proceedings of Whiplash 2000, Bath, England. May 16-18, 2000. pp 102-24.

Croft AC, Freeman MD. An evaluation of the neck injury criterion; recommendations for future consideration. *Association for the Advancement of Automotive Medicine*, October 2000 Meeting October 2-4, meeting (Abstract)

Freeman MD. Letter to the editor. *Cranio* 1999;17(3):160-1.

Freeman MD, Croft AC, Rossignol AM. A case/control study of chronic spine pain following whiplash injury. *Pain Research and Management* (under review)

Freeman MD, Croft AC, Rossignol AM. A critical evaluation of the methodology of a low back pain clinical trial *J Manipulative Physio Ther* 2000; 23(5):363-4.

Freeman MD, Croft AC, Rossignol AM. The prevalence of whiplash-associated chronic cervical pain among a random sample of patients with chronic spine pain. Abstract from proceedings of Cervical Spine Research Society Annual Meeting. Seattle, WA December 13-15, 1999.

Croft AC, Freeman MD. Commentary on "Pain after whiplash: a prospective controlled inception cohort study." The Back Letter 1999;14(4):43,5.

Freeman MD, Croft AC, Rossignol AM. Late whiplash risk factor analysis of a random sample of patients with chronic spine pain. *World Whiplash Associated Disorders Congress*, February 8-10, 1999, Vancouver, British Columbia

Freeman MD, Croft AC, Reiser M. The factual basis for effectively discrediting the (whiplash injury) defense expert. *Trial* March 1999

Croft AC Freeman MD. From railway spine to whiplash. *Topics in Clinical Chiropractic* (Trauma) 1998;5(3):54-61.

Freeman MD Response to letter to the editor. *Spine* 1999;24(1):100

Freeman MD, Croft AC, Rossignol AM, Weaver DS, Reiser M. A review and methodologic critique of the literature refuting whiplash syndrome. *Spine* 1999;24(1):86-98

26

Freeman MD, Croft AC, Reiser M. The factual basis for effectively discrediting the (whiplash injury) defense expert. American Trial Lawyers Association National Conference Reference Materials.

Freeman MD, Croft AC, Reiser M. Die epidemiologie des Schleudertraumas - wo liegt die Schelle Zur Verletzung? (The epidemiology of whiplash - is there a reliable threshold for whiplash injury?) *HWS-Distortion (Schleudetrauma) & Leichte Traumatische, Hirnverletzung.* Edited by Ettlin TM and Mürner J. June 25-6, 1998:99-118.

Freeman MD. The first CIREN conference: motor vehicle crash-related trauma and biomechanical engineering. *JACA* 1998;35(4):54-61.

Freeman MD. A study of chronic neck pain and whiplash injuries. *UMI Dissertation services,* Ann Arbor, MI. 1998:9820108.

Freeman MD, Croft AC, Rossignol AM. "Whiplash Associated Disorders (WAD) - Redefining Whiplash and its Management" by the Quebec Task Force: A Critical Evaluation. *Spine* 1998;23(9):1043-9.

Freeman MD, Croft AC. The Controversy over Late Whiplash: Are Chronic Symptoms after Whiplash Real?, in: Whiplash Injuries  Edited by M. Szpalski and R. Gunzburg. Lippencott-Raven. September 1997

Freeman MD, Croft AC. Late Whiplash Syndrome, 3rd reply. *The Lancet* July 13, 1996

Freeman MD, Fox DD, Richards TR. The superior intracapsular ligament of the sacroiliac joint: confirmation of Illi's ligament. *J Manipulative Physiol Ther* 1990;13(7):374-90.

27

## PRESENTATIONS

The role of cervical manipulation in neck pain. Cervical Spine Research Society Instructional Course, Monterey, CA, Nov 29-Dec 1, 2001

Whiplash injury and occult vertebral fracture: a case series of bone SPECT imaging of patients with persisting spine pain following a motor vehicle crash. Cervical Spine Research Society 29th Annual Meeting, Monterey, CA, Nov 29-Dec 1, 2001

Interpreting the medical literature with a focus on bias and confounding/Minimal Damage Crash Reconstruction. Crash 2001

Injury Pattern Analysis and Forensic Trauma Epidemiology. Lecture to Washington State Patrol, Lacy, WA, June 20, 2001

Case studies in multidisciplinary spine care. Chiropractic Association of Oregon, Portland OR, April 28, 2001

Injury Pattern Analysis and Forensic Trauma Epidemiology. Lecture to Washington State Patrol. Vancouver, WA, February 13, 2001

The role of cervical manipulation in neck pain. Cervical Spine Research Society Instructional Course. Charleston, South Carolina, December 1, 2000

Significant spinal injuries resulting from low-level accelerations: a case series of roller coaster injuries. Cervical Spine Research Society Annual Meeting. Charleston, South Carolina, December 1, 2000

Injury Pattern Analysis and Forensic Trauma Epidemiology. Lecture for Medical Examiner Division, Oregon State Police, Salem, OR, November 28, 2000

Minimal Damage Motor Vehicle Crash Reconstruction. Crash 2000, San Diego CA,  August 11-13, 2000

Analysis of the whiplash literature with emphasis on research out of Quebec and Saskatchewan. Presented to Saskatchewan Medical Group and Coalition Against No-Fault. Saskatoon, Saskatchewan. September 8th and 9th, 2000.

Forensic applications of crash reconstruction. CRASH 2000. San Diego, CA. August 11, 2000

Injury Pattern Analysis and Forensic Trauma Epidemiology; practical application in the forensic setting. Washington County CART Team training lecture, on behalf of Medical Examiner Division, Oregon State Police. Lake Oswego FD, Lake Oswego, Oregon. July 13, 2000

The epidemiology of acute and chronic whiplash injury in the U.S. HWS-Distorsion (Schleudetrauma) & Leichte Traumatische, Hirnverletzung. Invaliditat und Berufliche Reintegration. Basel, Switzerland. June 29-30, 2000

Whiplash injury risk factors. Whiplash 2000, Bath, England. May 18, 2000

How many whiplash injuries could there be? Whiplash 2000, Bath, England. May 17, 2000

Whiplash injury and occupant kinematics; the results of human volunteer crash testing. Society for Road Traffic Injuries (LFT), Oslo, Norway. April 3, 2000

Epidemiology of Whiplash Injuries. Swedish Orthopedic Society, Stockholm, Sweden. March 31, 2000

Methodologic pitfalls in epidemiological and clinical research, with examples from whiplash research. Arvetsinstitut (Institute for Musculoskeletal Medicine Research) Umea, Sweden. March 30, 2000

The prevalence of whiplash-associated chronic cervical pain among a random sample of patients with chronic spine pain. (Poster presentation) Cervical Spine Research Society Annual Meeting. Seattle, WA December 13-15, 1999.

High speed videography of occupant movement during human volunteer crash testing; searching for an injury threshold. North American Whiplash Trauma Congress, November 12, 1999.

Scientific Chair Address, North American Whiplash Trauma Congress, November 12, 1999.

Injury potential of the low speed crash. Presentation to Marion County CRASH team as part of regular accident reconstruction training. October 8, 1999.

Medical science and the low speed crash. Presentation at the Trial Advocacy Track of the American Trial Lawyer's Association Annual Conference, San Francisco, California, July 21, 1999.

Forensic aspects of low speed crash injuries. Presentation to the Tacoma Pierce County Bar Association, Tacoma, Washington, May 13, 1999.

The clinical aspects of the science of whiplash injuries. Presentation at the Chiropractic Association of Oregon Annual Conference, Wilsonville, Oregon, May 1, 1999.

The science of whiplash injuries: common mistakes in the reconstruction of low speed crashes. Presentation at Forensic Accident Reconstructionists of Oregon meeting, Eugene, Oregon, April 1, 1999.

Late whiplash risk factor analysis of a random sample of patients with chronic spine pain. Presentation at the Whiplash Associated Disorders World Congress, Vancouver, B.C. February 9, 1999.

The epidemiology of whiplash injuries; critiquing the literature. Grand rounds presentation Department of Public Health and Preventive Medicine, OHSU, Portland, Oregon. December 17, 1998.

The scientific appraisal of motor vehicle crash-related injuries. Presented at: Managing the Cost of Auto Injuries, a national forum on auto managed care. Orlando, FL. December 8, 1998.

Risk factors for chronic pain following acute whiplash injury. Presented at: Managing the Cost of Auto Injuries, a national forum on auto managed care. Orlando, FL. December 7, 1998.

The epidemiology of whiplash and late whiplash; documenting the science of injury. Presented at the annual meeting of the Maryland Trial Lawyers Association, December 5, 1998.

Critiquing the whiplash literature. Guest lecturer for Spine Research Institute of San Diego, Advanced Training Class, Coronado, California. November 21-22, 1998

Methodologic Flaws in the Whiplash Literature. Presentation to British Columbia Trial Lawyers Association, Vancouver, B.C., Victoria, B.C. November 19-20, 1998.

The epidemiology of whiplash injuries. Guest lecturer in Current Issues in Public Health, Department of Public Health and Preventive Medicine, OHSU, Portland, Oregon. October 7, 1998

The factual basis for effectively discrediting the (whiplash injury) defense expert. Presentation at American Trial Lawyers National Conference, Washington D.C., July 14, 1998.

The epidemiology of whiplash - is there a reliable threshold for whiplash injury? Presentation HWS-Distortion (Schleudetrauma) & Leichte Traumatische Medico-Legal Congress, June 26, 1998.

The Epidemiology of Late Whiplash. Presentation at HWS-Distortion (Schleudetrauma) & Leichte Traumatische Medico-Legal Congress, June 25, 1998.

Methodologic weaknesses in the whiplash literature. Presentation at Consumer Lawyers of Hawaii, Waikiki, Oahu, May 30, 1998.

The epidemiology of whiplash syndrome. Presentation to the Oregon Trial Lawyers Association, May 8, 1998, Portland, Oregon

The epidemiology of whiplash syndrome. Presentation to the British Columbia Chiropractic Association, January, 1998 Victoria, B.C.

30

The epidemiology of late whiplash. Presentation to the British Columbia Chiropractic Association, November, 1997 Vancouver, B.C.

Faculty member, and presenter, Lyons Davidson International Whiplash Conference - Bristol, England, September 2-4, 1997

Faculty member, and presenter, Whiplash '96 - International Symposium, Brussels, Belgium, November 15-16, 1996

Guest lecturer, St. Francis Hospital, San Francisco, CA. September 1994

Guest lecturer, White Plains Hospital, White Plains, NY. December 1993

31

# Michael D. Freeman, Ph.D., D.C., M.P.H.

**Forensic Trauma Epidemiologist**
Clinical Assistant Professor
Department of Public Health and Preventive Medicine
Oregon Health Sciences University School of Medicine
Mailing address: 1165 Union Street NE, Ste. 300 Salem, Oregon 97301
503 586-0127 • fax 503 763-3581

## 1998

January 06, 1998: Testify in Multnomah County Circuit Court, Oregon. Attorney: Kathryn Jackson.
January 15, 1998: Testify in Multnomah County Circuit Court, Oregon. Attorney: Kathryn Jackson.
Plaintiff: Diane Pielow
February 02, 1998: Testify in Marion County Circuit Court, Oregon. Attorney: Darris Rowell. Plaintiff:
Robyn Schulze.
February 05, 1998: Testify in Washington County Circuit Court, Oregon. Attorney: Linda Rudnick.
Plaintiff: Julie Rogers.
February 13, 1998: Testify in Washington Country Circuit Court, Oregon. Attorney: Kathryn Jackson.
Plaintiff: Tazan Simeles.
February 26, 1998: Testify in Multnomah County Circuit Court, Oregon. Attorney/client unknown.
April 15, 1998: Arbitration testimony in Portland, Oregon. Attorney: Randall Wolfe.
April 22, 1998: Testify in Multnomah County Circuit Court, Oregon. Attorney: Dan Gatti. Client: Steve
Lessey.
April 28, 1998: Arbitration testimony in Salem, Oregon. Attorney: Jim Vick. Plaintiff: Brandon Hadley.
May 01, 1998: Arbitration testimony in Salem, Oregon. Attorney: Jim Vick. Plaintiff: Ramona Torres.
June 03, 1998: Testify in Multnomah County Circuit Court, Oregon. Attorney: Dan Gatti. Client: Cathy
Camper.
June 12, 1998: Videotaped deposition. Attorney: Doug Green.
June 25, 1998: Arbitration testimony (via phone) in Hawaii. Attorney: David Brunstein. Plaintiff:
Simeone
July 09, 1998: Testify in Multnomah County Circuit Court, Oregon. Attorney: Kathryn Jackson.
Plaintiff: Dyann Jellesed.
July 15, 1998: Testify in Deschutes County Circuit Court, Oregon. Attorney: David Gray. Plaintiff:
Grace Pittman.
October 12, 1998: Videotaped deposition for trial. Attorney: David Gray. Plaintiff: Shelly Stark
October 13, 1998: Arbitration testimony in Marion County, Oregon. Attorney: Charese Rhony. Plaintiff:
Christina Austin.
October 29, 1998: Arbitration testimony in Multnomah County, Oregon. Attorney: Ron Elzinga.
Plaintiff: Chris Muresan.
November 12, 1998: Testimony in Washington County Circuit Court, Oregon. Attorney: Dean Heiling.
Plaintiff: R. Hanington.
November 13, 1998: Testimony in Lane County Circuit Court, Oregon. Attorney: Jeff Wing. Plaintiff:
Beverly Ficek.
November 16, 1998: Testimony in Seattle, Washington, Circuit Court. Attorney: Chris Davis. Plaintiff:
Nick Beck.
December 10, 1998: Videotaped deposition in Marion County, Oregon. Attorney: Paul Ferder. Plaintiff:
Bobbie Douglas.

Michael D. Freeman, Ph.D., D.C., M.P.H.
Page 2 of 7

## 1999

January 20, 1999: Arbitration testimony in Marion County, Oregon. Attorney: Jim Vick. Plaintiff: Ann Prantl

February 17, 1999: Testimony in Multnomah County Circuit Court, Oregon. Attorney: Tim Grabe. Case: Evarts v. Fort.

February 25, 1999: Deposition in Honolulu, Hawaii. Defense Attorney: Wayne Sakamoto. Plaintiff Attorney: David Brustein. Case: Simeone v. Imamura.

March 03, 1999: Testimony in Multnomah County Circuit Court, Oregon. Attorney: Dan Gatti. Case: Lisa McKinley v. Eugene D. Johnson.

April 13, 1999: Testimony in Marion County Circuit Court, Oregon. Attorney: James Vick. Case: Gordon Dick v. Dixie Jordan.

April 16, 1999: Testimony in Mulnomah County Circuit Court, Oregon. Attorney: Tom D'Amore. Plaintiff: Anthimiades.

May 20, 1999: Phone deposition in Bellevue, Washington. Attorney: John Schaffer. Case: Golder v. Moe

April 23, 1999: Testimony. Attorney: David Brustein. Plaintiff: Simeone

May 26, 1999: Testimony in Circuit Court in Erie, Pennsylvania. Attorney: Segel.  Plaintiff: Majczyk.

May 28, 1999: Videotaped deposition. Attorney: Chris Davis. Case: Golder  v. Moe.

July 29, 1999: Testimony in Lane County Circuit Court, Oregon. Attorney: Don Corson. Plaintiff: Curt Johnson.

August 03, 1999: Testimony in Multnomah County Circuit Court, Oregon. Attorney: Dan Gatti. Plaintiff: Kristie Houldson.

August 25, 1999: Testimony. Attorney: Walsh. Plaintiff: Buehler.

September 02, 1999: Deposition. Attorney: Michael Carroll. Case: Burcham v. State Farm.

September 20, 1999: Video Deposition. Attorney: Eric Jonson.

September 28, 1999: Testimony by phone. Attorney: Mike Carroll. Case: Judith Burcham v. State Farm

October 11, 1999: Testimony in Multnomah County Circuit Court, Oregon. Case: Hixson v. John Deere

October 11, 1999: Testimony. Attorney: Gaylord. Plaintiff: Wilcox.

October 12, 1999: Deposition. Attorney: Defreitas. Plaintiff: Linda Nelson

October 27, 1999: Testimony in Hermiston, Oregon. Attorney: Lawrence Baron. Plaintiff: Chaney

November 03, 1999:  Testimony. Attorney: Dennis Richarson.  Case: Lauderdale v. Pfann

November 08, 1999: Testimony. Attorney D'Amore. Plaintiff: Sheetz.

November 19, 1999: Testimony in Washington County Circuit Court, Oregon.  Attorney: Jackson. Plaintiff: Stump.


## 2000

January 03, 2000: Testimony in Seattle, Washington. Attorney: Ray Polakovich. Case: Presley v. McGovern

January 12, 2000:  Deposition. Attorney: Kim/Shadduck. Case: Pinpin v. Morita.

January 13, 2000: Testimony in Multnomah County Circuit Court, Oregon. Attorney: Jeff Foote Plaintiff: Ellsworth

January 19, 2000: Testimony in Multomah County Circuit Court, Oregon. Attorney: Susan Isaacs. Case: Carpenter v. Thyravong.

January 20, 2000: Testimony in St. Helens, Oregon. Attorney: Jana Toran. Case: Cranston v. Brajcich.

February 01, 2000: Deposition. Attorney: Robert Jurasek. Case: Watt v. Wilder

February 07, 2000: Deposition. Attorney: Jackson. Case: Dixon v. Bates.

February 08, 2000: Videotaped Deposition. Attorney: Dan Gatti. Plaintiff: Samar Abujaudeh

February 15, 2000: Deposition. Attorney: Harris.  Case: Kirchner v. Wilson.

February 22, 2000: Deposition. Attorney: Ron Ripley. Case: Graham v. Kim.

February 24, 2000: Testimony at the OBCE Board. Attorney: Jim Vick. Plaintiff: Christian Schuster.

Michael D. Freeman, Ph.D., D.C., M.P.H.
Page 3 of 7

## 2000 continued

March 10, 2000: Phone Deposition. Attorney: Frank Thompson. Case: Fred McCracken v. Schneider National Bulk Carriers, Inc.

March 14, 2000: Testimony in Multnomah County, Oregon. Attorney: Nancy Chapman/ Dolores Empey. Case: Cynthia Baker v. York International

March 16, 2000: Video Deposition. Attorney: Darin Schanker. Case: Adian v. Pedraza

May 08, 2000: Testimony in Beaverton, OR. Attorney: Linda Rudnick. Case: Aiello v. Farmers Insurance Company.

May 09, 2000: Testimony in Washington County Court House, Oregon. Attorney: Kirk L. Emmons. Case: Strader v. Haynes

May 10, 2000: Video Deposition in Hillsboro, Oregon. Attorney: Jim Hailey. Case: Bowers v. Bausch

May 28, 2000: Video Deposition. Attorney: Chris Davis. Case: Golder v. Moe.

June 06, 2000: Video Deposition in Colorado. Attorney: Ben Silva. Case: Goosney v. Thai.

June 07, 2000: Testimony in Colorado. Attorney: Fielder. Case: State of Colorado v. Ferraro.

June 12, 2000: Phone Deposition. Attorney: Glen Lowenthal. Case: Batruch v. Alpha Metals, Inc..

June 12, 2000: Discovery Deposition. Attorney: Mike Carroll. Case: Surridge v. Middlebrooks.

June 14, 2000: Testimony in Alabama. Attorney: Scheussler. Case: Daronica Covington and Josephine Tolbert v. Broch.

June 15, 2000: Phone Testimony at Willamette Spine Center in Salem, Oregon. Attorney: Tom Herd. Case: Schorsch v. Anderson Trucking.

June 15, 2000: Testimony. Attorney: Mike Carroll. Plaintiff: Surridge v. Middlebrooks.

June 19, 2000: Deposition. Attorney: Diane Fair. Case: Butcher v. Hughes.

June 22, 2000: Deposition. Attorney: John Lezamiz. Case: Chavez v. Moore.

July 12, 2000: Testimony in Grants Pass, OR. Attorney: Mustafa Kasubhai. Case: Shreeves v. Woodruff.

July 14, 2000: Video deposition. Attorney: Allen McMichael. Case: Abusrur v. State Farm.

July 27, 2000: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Dale Gaar. Case: Hans Jenni.

August 08, 2000: Testimony in Atlanta, Georgia. Attorney: Glen Loewenthal. Case: Batruch v. Alpha Metals.

August 25, 2000: Testimony at Lane County Circuit Court in Eugene, Oregon. Attorney: Stupasky, Tina. Case: Micki Scott v. Lane Transit District.

August 28, 2000: Deposition. Attorney: Dan Zeidman. Case: James Gutierrez.

September 12, 2000: Testimony in Seattle, Washington. Attorney: Bolin, Eugene. Case: Peterson v. Schneider.

September 26, 2000: Testimony in Benton County Circuit Court in Corvallis, Oregon. Attorney: Jeff Thayer. Case: Cheryl Watkins.

September 27, 2000: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Michael Blue. Case: Phelps v. Smith.

October 04, 2000: Testimony in San Antonio, Texas. Attorney: Andrew Toscano. Case: Arnstead v. City of San Antonio.

October 12, 2000: Deposition. Attorney: Don Carter. Case: Ruiz v. Davis.

October 18, 2000: Testimony in Utah. Attorney: Danny Frazier. Case: Katie Platt v. Nabisco.

October 24, 2000: Telephone deposition. Attorney: Gursten. Case: Lesley and Crystle Knight.

November 02, 2000: Testimony in Colorado. Attorney: Crosse, Charles. Case: Schott, Patricia.

November 16, 2000: Deposition in San Antonio, Texas. Attorney: Salazar, Ron. Case: Knight v. Flores.

December 20, 2000: Testimony at Multnomah County Courthouse, Oregon. Attorney: Krystin Draper. Case: Mohammed Sheikh-nur.

December 28, 2000: Deposition. Attorney: Tummell. Case: Rivera/Villarreal v. Martinez

Michael D. Freeman, Ph.D., D.C., M.P.H.
Page 4 of 7

## 2001

January 09, 2001:  Deposition at Willamette Spine Center in Salem, Oregon.  Attorney:  Miranda, Michael.  Case:  Ulrickson v. Sawyer.

January 10, 2001:  Testimony in Marion County, Oregon. Attorney: Vick, Jim.  Case: McBride, Karen.

January 16, 2001:  Deposition at Willamette Spine Center in Salem, Oregon.  Attorney: Mesher, Barry.  Case:  McKinney v. Eastman.

January 17, 2001:  Testimony.  Attorney: Belz, David.  Case:  Vargas v. Chism-Ceja.

January 18, 2001:  Testimony in Portland, Oregon.  Attorney: Bottini, Bruce.  Case:  Williams, David Lee.

January 25, 2001:  Testimony. Attorney: Salazar, Ron.  Case:  Morrow v. Durkop.

February 01, 2001:  Testimony in Portland, Oregon.  Attorney:  Bottini, Bruce.  Case:  Seeborg, Dayna.

February 21, 2001:  Testimony.  Attorney; Tummel, Harold.  Case: Rivera/Villarreal v. Martinez.

February 22, 2001:  Deposition. Attorney: Goldsman, Gene.  Case:  Miller, Frances.

April 12, 2001:  Deposition. Attorney: De Funis, Marco. Case:  Ziegman.

April 18, 2001:  Testimony. Attorney: Zeidman, Dan.  Case:  Gutierrez v. Beck.

April 20, 2001: Deposition at Willamette Spine Center in Salem, Oregon.  Attorney:  Crump, David.  Case:  Tutunenko v. Ege.

April 23, 2001:  Phone Deposition.  Attorney:  Hand, Terrance.  Case:  Keener v. Mid-Continent Casualty.

May 17, 2001:  Deposition. Attorney:  Grissom, Stone.  Case:  Lapinsky v. Pioneer Builders Supply Co., et. al.

June 07, 2001: Testimony in Clark County, Washington. Attorney:  Johnson, Eric. Case:  Stegehuis, Jolanda.

June 12, 2001: Phone deposition. Attorney:  Lee, Larry.  Case:  Clayton v. Snow.

June 12, 2001:  Video Deposition at Willamette Spine Center in Salem, Oregon. Attorney:  Paulson, Jane. Case:  Rattey, Cheryle.

June 28, 2001:  Telephone deposition. Attorney:  Peery, Dennis. Case:  Rangel.

July 09, 2001:  Testimony in Multnomah County Courthouse, Oregon.  Attorney:  Rudnick, Linda.  Case:  Nassif v. Miller.

July 10, 2001:  Deposition at Willamette Spine Center in Salem, Oregon.  Attorney:  Herd, Thomas.  Case:  Squazzo, Kristen.

July 23, 2001:  Deposition in Portland, Oregon.  Attorney:  Kisner, Keith.  Case:  Capetillo, et al. v. County of Hidalgo, et al.

September 10, 2001:  Telephone testimony.  Attorney: Furlong, Gary.  Case:  Bowler Arbitration

September 26, 2001:  Deposition at Willamette Spine Center in Salem, Oregon.  Attorney: Salazar, Ronald. Case:  Knight v. Flores.

October 03, 2001:  Testimony in San Antonio, Texas.  Attorney:  Peery, Dennis.  Case:  Rangel.

October 30, 2001:  Deposition at Willamette Spine Center in Salem, Oregon.  Attorney: Chandler, Reich.  Case:  Williams, Maria.

November 06, 2001:  Testimony in San Antonio, Texas.  Attorney: Toscano, Andrew.  Case:  Ramirez, Enrique.

November 08, 2001:  Deposition in Houston, Texas.  Attorney:  Higdon, Paul.  Case:  Jackson and Jackson v. Mid-Con-Co., and Mid-Con Gas Corp.

November 28, 2001:  Testimony in Eugene, Oregon.  Attorney: Bradley, Todd.  Case:  Blackmore, Mark.

## 2002

January 15, 2002: Testimony at Multnomah County Courthouse, Oregon. Attorney: Thuemmel, Robert. Case: State v. Keller.

February 21, 2002: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Agnetti, John. Case: Vargas, Daniel & Maria.

March 7, 2002: Phone deposition. Attorney: Harrison, Patrick. Case: Brown, Joyce.

March 28, 2002: Phone deposition. Attorney: McKenna, Ken. Case: Peters, Tim.

May 6, 2002: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Chandler, Reich. Case: Williams, Maria v. Gage.

May 22, 2002: Video deposition at Willamette Spine Center in Salem, Oregon. Attorney: Bufalini, David. Case: Kamrar, Richard and Janis v. Galarneau.

May 23, 2002: Video deposition at Tokyo University in Salem, Oregon. Attorney: Jeffrey Wrage. Case: Fronczak, Renee v. Walmart.

May 28, 2002: Video deposition at Willamette Spine Center in Salem, Oregon. Attorney: Cooper, John. Case: Stenberg v. Giannageli.

May 30, 2002: Video deposition at Willamette Spine Center in Salem, Oregon. Attorney: Cardenas, Leonard. Case: Lancaster, Teresa v. State Farm.

June 11, 2002: Phone deposition. Attorney: Chandler, Reich. Case: Williams, Maria v. Gage.

June 27, 2002: Video deposition. Attorney: Marvin, Jerry. Case: Taylor, Leland v. Allstate.

July 18, 2002: Arbitration Testimony in Portland, Oregon. Attorney: Merrick, Jeff. Plaintiff: Halley, Andrew.

August12, 2002: Video Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Gordon, Bob. Case: Warren-Neil, Sharon.

August 22, 2002: Testimony at Lane County Courthouse, Oregon. Attorney: Corson, Don. Case: Williams v. McMeans.

September 3, 2002: Testimony in Portland, Oregon. Attorney: Lafky, Kevin. Case: Gilardi-Reed, Cynthia.

September 11, 2002: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Borton, Joe. Case: Vantries v. Hobbs.

September 16, 2002: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Squires, Wendy. Case: Arnold, Cindy.

September 23, 2002: Testimony in Boise, Idaho. Attorney: Hawkes, Lowell. Case: Morris v. Clark.

September 24, 2002: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Smart, Will. Case: Ma v. Craig.

October 1, 2002: Testimony at Marion County Courthouse, Oregon. Attorney: Ferder, Paul. Plaintiffs: Ferguson, John and Rodriguez, Maria.

October 7, 2002: Video Testimony at Tokyo University in Salem, Oregon. Attorney: Wrage, Jeff. Case: Fronczak, Rene.

October 21, 2002: Deposition at Willamette Spine Center in Salem, Oregon. Attorney: Bishop, Randy. Case: Rice v. Watterson.

October 29, 2002: Testimony in Omaha, Nebraska. Attorney: Rubes, Stephen. Case: Adams, Diane.

October 31, 2002: Continuation of deposition at Willamette Spine Center in Salem, Oregon. Attorney: Squires, Wendy. Case: Arnold, Cindy.

November 5, 2002: Testimony in Alberta, Canada. Attorney: Steinfeld, Barry. Case: Jensen, Emma.

November 11, 2002: Video Deposition at Tokyo University in Salem, Oregon. Attorney: Allaben, Randy. Case: Kase v. State Farm.

November 22, 2002: Deposition at Willamette Spine Center, Salem, Oregon. Attorney: Stratton, Mike. Case: Klimaszewski.

November 26, 2002: Phone deposition at Willamette Spine Center, Salem, Oregon. Attorney: Hebert, Julius. Case: Barrilleaux, Timothy.

Michael D. Freeman, Ph.D., D.C., M.P.H.
Page 6 of 7

## 2002 continued

December 10, 2002: Video Deposition at Tokyo University in Salem, Oregon.  Attorney: Donahue, Mike.  Case: Perry, Edmund.

December 17, 2002:  Deposition at Willamette Spine Center in Salem, Oregon.  Attorney:  Hess, Scott. Case: Montemurro v. Wilson.

## 2003

January 23, 2003: Deposition at Willamette Spine Center in Salem, Oregon.  Attorney: Lawson, Bill. Case:  Berbig v. Jensen.

February 6, 2003:  Video Deposition at Willamette Spine Center in Salem, Oregon.  Attorney: Agnetti, John.  Case:  Vargas v. Rutler.

February 20, 2003:  Testimony at Marion County Courthouse, Oregon.  Attorney:  Roy, Matthew.  Case: Oelkers, Danielle.

March 7, 2003:  Deposition in Omaha, Nebraska.  Attorney:  Moodie, Bob.  Case:  Poley, Beverly.

April 15, 2003:  Phone deposition at Willamette Spine Center, Salem, Oregon.  Attorney:  Allaben, Randy.  Case:  Kase v. State Farm.

April 29, 2003:  Testimony in Klamath Falls, Oregon.  Attorney:  Stephen Hendricks.  Case:  Jackson v. Viets.

April 30, 2003:  Phone Deposition at Willamette Spine Center, Salem, Oregon.  Attorney:  Anderson, Tim.  Case:  Tsikurios, Maria.

May 6, 2003: Phone Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Jacobus, Bruce. Case: Corapi, Richard.

May 14, 2003: Video Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Alexander, John. Case: Bober, Melanie.

May 19, 2003: Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Lane, Steve. Case: Hobson, Janice.

May 27, 2003: Video Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Merriner, Chuck. Case: Angasan.

June 23, 2003: Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Vigil, Lisa. Case: Salvador v. Loadstar.

June 25, 2003: Video Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Merriner, Chuck. Case: Angasan.

June 25, 2003: Video Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Merriner, Chuck. Case: Bonette.

July 9, 2003:  Phone Deposition (continuation of previous event) at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Lane, Steve. Case: Hobson, Janice.

August 13, 2003: Phone Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Smith, Mark. Case: Abernethy, Teresa.

August 22, 2003: Video Deposition in San Diego, California. Attorney: Scheingross, Alex. Case: Drylie.

September 2, 2003: Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Vloedman, Andrew. Case: Etienne v. Staples.

September 3, 2003: Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Bush, Michael. Case: Schuhow, Randy.

September 4, 2003: Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Copulos, William. Case: Browne v. Loo.

September 9, 2003: Testimony in Las Cruces, New Mexico. Attorney: Vigil, Lisa. Case: Salvador v. Loadstar.

September 25, 2003: Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Crane, Stephen. Case: Shanahan.

Michael D. Freeman, Ph.D., D.C., M.P.H.
Page 7 of 7
October 21, 2003: Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Fryer, Keith. Case: Troncalli v. Rosser.

## 2003 Continued

October 29, 2003: Testimony in McMinnville, Oregon. Attorney: Pickett, Randolph. Case: Cavaness
November 24, 2003: Phone Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: Weisser, Jason. Case: Molina.
December 16, 2003: Deposition at attorney offices in San Diego, California. Attorney: Marino, Richard. Case: Scrofani.
December 17, 2003: Phone Deposition at Pacific Rim Imaging Admin Offices, Salem, Oregon. Attorney: White, Arnold. Case: Hicks v. Lensky.

## 2004

Bill W. Timberlake, D.C.
PO Box 270220
Dallas, Texas 75227
214-381-1558


November 20, 2003


Mr. David Kassabian
Kassabian, Doyle & Weatherford, P.C.
1521 N. Cooper Street
Suite 650, LB 21
Arlington, Texas 76011

Dear Mr. Kassabian:

You have asked me to review materials from Accident & Injury Chiropractic
and provide my opinion in regards to treatment.

After review of 100 randomly sampled cases from Accident & Injury
Chiropractic and documents, memos and contracts which I understand have
been produced by the defendants in this case, I have formed the following
opinion:

1.    It is my opinion that Accident & Injury Chiropractic aggressively treats
       an unusually high percentage of adult motor vehicle patients for
       subjective complaints and/or problems which typically self-resolve
       without treatment.

       A review of the sample cases demonstrates that 89 patients out of
       100 were treated for typically self-resolving problems (Question No. 3
       in enclosed report).

       Support for the above opinion includes, but is not limited to, the
       following:

       1)  My 39 years of practice of chiropractic.
       2)  The "Scientific Monograph of the Quebec Taskforce on Whiplash



EXHIBIT

B

39

Page 2 Cont'd...
David Kassabian
November 20, 2003

  Associated Disorders" (published in <u>Spine</u>, 1995, W. O. Spitzar,
  et al), documentation found in the Declaration of the Editorial
  Board, Section 5, Page 3.
 3) The <u>Official Disability Guidelines</u> of the Work Loss Data Institute,
  Seventh Edition, Page 703, Page 863, Page 864.

In most cases, the aggressive treatment includes treatment on
consecutive days with multiple modalities per visit.

2. It is my opinion that the services provided to the patients in the 100
 sample study contained no reasonable documentation to justify all the
 services provided.

 In relating to Question No. 4 in the Summary of Findings of Review,
 it is noted that 95% of the cases contained services which were not
 documented as justified.

 Included in the unjustified services performed were:

 "Intersegmental traction". Such a device is not broadly accepted as
 traction by the healthcare communities at large and is a "roller table"
 which rolls up and down the patient's back and is not demonstrated as
 reasonable, necessary or therapeutically required in 95 of the 100 cases.

 Support for the above opinion can be found in:

 1) <u>Therapeutic Modalities for Allied Health Professionals</u>, Page 359
  (which defines traction),
 2) <u>Mosby's Dictionary</u>, Page 1573 (which defines traction),
 3) <u>Dorland's Illustrated Dictionary</u>, 23rd Edition, Page 1452 (which
  defines traction),
 4) <u>American Medical Association Current Procedural Terminology</u>,
  Standard Edition, Page 395,
 5) Operator's Manual for "Spinalign Table", Page 3,
 6) Instruction Manual for "Magnum Table", Page 3, (which

Page 3 Cont'd...
David Kassabian
November 20, 2003

demonstrates contra-indications of use including "ruptured disc"),

7) Instruction Manual from "Eurotrak" Table (which relates contra-indications for use as "spinal trauma"),

8) Advertisement from U. S. Tables "Spinalign" describing the table as a massage table,

9) Information from the "Quantum 400 Electromechanical Treatment Table" (which describes the table as designed to release tension and deliver soothing massage),

10) Information from manufacturer of ATT 300 Intersegmental Traction Table (which describes the table as a "motorized mobilization" and is contra-indicated in acute disc disease or radiculitis).

3.   It is my opinion that the healthcare providers at Accident & Injury Chiropractic Clinic prescribe and refer grossly unreasonable volumes of MRI examinations on adults.

Noted in Question No. 5 of the Summary of Findings of Review is the fact that 73 of the 100 cases were prescribed MRI's and Question No. 6 on the Summary of Findings of Review demonstrates that 57 of the 100 patients were referred and received MRI studies.

Noting in Question No. 7 of the Summary of Findings of Review that only 2 of the 57 MRI's were reasonable and necessary on the basis of broadly accepted standards of use of MRI by the healthcare communities at large, including the chiropractic healthcare community.

Additional rationale for the above opinion can be found in the "U.S. Department of Health and Human Services Agency for Healthcare Policy and Research", Quick Reference Guide for Clinicians No. 14, Page 9.

4.   On the basis of the Summary of Findings of Review, it is my opinion that there is an inordinate and unnecessary level of referral of adult patients to selected M.D.'s or D.O.'s. It is my opinion that such referral

41

Page 4 Cont'd...
David Kassabian
November 20, 2003

is routine and arbitrary and unnecessary.

Support for the above opinion is based on my experience in 39 years
of chiropractic practice and the American Chiropractic Association's
polling which demonstrates that only 9% of chiropractic patients are
referred to M.D./D.O.

There is an absence of reasonable basis for referral in the vast majority
of the cases noting that Question No. 8 on the Summary of Findings of
Review demonstrated that 88 of the 100 were referred to selected
M.D.'s or D.O.'s.

5.  On the basis of the Summary of Findings of Review, it is my opinion
    that the frequency of treatment of the 100 sample patients was
    unreasonable and unnecessary.  It is my opinion that the necessity for
    consecutive day treatment is not supported as reasonable in 82 of the
    100 sample patients.

    Rationale for the above opinion includes, but is not limited to:
    the Official Disability Guidelines for the Work Loss Data Institute,
    2002, Seventh Edition, and the broadly accepted standards in the
    chiropractic community.

6.  After review of the Summary of Findings of Review, it is my opinion that
    the services rendered each office visit by Accident & Injury is
    essentially the same on all patients and is designed to generate revenue
    for Bob Smith as opposed to billing for necessary and reasonable
    services.

    Rationale for the above opinion is the fact that the record reflects
    essentially the same services for all patients, excluding children,
    and is billing for services which, for the most part, is passive treatment
    without one-on-one attention from the healthcare provider.

42

Page 5 Cont'd...
David Kassabian
November 20, 2003

Further note should be made that certain billing includes "therapeutic exercise" coded 97110. It is clear that such code requires one-on-one attendance with the physician or physical therapist; and the record is void of documentation that such clinical use of exercise, as opposed to home exercise, was reasonable and necessary and void of record to demonstrate that there was one-on-one attendance with the patient during the exercise.

Additionally, the hot and cold pack charges generate billing which is not necessary in that the patient was sold an ice pack in most instances for home use, and such is unreasonable, unnecessary and is shown to be so by the Federal Register, Volume 61, No. 227, November, 1996, Rules and Regulations 59499.

Additionally, it is unreasonable to assume that all patients would require the same treatment except for purposes other than to generate billing.

7.  After review of the Summary of Findings of Review, it is my opinion that referral of patients was to the same facilities. The facilities referred to are known to be owned or controlled by Bob Smith; and such referral prohibits uncontrolled opinion as to the status of patients.

Support for the above opinion includes, but is not limited to, the indication that the M.D./D.O. examinations were onsite at Accident & Injury Chiropractic Clinic by the same doctors "referred to". In addition, referrals to selected MRI readers is not reasonable and prohibits independent opinion.

In addition, referral to Lone Star Radiology for x-ray "re-reading" is found in almost all cases (Question No. 13 demonstrates 83 of the 100 were x-rayed, and Question No. 14 demonstrates that 79 of those 83 referrals were unnecessary). Further it is noted that Lone Star Radiology appears to be owned by Bob Smith.

43

Page 6 Cont'd...
David Kassabian
November 20, 2003

Support for the above opinion can be demonstrated in the usual and customary habits of the practice of chiropractic which demonstrates that remarkably few chiropractic patients are referred for outside x-ray interpretation, of MRI or second opinion evaluation or concurrent treatment.

Support for the above opinion also includes my experience in 39 years of chiropractic practice, my observation of cases reviewed since 1972 and broadly accepted standards in the chiropractic community.

8.  Based on the Summary of Findings of Review, it is my opinion that few, if any, of the alleged "disc herniations" (code 722.0 and 722.10) were supported as related to the alleged accidents.  It is my opinion that use of such diagnosis is a misrepresentation of the patient's injuries and such diagnosis encourages third party payment for cases which are likely totally subjective, no greater than strain/sprain problems and possibly not present.  In addition, it is my opinion that the use of "disc diagnosis" generates unnecessary compensation for damages.

Support for the above opinion includes, but is not limited to:

1) Spine Letter, July, 1995,  "Highest Rate of False Positives Shown to date on MRI Findings"
2) Spine, Volume 20, No. 24, PT 2613-2625, "1995 Volvo Award, The Diagnostic Accuracy of MRI Work Perception and Psycho-social Factors in Identifying Symptomatic Disc Herniations", Norbert Boos, M.D., et al.
3) New England Journal of Medicine, 331;2,69-73, July 14, 1994, "Magnetic Resonance Imaging of the Lumbar Spine in People Without Back Pain", (Jensen, M.D., et al)

9.  On the basis of the Summary of Findings of Review, it is my opinion that the referral of x-rays by Accident & Injury Chiropractic to Lone Star Radiology for "re-reading" was inordinate, unreasonable and unnecessary.

44

Page 7 Cont'd...
David Kassabian
November 20, 2003

Support for the above opinion includes, but is not limited to, the fact that the vast and overwhelming majority of chiropractors treating same and similar injuries do not require re-reading of their x-rays. In addition, it should be noted that Texas Chiropractic College references the x-ray education of chiropractors as opposed to other healthcare providers demonstrating a much higher level of training in x-ray than most other practitioners (www.txchiro.edu). It is my opinion that 3 out of the 79 referrals for second opinion reading of the x-rays was reasonable and necessary.

Bill W. Timberlake, D.C., F.I.C.C.
License No. 2167

45

# SUMMARY OF FINDINGS OF REVIEW IN 100 RANDOMLY SAMPLED A&I CASES

**QUESTION NO. 2**   **Is there documented justification for any treatment?**

66 Yes
26 No
8 Uncertain

**QUESTION NO. 3**   **Is treatment optional?**

89 Yes
10 No
1 Does Not Apply

**QUESTION NO. 4**   **Does documentation justify all services?**

4 Yes
95 No
1 Uncertain

**QUESTION NO. 5**   **Was MRI prescribed by A&I?**

73 Yes
26 No
1 Uncertain

Note:  10 Cases of "No MRI" were children.

<u>Ages</u>

| | |
|---|---|
| Case 13...2 year old | Case 25...2 year old |
| Case 16...7 year old | Case 30...5 year old |
| Case 17...10 year old | Case 37...13 year old |
| Case 19...7 year old | Case 42...5 year old |
| Case 20...6 year old | Case 48...1 year old |

46

**Page 2 Cont'd...**
**Summary of Findings**
**Randomly Sampled 100 Cases**

| | |
|---|---|
| **Question No. 6** | **Was MRI performed?** |

**57 Yes**
**41 No**
 **2 Uncertain**

**Note No. 1...Some scheduled for MRI, but not**
**performed.**

**Note No. 2...Record of multiple MRI's on a single**
**patient:**

| | |
|---|---|
| **Case No. 10...3** | **Case No. 38...2** |
| **Case No. 11...2** | **Case No. 39...2** |
| **Case No. 15...2** | **Case No. 41...2** |
| **Case No. 21...2** | **Case No. 43...2** |
| **Case No. 26...2** | **Case No. 44...2** |
| **Case No. 27...2** | **Case No. 45...2** |
| **Case No. 33...2** | **Case No. 47...2** |
| **Case No. 34...2** | **Case No. 49...2** |
| **Case No. 36...3** | **Case No. 50...2** |

| | |
|---|---|
| **Question No. 7** | **Was MRI justified as reasonable or necessary?** |

 **2 Yes**
**70 No**
**28 Not applicable**

**Note:  Brain MRI on Case 27 was reasonable and**
**necessary.**

| | |
|---|---|
| **Question No. 8** | **Was referral to MD/DO for consultation or treatment, concurrently, justified as reasonable or necessary?** |

**Page 3 Cont'd...**
**Summary of Findings**
**Randomly Sampled 100 Cases**

6 Yes
88 No
6 Not applicable

Notes:

Case No. 3...MD referral for pregnancy spotting only.
Case No. 8...Patient was pregnant.
Case No. 18...Dislocation of collar bone.
Case No. 44...Fracture.

| | |
|---|---|
| Question No. 9 | Was the alleged trauma significant? |

11 Yes
38 No
47 Uncertain

Note No. 1...Accident report was considered.

Note No. 2..."Uncertain" case No. 38 (patient not listed in accident victims on accident report)

| | |
|---|---|
| Question No. 10 | Were there alleged radicular symptoms? |

15 Yes
83 No
2 Not applicable

| | |
|---|---|
| Question No. 11 | Were there examination findings that pre-existed the date of the accident? |

32 Yes
21 No
42 Uncertain
5 Not applicable

48

**Page 4 Cont'd...**
**Summary of Findings**
**Randomly Sampled 100 Cases**

> **Note:  Architectural findings included in "Uncertain".**

Question No. 12     **Was the frequency of treatment justified?**

     2 Yes
     82 No
     16 Not applicable

Question No. 13     **Did A&I perform x-rays?**

     **83 Yes**
     **17 No**

     **Note:  On patients with no x-rays, please find the following:**

     **Case No. 3...Patient pregnant.**
     **Case No. 13...Age 2.**
     **Case No. 16...Age 7.**
     **Case No. 17...Age 10.**
     **Case No. 20...Age 6.**
     **Case No. 25...Age 2.**
     **Case No. 30...Age 5.**
     **Case No. 42...Age 5.**
     **Case No. 48...Age 1.**

Question No. 14     **Was second opinion x-ray reading justified?**

     3 Yes
     79 No
     18 Not applicable

     **Note No. 1:  On Case No. 14, leg x-ray re-reading only was justified.**

49

**Page 5 Cont'd...**
**Summary of Findings**
**Randomly Sampled 100 Cases**

Note No. 2:  Case No. 43 was congenital defect.

| | |
|---|---|
| **Question No. 15** | **Was there justification for clinical treatment beyond norm for subjective musculoskeletal injuries?** |

 0 Yes
90 No
 1 Uncertain
 9 Not applicable

Note:  Case No. 8 = "Uncertain" as patient left after two visits  pregnant.

| | |
|---|---|
| **Question No. 16** | **Is the necessity for future treatment or diagnostics established?** |

 0 Yes
97 No
 2 Uncertain
 1 Not applicable

Note No. 1...Case No. 8 left after two visits = "Uncertain"

Note No. 2...Case No. 14 (blind patient apparently released for "non-compliance")

| | |
|---|---|
| **Question No. 17** | **In all chiropractic/medical probability, is future impairment likely?** |

 0 Yes
98 No
 2 Uncertain

**Page 6 Cont'd...**
**Summary of Findings**
**Randomly Sampled 100 Cases**

Notes:        Case No. 8 = patient pregnant.
              Case No. 14 blind patient released for
                      non-compliance

Question No. 18        Does final billing give a disc herniation diagnosis?

51 Yes
47 No
 2 Not applicable

Note No. 1...There were diagnosis of multiple disc
            injuries in the following cases:

Case No. 10  2 HNP's          Case No. 30  2 HNP's
Case No. 11  2 HNP's          Case No. 36  2 HNP's
Case No. 15  2 HNP's          Case No. 38  2 HNP's
Case No. 24  2 HNP's          Case No. 39  2 HNP's
Case No. 29  2 HNP's          Case No. 43  2 HNP's

Note No. 2...It is noted that there were multiple
            diagnosis of herniated disc with no MRI.

Note No. 3...The cases shown to have no diagnosis of
            herniated disc included the ten children in
            this study.

Below please find a reflection of our records indicating times in which Dr. Bill Timberlake has been deposed or testified:

December 28, 2000, Hixon vs. USAA

SOAH Hearing  August 16, 2001, Re:  Robert Castillo

SOAH Hearing  October 10, 2001, Re:  Aubrey Hall

SOAH Hearing  September 10, 2001, Re:  Daryl Williams

December 4, 2001, 160th District Court, Dallas, Re:  Michael Haggerty

SOAH Hearing  January 7, 2002, Re:  Beverly Morgan

February 7, 2002, Dallas County Court #2, Dallas Re:  Ozell Barrett

April 11, 2002, Dallas County Court #3, Dallas, Re:  Sharon Daniels

SOAH Hearing  July 18, 2002, Re:  Ernesto Vargus

September 5, 2002, Re:  Luis Rodriguez

June 19, 2003, Re:  Audrey Hall

February 17, 2003, Dallas County Court #2, Dallas,  Re:  Ozell Barrett

April 30, 2003,  Dallas County Court #5, Dallas, Re:  K. Pettifer

June 5, 2003,  Dallas County Court #3, Dallas, Re:  Deborah Jones

SOAH Hearing  November 6, 2003, Re:  Ignacio Acosta

52

Bill W. Timberlake, D.C.
**dba** Chiro Claims Plus, Inc.
PO Box 270220
Dallas, Texas 75227
214-381-1558

November 20, 2003

TO WHOM IT MAY CONCERN:

Please be advised that Dr. Bill W. Timberlake's charge is now and has been $140.00 per hour for review and consultation and testimony, representing reimbursement for time out of office.

Bill W. Timberlake, D.C., F.I.C.C.
License DC 2167

BWT:jt

53