

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, *et al.*, | § | |
| | § | |
| Plaintiffs/Petitioners, | § | |
| vs. | § | CIVIL ACTION NO. 3-01CV2247-N |
| | § | |
| RECEIVABLE FINANCE COMPANY, | § | |
| L.L.C., *et al.*, | § | |
| | § | |
| Defendants/Respondents. | § | |

## APPENDIX

1.  Affidavit of LOUIS SAUCEDO, D.C. and all exhibits attached thereto;

2.  Affidavit of Kenneth C. Thomas, B.S., M.S., D.C.;

3.  Affidavit of Lindy D. Jones authenticating deposition excerpts and documents produced in discovery;

4.  Documents Bates stamped CM17136-CM17138; and

5.  Excerpts from Deposition of Bruce Vest taken on June 3, 2004.

Recycled   Stock # DO-25-SS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALLSTATE INSURANCE COMPANY, *et al.*, §
    §
        Plaintiffs/Petitioners, §
vs. §    CIVIL ACTION NO. 3-01CV2247-N
    §
RECEIVABLE FINANCE COMPANY, §
L.L.C., *et al.*, §
    §
        Defendants/Respondents. §

## AFFIDAVIT OF DR. LOUIS SAUCEDO, D.C.

THE STATE OF TEXAS    §
    §
COUNTY OF DALLAS    §

BEFORE ME, the undersigned notary public in and for the said county and state, on this day personally appeared DR. LOUIS SAUCEDO, who after being duly sworn, did upon oath state the following:

1. "My name is LOUIS SAUCEDO, D.C. I am over the age of eighteen (18) years, am fully competent to testify to the matters stated in this affidavit. I have not been convicted of a crime. The facts stated herein are true and correct of my own personal knowledge.

2. "I have read Defendant Saucedo's Motion for Summary Judgment and Brief In Support of Motion For Summary Judgment and every factual statement therein is true and correct.

3. "I am a licensed chiropractor in good standing with the State of Texas and have been so for 9 years. My resume is attached as Exhibit 'A' to this affidavit and describes my education and experience.

---

AFFIDAVIT OF DR. LOUIS SAUCEDO, D.C. —Page 1
J:\LDJ\Receivable\allstate\MSJs Affs Brfs 6-04\Saucedo Aff.wpd

4.    "I am an employee of Accident & Injury Pain Centers, Inc. ('A&I') and have been so employed for 8 years.   Exhibit B attached hereto is a true and correct copy of my Employment Agreement with A&I.

5.    "I have reviewed all the files of patients to whom I rendered and /or supervised treatment.  Such treatment was based on the patient history, the patient complaints regarding any injuries, my physical examinations and observations and training.  My review of each of these files confirms that all such treatment was medically necessary and was rendered on the dates set forth in the file.  Further, my review of each such file confirms there was no 'up-coding' to increase the cost of care.  There was no up-coding of HCFA-1500 forms and all such form codes for treatment were authorized by me.  All such diagnostic referrals were medically necessary.

6.    "As a clinic director, I am familiar with the policies and procedures of A&I.  I am also aware of A&I's zero tolerance for fraud.  I did not participate in, witness or become aware of any unreasonable care or billing at the A&I clinic where I served as director.

7.    "I was subject to the supervision of the chief of staff, but they never interfered in patient treatment that I found to be medically necessary.  No lay person ever influenced or directed treatment of my patients nor requested I order diagnostic testing without a finding of medical necessity.

8.    "I only ordered diagnostic testing such as x-rays, magnetic resonance imaging and CT scans when I determined such items were medically necessary to treat my patients based on the aforementioned factors including patient history, the patient complaints regarding injuries and my physical examination.

9.    "I was free to refer patients to any facility I choose for such diagnostic testing but normally used entities that I later discovered were owned by A&I.  My referrals were based on medical necessity, but also on quality of service, convenience and the fact that the testing could be done without pre-payment.

10.   "All medical treatments rendered by me were reasonable and necessary for each patient, and was rendered on the dates set forth on the billing statements.

11.   "I am a salaried employee of A&I.  I do not receive any bonus, stipend or additional compensation or incentive for the referral of patients or for the ordering of any diagnostic testing.  My only compensation or benefit I receive from A&I or any of the Defendants is my salary paid by A&I.  I do not and have not received any compensation from any other Defendants in this case."

---

AFFIDAVIT OF DR. LOUIS SAUCEDO, D.C. —Page 2
J:\LDJ\Receivable\allstate\MSJs Affs Brfs 6-04\Saucedo Aff.wpd

Further, affiant sayeth not.

Signed this _18_ day of June, 2004

_____
LOUIS SAUCEDO, D.C.


THE STATE OF TEXAS      §
                        §
COUNTY OF DALLAS        §


SUBSCRIBED AND SWORN TO BEFORE ME, this _18th_ day of June, 2004.

_____
Notary Public in and for the State of Texas

KATHY WASHINGTON
NOTARY PUBLIC
State of Texas
Comm. Exp. 07-05-2005

AFFIDAVIT OF DR. LOUIS SAUCEDO, D.C. —Page 3
J:\LDJ\Receivable\allstate\MSJs Affs Brfs 6-04\Saucedo Aff.wpd

# LOU SAUCEDO, JR., D.C.
8080 Park Lane, Suite 500
Dallas, Texas 75231
(214) 649-1408

## EXPERIENCE

06-99 to Present    **ACCIDENT & INJURY CHIROPRACTIC** - Dallas, Texas
Assistant Chief of Staff – Corporate office.

06-96 to 06-99    **ACCIDENT & INJURY CHIROPRACTIC** - Dallas, Texas
Clinic Director - North Dallas Clinic.    Supervisor as well as treating doctor in
the North Dallas Clinic for Accident & Injury Chiropractic.

10-95 to 06-96    **ARLINGTON CHIROPRACTIC** - Arlington, Texas
Treating physician in satellite clinic as the sole doctor for treatment and
management of care in the Arlington office.

02-95 to 10-95    **CAMP WISDOM BACK AND NECK CARE CENTER** - Duncanville,
**Texas**
Performed patient physical exams, various physical modalities, administered and
developed radiographs, interpreted radiographic studies, created narrative reports
for attorneys and other medical professionals and assisted in all aspects of running
a chiropractic office.

08-94 - 02-95    **FAMILY FOOT CARE** - Lewisville, Texas
Administered physical therapy, performed patient physical exams, radiographic
studies, assisted in-house surgery, and formulated patient treatment programs.

08-91 - 08-92    **ALLERGY ASSOCIATES OF BRAZOS VALLEY** - Bryan, Texas
Administered intra-muscular injections of allergy medications, calculated and
formulated allergy serums for allergy patients, organized and maintained a
laboratory, performed phlebotomies, and assisted with date entry and filing.

## EDUCATION

**PARKER COLLEGE OF CHIROPRACTIC** - Dallas, Texas
Doctor of Chiropractic - 1995

**TEXAS A & M UNIVERSITY** - College Station, Texas
Bachelor of Science in Biomedical Science - 1991

## SPECIALIZED TRAINING / CONTINUING EDUCATION

2003    CRASH 2003, The Spine Research Institute of San Diego and Center
for Research into Automotive Safety and Health

**Certification in Low Speed Rear Impact Automobile Crash Reconstruction**
**Participated in 12 Actual Crash Testing studies**

TWCC Medical Fee Guideline Seminar, TWCC

2002     Whiplash & Practice Management Seminar

American Academy of Disability Evaluation Physicians, AMA Guides, 4th Edition Training Course.

Health Care Provider Workshop 2002, Texas Mutual Insurance Company

2001     Peer Utilization Review & Insurance Consultant Certification Program

Wholeperson Institute-sponsored Designated Doctor Training

Confidentiality Of Medical Records in Texas, Lorman Education Services

2000     Continued certification from Spine Research Institute of San Diego

1998-99   Certification from Spine Research Institute of San Diego

**Studies included:**
  **Epidemiology of whiplash injuries**
  **Outcome studies**
  **Accident reconstruction**
  **Radiographic and advanced imaging including CT, MRI, Discography, SPECT, PET**
  **Electrodiagnostic testing including EMG, NCV, SSEP, DSEP, EEG, BAER, VEP, ENG, BEAM**

1997     Parker Homecoming Seminar

1996     Parker Homecoming Seminar

## SKILLS / ACTIVITIES / AWARDS

- Member of the Texas Chiropractic Association
- Diplomat of the Texas Board of Chiropractic Examiners
- Diplomat of the National Board of Chiropractic Examiners
- Elected to the 1994-95 Who's Who Among Students in American Universities and Colleges
- Former Certified Emergency Medical Technician
- Former Certified CPR Instructor
- Multiple Trimesters on the Deans List at Parker College

**ACCIDENT & INJURY PAIN CENTERS, INC.**
**(CHIROPRACTIC CLINICS)**
**200 WYNNEWOOD VILLAGE**
**Dallas, Texas 75224**

## ASSOCIATE DOCTOR AGREEMENT

This Associate Doctor Agreement (this "Agreement") is made and entered into effective as of May 1, 1999 by and between Accident & Injury Pain Centers, Inc., a Texas business corporation, d/b/a Accident & Injury Chiropractic (hereinafter called the "Holding Company"), and Dr. Lou Saucedo, D.C. (hereinafter called "Doctor"). It supersedes any and all prior agreements or understandings between the parties, whether written or oral, including but not limited to that certain Associate Doctor Agreement entered into between the parties on or about June 1, 1998.

### WITNESSETH:

WHEREAS, 100% of the outstanding stock of the Holding Company is owned by Robert M. Smith (the Holding Company and Robert M. Smith may be hereinafter collectively referred to as "Smith"); and

WHEREAS, the Holding Company owns and operates several chiropractic clinics through wholly owned subsidiaries (the "Subsidiaries"); and

WHEREAS, pursuant to this Agreement, Doctor desires to exercise his talents and services for the benefit of the Company at the clinic and to their mutual benefit and to utilize the facilities and services provided by the Company (for purposes of this Agreement, the defined terms "Clinic" and "Company" shall refer to the specific chiropractic clinic at which Doctor is performing chiropractic services at the applicable time and the Subsidiary of the Holding Company owning and operating said Clinic) (it being agreed that it is the current intent of the parties that Doctor shall provide services at the ACCIDENT & INJURY CHIROPRACTIC CLINIC OF NORTH DALLAS owned by Accident & Injury Pain Centers, Inc., a Texas business corporation, d/b/a Accident & Injury Chiropractic);

NOW, THEREFORE, in consideration of the mutual promises of each, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant and agree as follows:

1.   RELATIONSHIP BETWEEN THE COMPANY AND DOCTOR.   The Company and Doctor do hereby acknowledge and agree that Doctor shall, in all matters hereunder, be regarded as an employee of the Company.  Except as permitted by the provisions in Section 10 below, during the term of this Agreement Doctor may not provide chiropractic services to patients not belonging to the Company.  Doctor hereby represents and warrants to Smith and the Company that Doctor is not currently under contract with any other individual or entity which would preclude Doctor from entering into this Agreement.  Doctor represents

that the Company and Smith have not induced Doctor to enter into this Agreement and acknowledges that Smith and the Company are relying on the representation contained herein. Doctor shall indemnify, defend and hold harmless Smith and the Company from any liability, cost or expense pursuant to a breach of this representation.

2. <u>TERM.</u> Doctor agrees that this Agreement does not create an obligation on the part of the Company to continue the Doctor's employment. The Company makes no representation or promise that Doctor's employment will continue for a set period of time. Doctor is an "at will" employee and may be terminated by the Company at any time with or without cause (the time during which Doctor remains employed by the Company being referred to herein as the "Term of Employment").

3. <u>SUPPLY OF PREMISES AND SERVICES BY COMPANY.</u> The Company shall make available to Doctor the nonexclusive use of all the leased premises upon which the Clinic is located, together with equipment, supplies, personnel and office space situated thereon, during the term of this Agreement at all normal business hours for the purpose of permitting Doctor to engage in the performance of chiropractic services. In addition, the Company shall provide billing and accounting services, collection services, secretarial support staff, insurance coordination services and general practice management services, all of which Doctor hereby acknowledges and agrees support his performance of Chiropractic services. Doctor specifically acknowledges that Robert M. Smith is not a licensed chiropractor, and that services provided by the Company and Robert M. Smith personally (for the Company and/or the Holding Company) shall be in the nature of a management consultant to Doctor and are intended to assist the growth, stability and economics of the practice of chiropractic by Doctor at the Clinic. Robert M. Smith's assistance of Doctor hereunder (personally and through the Company and/or the Holding Company), including consulting with Doctor concerning communication and management skills and the matters to be provided by the Company hereunder, is not intended to, nor shall same be construed as, interfering or controlling or attempting to control in any manner whatsoever Doctor's professional judgment or manner of practice of chiropractic.

4. <u>ADVERTISING</u> The Company and Smith shall be in charge of all advertising and related promotional aspects of the Clinic. Doctor hereby agrees and consents to the use of Doctor's picture and name in any advertisements or other promotional materials prepared by the Company and/or Smith. In the event of the termination of this Agreement for any reason, the Company will endeavor, as soon as reasonably practical (and at the end of any prepaid advertisement spots), to amend or change all such advertisements or promotional materials to exclude references to Doctor and Doctor's picture.

5. <u>SERVICES AND DUTIES OF DOCTOR</u>

   (a) Doctor shall render chiropractic services to patients at the Clinic in accordance with established professional practices. Doctor shall perform all services and duties normally associated with the providing of chiropractic care, including without limitation, diagnosing and treating patients, performing x-rays and examinations on

patients, and participating in and supervising physical therapy, rehabilitation and similar programs (as may be provided elsewhere herein). In addition, Doctor shall undertake acts consistent with and related to said services as directed by licensed chiropractors engaged by the Company and/or Smith to serve as Chief of Staff. As of the date hereof Dr. Thomas Rhudy, D.C. serves in this capacity for the Clinic. In addition, the Company has established an independent Compliance Board to ensure that the policies and procedures implemented by the Company comply with all appropriate regulations concerning the practice of chiropractic and the operation of the Clinics, including but not limited to proper billing practices. It is acknowledged that the Director of Operations, the Chief of Staff and the Compliance Board have reviewed and approved a Policy Manual of chiropractic and operating policies and procedures (the "Policy Manual"), a copy of which has been provided to Doctor and the receipt of which is hereby acknowledged, which Doctor shall utilize and follow in the performance of chiropractic services hereunder, as same may be amended from time to time. Doctor's duties consistent with and related to the practice of chiropractic shall include, without limitation, the prompt completion (within 7 days of the event) of (i) all necessary paperwork and filings (such as billing information and patient records, insurance forms and narrative forms) required for the prudent management of the professional aspects of the Clinic and (ii) any similar reports requested by the Director of Operations, the Chief of Staff or the Compliance Board.

(b)      Doctor acknowledges that the Company will establish reasonable and regular business hours for the Clinic, and that Doctor is responsible for being available to render chiropractic services during such hours. Doctor acknowledges it is to the mutual benefit of Doctor and the Company to establish additional reasonable criteria for the scheduling of time periods at which Doctor shall always be available at the Clinic. Accordingly, it is agreed as follow:

(i) during the initial twelve-month period commencing as of the effective date of this Agreement, Doctor shall be entitled to 10 days of paid leave (i.e. vacation);

(ii) standard holidays pursuant to which the Clinic shall be closed shall only be Thanksgiving Day, Christmas Day, New Years Day, July 4th, Memorial Day and Labor Day;

(iii) given the needs of patients visiting the Clinic, it is agreed that the Clinic shall not be closed for two consecutive business days, unless agreed to by the Company (for this purpose, Saturday shall be considered a business day);

(iv) any leave days (i.e. vacation days) requested by Doctor must be preceded by thirty (30) days written notice to Smith and/or the Director of Operations;

(v) in the event Doctor will be absent from the Clinic due to illness, Doctor must inform the Company of same by 7:00 a.m. the morning of the illness;

(vi) in the event Doctor's sick leave does not exceed five (5) days during any annual period, the Company shall compensate Doctor for such unused days based upon the average daily compensation received by the Doctor during the immediate preceding annual period; and

(vii) Doctor shall be authorized to expend all time necessary to meet relicensing requirements of the Texas Chiropractic Board, as well as to satisfy the testing requirements established by the Compliance Board and/or the Chief of Staff.

(c) As a chiropractor, Doctor recognizes that it is his responsibility to practice in accordance with the state laws and disciplinary rules governing the profession of chiropractic, including but not limited to understanding and properly applying CPT codes as established and outlined in the Current Procedural Terminology handbook prepared by the American Medical Association. Doctor is solely responsible for any act which could be considered outside the codes of chiropractic practice as defined by state or federal law. Furthermore, Doctor agrees to be responsible for any legal fees, penalties and the like incurred in connection with his conduct of the profession of chiropractic.

(d) Doctor shall, throughout the term hereof, perform his duties diligently, prudently and to the best of his ability and, without limiting the generality of the foregoing, Doctor shall provide, to the fullest extent possible, his special, unique and unusual personal services to enable the Clinic to be successful.

(e) Both parties specifically understand and agree that they are not partners or shareholders and nothing herein shall be construed to make this Agreement a partnership or joint venture, or to grant to Doctor any stock ownership interest in the Company or Holding Company.

(f) In the event the Director of Operations, the Chief of Staff, the Compliance Board, or, at the option of the Company, another licensed chiropractor engaged by the Company or Smith and/or the Holding Company, determines that Doctor is providing unsatisfactory chiropractic services, the Company shall notify Doctor of same, and shall make recommendations to Doctor with the intent of facilitating Doctor's improvement of his professional care. Doctor's failure to successfully implement these recommendations and improve the standard of professional care to a level satisfactory to the Director of Operations, the Chief of Staff, the Compliance Board, and/or the Company may lead to further disciplinary actions against the Doctor, and may result in termination. Nothing contained in this provision or in this Agreement shall be construed as the Company interfering with, controlling or attempting to control in any manner whatsoever, any aspect of Doctor's professional judgment or manner of provision of chiropractic services.

6.   ASSIGNMENT OF PROFESSIONAL FEES.

(a)   In partial consideration for the services and facilities provided by the Company to Doctor as provided above, Doctor agrees that all amounts due and owing by patients or third party payers for chiropractic services rendered by Doctor at the Clinic will be billed by the Company, and all cash or other consideration received for said services rendered by Doctor during the term of this Agreement shall be assigned herein for payment to the Company. The Company shall remit to Doctor the amount set forth and computed in accordance with Section 8 below. The balance of the receipts received for chiropractic services rendered by Doctor at the Clinic shall be retained by the Company.

(b)   Doctor hereby agrees to promptly endorse and/or stamp Doctor's name on any checks or other instruments made payable to Doctor for services rendered at the Clinic to and for the account and benefit of the Company. Doctor shall utilize his best efforts to cause all insurance companies, patients and other third parties to make all checks and other amounts payable to the Company, as opposed to Doctor (it being specifically agreed that the Company is the sole owner of all amounts payable with respect to patient care and that Doctor is only entitled to payment from the Company of the compensation set forth in Section 8 below). Such best efforts shall include, at the option of the Company, Doctor's written request of same to such parties.

(c)   In the event this Agreement is terminated for any reason whatsoever, Doctor and the Company agree that all cash receipts by the Clinic shall include prepayment for chiropractic services which have not yet been rendered by Doctor, and the Company shall not be obligated to remit to Doctor any such amounts. The parties agree that should this Agreement terminate for any reason whatsoever, the Company shall retain all sums due as accounts receivable to the Clinic for patient services performed by Doctor. Doctor shall only be entitled to receive compensation through the actual date of termination (which will include only base compensation calculated through the date of termination).

(d)   In connection with the billing and collection services to be provided by Company, throughout the term of this Agreement, Doctor hereby grants to Company an exclusive special power of attorney and appoints Company as Doctor's exclusive true and lawful agent and attorney-in-fact, and Company hereby accepts such special power of attorney and appointment. The special power of attorney granted herein shall be coupled with an interest and shall be irrevocable except with Company's written consent. The special power of attorney shall be for the following purposes:

1.   To bill for services rendered by Doctor or otherwise due to Company for such services;

2.   To collect and receive all accounts receivable arising from rendering the services contemplated herein and taking whatever actions Company deems

necessary or prudent to collect, compromise, or discharge such accounts;

3. Take possession of, endorse, and deposit any checks or other instruments received in payment of accounts receivable for services rendered; and

4. Disburse such funds to creditors and other persons.

7. <u>ASSIGNMENT OF PATIENTS TO DOCTOR.</u> The Company may assign patients to Doctor, and Doctor agrees to render all chiropractic services to all patients at the Clinic in accordance with a Schedule of Fees to be determined by the Company and which from time to time may change at the discretion of the Company; provided, however, all such fees shall be reasonable and comparable with other chiropractic clinics in the Greater Metroplex Area of the Clinic. The Company shall establish financial policies with regard to patients, such as setting the minimum financial parameters of patient acceptance, establishing minimum payment plans prior to the rendition of services, requiring approved attorneys on personal injury cases, personal credit requirements, the payment of all expenses in advance by the patient and related matters. In addition to the foregoing, in the event the Director of Operations, the Chief of Staff or a third party chiropractor engaged by the Company, recommends to the Company that the patients of Doctor be reassigned, the Company shall have the right to reassign any patients of the Doctor to another licensed chiropractor working at the Clinic. Doctor agrees to cooperate fully in any such reassignment, including without limitation prompt completion of narrative forms and, if medically appropriate, recommending to the patient the replacement chiropractor.

8. <u>COMPENSATION</u>

(a) The Company shall remit to Doctor a base salary of $7,500.00 per month in 2 equal semi-monthly installments.

(b) Doctor agrees to accept any assignment by the Holding Company to a specific Company and Clinic. The Holding Company hereby retains the exclusive right to assign Doctor to any Clinic at any time during the term hereof.

(c) Doctor acknowledges and agrees that the chiropractic care to be rendered to patients of the clinic will include, as a continuing integral step in such care, procedures involving rehabilitation services (including, but not limited to, work hardening programs, chronic care programs, physical therapy programs, computerized functional capacity testing, computerized nerve route testing and other related testing services) and CT scan, magnetic resonance imaging and related diagnostic services (collectively, the "Related Services"). Doctor acknowledges that the Company, in providing the Related Services to patients of each Clinic, will incur certain expenses to independent contractors and/or third parties, such as payments for the use of facilities and equipment and other costs (collectively, the "Related Service Costs"). Doctor acknowledges and agrees that his services to be provided under this Agreement for patients of the Clinic shall include, without limitation, Doctor

providing the Related Services to the extent the same are within the professional expertise of Doctor (which shall include, without limitation, consulting services rendered by Doctor with respect to the Related Services). Doctor acknowledges and agrees that all patient fees and receivables attributable to the Related Services shall be the exclusive property of the Company, consistent with the provisions of this Agreement.

(d)     All preapproved, reasonable travel and entertainment expenses will be paid in a timely manner.

(e)     In each calendar month in which Doctor treats eighty (80) new patients, Doctor will be entitled to receive a bonus of Four Hundred Dollars ($400.00) to be paid in addition to the base salary outlined above. In each calendar month in which Doctor treats one hundred (100) new patients, Doctor will be entitled to receive a total bonus of Seven Hundred Dollars ($700.00) in addition to his base salary. In each calendar month in which Doctor treats one hundred twenty-five (125) new patients, Doctor will be entitled to receive a total bonus of One Thousand ($1,000.00). Doctor will also be entitled to receive an additional bonus of Three Hundred Dollars ($300.00) for each further additional increase of twenty-five (25) new patients in each calendar month. In addition, Doctor will be entitled to receive an additional bonus of Two Hundred Fifty Dollars ($250.00) for each passing grade received on clinic inspections conducted by the Compliance Board. These bonuses are to be paid along with the semi-monthly installment of that base salary remitted on or about the 15th of the following month.

9.     TERMINATION OF THIS AGREEMENT.

(a)     This Agreement, or any renewal thereof, may be terminated by the Holding Company or the Company for any reason whatsoever immediately upon notice in writing to Doctor (or orally in person to Doctor when witnessed by a third party). Notwithstanding any other provisions of this Agreement, Doctor shall, for all purposes, be an "employee at will" of the Company and subject to dismissal with or without cause. If and when this Agreement is terminated, Doctor agrees to immediately surrender any keys to the Clinic to a representative of the Company and to immediately return all property, patient files and other records (including all copies of the Policy Manual) to the Company. In the event of any such termination, Doctor shall immediately vacate the Clinic. Doctor and the Company shall arrange for a mutually agreeable time after business hours pursuant to which Doctor shall be entitled to remove any personal property owned by Doctor and located at the Clinic.

(b)     In the event of the termination of this Agreement for any reason whatsoever, Doctor shall be required to complete all outstanding narrative reports and insurance forms for patients served by Doctor at the Clinic. In the event Doctor does not complete such reports in a prompt and appropriate manner (and in all events within five (5) days) to the satisfaction of the Director of Operations and/or the Company, the

Company shall be authorized to assign a licensed chiropractor to undertake such tasks on behalf of the patient, if necessary to ensure adequate patient care in the opinion of said replacement chiropractor. Doctor hereby agrees to indemnify, defend and hold harmless the replacement chiropractor, Smith and the Company and its shareholders, officers, directors, and other agents from and against any all costs and liability arising out of Doctor's failure to so complete the narrative reports and insurance reports and the actions of the replacement chiropractor in undertaking to do same.

(c)     All amounts due to Doctor from the Company hereunder through the date of termination may be withheld until Doctor satisfies the requirements set forth in this Agreement, including those set forth herein concerning the return of all records, patient files and other reports (including all copies of the Policy Manual) to the Company, and satisfactory completion of all narrative reports and insurance forms as required hereunder. Doctor shall only be entitled to compensation through the date of termination as specified above.

(d)     Both parties acknowledge and agree that it is to the patient's benefit to be notified of any termination of this Agreement. Accordingly, Doctor hereby agrees that the Company shall be authorized exclusively to contact patients of the clinic to notify them of the termination of this Agreement and of the reassignment of their file to a new licensed chiropractor. Doctor agrees to cooperate with the Company in sending such letter and, if medically appropriate, agrees to recommend to the patient the replacement chiropractor. In no instance shall Doctor be authorized to communicate directly with the patient without the consent of the Company, which consent may be withheld in the Company's sole discretion.

10.     NON-COMPETE PROVISIONS.

(a)     Doctor acknowledges and agrees that by virtue of this Agreement Doctor shall have access to and receive (i) confidential and proprietary information of the Company (including without limitation the Policy Manual specified in Section 5 above) and (ii) specialized knowledge and training with respect to financial management aspects of chiropractic clinics and certain communication skills and practice management ideas which are the exclusive property of the Company and Smith.

(b)     Doctor acknowledges and agrees that the Holding Company would not enter into this Agreement and/or allow Doctor to treat patients at the Clinic and utilize the facilities and business services of the Company described herein unless Doctor agreed with the non-competition provisions set forth herein, which Doctor acknowledges are reasonable.

(c)     During the term of this Agreement, Doctor shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or

participate in (including without limitation performance of chiropractic services) any business that is in competition in any manner whatsoever with the business of the Company, Smith or any entity controlled or owned by, directly or indirectly, Robert M. Smith (collectively, the "Smith Clinics"). Furthermore, upon termination of this Agreement for any reason whatsoever, Doctor expressly agrees not to engage or participate, directly or indirectly (as specified above), in any business that is in competition in any manner with the Smith Clinics and that is located within ten (10) miles of the Clinic at which Doctor principally provided his services hereunder or that is located within five (5) miles of any Smith Clinic for a period of two (2) years. Doctor further covenants not to make any effort to contact patients who have undergone or who are undergoing treatment, care, consultation or diagnosis at the Clinic, or who have visited or who are visiting the Clinic for any professional reason or purpose whatsoever, by means of personal contact, appeal or correspondence of any nature whatsoever, including phone calls, the U.S. postal service, or any other mail service through any direct mail promotion, fliers, circulars, or solicitors, prior to the termination of this Agreement or for a period of two (2) years following the termination of this Agreement for any reason whatsoever, without the express written consent of the Company, which consent may be withheld in the sole and absolute discretion of the Company.

(d)     Doctor acknowledges and agrees that the provisions of this section shall be enforceable by an action for specific performance or injunction in a state or federal court of law having jurisdiction in this case. Doctor does hereby agree to hold harmless and indemnify the Company and Smith for any expense incurred by the Company or Smith in any legal proceedings engaged in to enforce the provisions of this section.

(e)     Doctor will not, during or for two (2) years after the termination of this Agreement for any reason whatsoever, attempt to disrupt, terminate or otherwise interfere with the employment relationships of employees of the Company, or of the Smith Clinics, or seek to interfere in any manner with Robert M. Smith's ownership of the Smith Clinics.

(f)     In the course of his employment Doctor will have access to confidential and proprietary records and data, including without limitation patient lists and patients records and the Policy Manual, which are the sole property of the Company and Smith. During the term of this Agreement, and thereafter in perpetuity, Doctor agrees that he will not, directly or indirectly, disclose or use any such confidential information except as required in the course of performance services hereunder. All patient files, patient lists and related records which Doctor has knowledge of or reviews pursuant to the performance of services hereunder (including but not limited to the Policy Manual) shall be deemed to be confidential and proprietary data owned by the Company and Smith and subject to these nondisclosure provisions and the provisions in Section 11 below.

(g)    In the event of any breach, threatened or actual, by Doctor of his covenants hereunder, it is expressly agreed that, in addition to any other remedy available to the Company and/or Smith, it shall be entitled as a matter of right to a writ of injunction to prevent such breach. Failure to insist upon the strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder at any one or more times or in any one or more instances be deemed a waiver or relinquishment of the same or any other right or power at any other time or in any other instance.

11.    DISCIPLINARY PROCEDURES.   The following provides an outline of the progressive disciplinary procedures to be utilized with doctors employed by Accident & Injury Pain Centers, Inc. and its subsidiaries. These procedures are subject to revision without notice at the sole discretion of Accident & Injury Pain Centers, Inc. Upon the recommendation of the Compliance Board, the Chief of Staff, or the doctor's immediate supervisor, the following should occur:

1.    On the first infraction, a warning (which may be documented in the doctor's personnel file) may be given, and a review of the patient files or other matter which gave rise to the infraction may occur.

2.    On the second infraction, the doctor may be placed on administrative watch, or given a three-day reassignment to the clinic most nearly located to the corporate offices for training under the auspices of the Chief of Staff and/or the Compliance Board. Such infraction and/or reassignment will be documented in the doctor's personnel file.

3.    On the third infraction, the doctor, if a clinic director, may be removed as clinic director and/or reassigned to another clinic in the same or reduced capacity, and at the same or reduced compensation. An associate doctor is subject to termination of employment following a third infraction.

4.    On the fourth infraction within any twelve-month period, the doctor is subject to immediate termination of employment.

12.    RECORDS.   Doctor agrees that all patient case histories, x-rays, laboratory reports, and patients' case records and any and all associated information whatsoever pertaining to any and all patients who are undergoing or who have undergone treatment, care, consultation or diagnosis at the clinic, or who have visited or are visiting the Clinic for any professional reason whatsoever, are the sole property of the Company and Smith and as such may not be taken from the Clinic and into the personal custody of Doctor for reasons of rendering service to the Company's patients except as provided for in this Agreement. Upon termination of this Agreement for any reason whatsoever, Doctor agrees not to take or remove originals of said files or documents or copies thereof unless express written permission is first received from the Company. Doctor agrees to be liable for damages, including legal fees incurred by the Company if such breach occurs in the event he does copy

or remove for personal use any patient file information as outlined above (or of the Policy Manual). Doctor acknowledges and agrees that the Policy Manual is a copyright material of Robert M. Smith and the Company.

13.    PERSONAL PROPERTY OF DOCTOR/AND OF CLINIC.

(a)    If Doctor shall transfer any of his own personal property to the Clinic, such as chairs, desks, or any other equipment for personal use, Doctor shall mark or label any and all such personal property so as to clearly identify said personal property as belonging to Doctor so as to distinguish it from property belonging to the Company. Doctor shall provide his own fire, extended coverage, theft, and any other insurance coverage Doctor deems necessary to protect said property, but in any event, shall indemnify the Company for any loss which may be suffered by the Company resulting from Doctor's transfer or use of his own personal property or his failure to obtain and maintain as current said insurance.

(b)    Doctor covenants to maintain the Clinic, and the equipment and supplies thereon owned or leased by the Company, in a good state of repair and covenants to commit no waste or damage upon the same. Doctor shall hold harmless and indemnify the Company and Smith for any claim, loss, or damage, including reasonable attorney's fees and court costs, arising out of Doctor's use of the equipment, supplies, personnel and office space at the Clinic under the provisions of this Agreement.

14.    TAXES/ OTHER MATTERS.    Doctor and the Company hereby agree that for federal income tax reporting purposes, Doctor shall be deemed to be an employee of the Company, and the Company shall withhold taxes from Doctor's compensation in a manner consistent therewith. In addition to the compensation described in Section 8 above, at the sole and absolute discretion of the Company, the Company may provide health and related standard insurance benefits to Doctor; provided, in no event shall Doctor ever be entitled to any interest in any pension, profit sharing or related employee benefit fund established by the Company or Holding Company.

15.    WAIVER OF BREACH.    Failure of either party to protest a breach by the other party or waiver by either party of a breach shall not operate as or be construed as a waiver of rights or remedies as to that breach, and a waiver by either party of a breach shall not operate as or be construed as a waiver of right or remedies as to that breach, and a waiver by either party of a breach shall not operate as or be construed as a waiver of rights or remedies as to any subsequent breach by the other party.

16.    SUCCESSORS AND ASSIGNS.    The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Holding Company. Doctor may not assign this Agreement nor any of his rights or obligations hereunder to any person, firm or entity without the expressed written consent of the Company. The Holding Company shall be entitled to assign this Agreement without the consent of Doctor to any entity owned or controlled by, directly or indirectly, Robert M.

Smith. In addition, the Holding Company shall be entitled to assign this agreement without the consent of Doctor to any individual or entity acquiring substantially all of the assets or stock of the Company, and to the heirs, successors and assigns of Robert M. Smith upon his death or other involuntary conveyance.

17.  **ENTIRE AGREEMENT.**   This instrument contains the entire agreement between the parties, and it may not be amended orally, but only by an Agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought. This Agreement supersedes any and all prior oral or written agreements or understandings among the parties hereto regarding the subject matter hereof.

18.  **NOTICES.**   Any notice required or permitted to be given under this Agreement shall be made in writing, and shall be effective when personally delivered or mailed, by registered or certified mail as follows:

TO THE COMPANY:     Robert M. Smith, President
Accident & Injury Pain Centers, Inc.
d/b/a  Accident & Injury Chiropractic
200 Wynnewood Village
Dallas, Texas  75224

TO DOCTOR:     Dr. Lou Saucedo, D.C.

_____
_____

Either party may change its said address by written notice to the other party in accordance with the terms hereof.

19.  **SETTLEMENT.**   In consideration for entering into this Agreement, Doctor hereby fully releases and discharges the Holding Company, each Company, each Clinic, Robert M. Smith and any and all entities owned or controlled, partially or wholly, directly or indirectly, by Robert M. Smith from any and all costs, expenses, damages, claims, liabilities or causes of action of whatever nature, whether known or unknown, contingent or fixed, relating to or arising out of any event prior to the date of this Agreement.

20.  **INSURANCE / MALPRACTICE.**   Doctor acknowledges and agrees that as a licensed chiropractor Doctor shall be responsible for all chiropractic services and other medical affairs relating to the Clinic. Doctor shall also be responsible for any and all malpractice claims relating to the Clinic or Company, whether such malpractice claim is based upon services rendered by Doctor or any other licensed chiropractor performing services therein. Doctor shall be responsible for maintaining comprehensive medical malpractice insurance covering his acts. Said insurance company and insurance coverage shall be subject to approval by the Company and shall name the Company, the Holding Company and Robert M. Smith as additional insured parties. The Company shall be responsible for the payment of the

insurance premium.

21.    LIMITED CAPACITY OF SMITH. Doctor acknowledges that Robert M. Smith is executing this Agreement solely due to the rights granted to him hereunder, and nothing in this Agreement shall be construed as a guarantee of the performance of the Holding Company or Company hereunder by Robert M. Smith. All payments of compensation to Doctor shall be made exclusively by the applicable Company.

22.    SECTION HEADINGS.     The section headings contained herein are for convenience only, and do not purport accurately to summarize the contents of the paragraph they head, and shall not modify, or in any way affect the provisions of this Agreement or be of any relevance in the construction thereof.

23.    MUTUAL PREPARATION. Each party has read the foregoing Agreement, fully understands the contents thereof, has been independently advised as to its legal effect, and is under no duress or pressure of any sort to execute it.  This Agreement was mutually prepared and shall not be construed against any party by reason of his role in such preparation.

24.    MISCELLANEOUS.  This Agreement shall be construed in accordance with and governed for all purposes by the laws of the State of Texas. In any action for enforcement or breach of any of the terms, conditions or covenants of this Agreement, exclusive venue for such action shall lie in a court of proper jurisdiction in Dallas County, Texas.  In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall, for any reason, be held to be excessively broad as to time, duration, geographical scope, activity, or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

25.    GENDER.     Pronouns of any gender used herein shall include the other genders, and the singular and plural shall include each other.

26.    NO SMOKING DESIGNATION.     To the extent consistent with state and federal law, all premises within the Clinic shall be designated as non-smoking, unless Doctor is notified to the contrary by the Company.  In the event any state or federal law ever requires a smoking area, same shall be designated by the Company in its sole and absolute discretion.

IN WITNESS WHEREOF, the parties have executed this Agreement the date and year first above written.

ACCIDENT & INJURY PAIN CENTERS, INC.,
a Texas business corporation d/b/a
Accident & Injury Chiropractic

By: _____
Robert  Smith, President

DOCTOR:
Dr. Lou Saucedo , D.C.

_____

ACKNOWLEDGED AND AGREED TO:

_____
ROBERT  SMITH

STATE OF TEXAS    )
                           )
COUNTY OF DALLAS   )

      BEFORE ME, the undersigned authority, on this day personally appeared Robert Smith, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacities stated.

      Given under my hand and seal of office this _____ day of _____, 199___.

                                       _____
                                       Notary Public in and for
                                       The State of Texas

[SEAL]

                                       My Commission Expires:_____

STATE OF TEXAS    )
                           )
COUNTY OF _____  )

      BEFORE ME, the undersigned authority, on this day personally appeared Dr. Lou Saucedo, D.C., known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity stated.

      Given under my hand and seal of office this _____ day of _____, 199___.

                                          _____
                                       Notary Public in and for
                                       The State of Texas

[SEAL]

                                       My Commission Expires:_____



Recycled   Stock # DO-25-SS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, *et al.*, | § | |
| | § | |
| Plaintiffs/Petitioners, | § | |
| vs. | § | CIVIL ACTION NO. 3-01CV2247-N |
| | § | |
| RECEIVABLE FINANCE COMPANY, | § | |
| L.L.C., *et al.*, | § | |
| | § | |
| Defendants/Respondents. | § | |

### AFFIDAVIT OF KENNETH C. THOMAS, B.S., M.S., D.C.

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned notary public in and for the said county and state, on this day personally appeared Kenneth C. Thomas, who after being duly sworn, did upon oath state the following:

1.  "My name is Kenneth C. Thomas, B.S., M.S., D.C.   I am over the age of eighteen (18) years, am fully competent to testify to the matters stated in this affidavit.  I have not been convicted of a crime.  The facts stated herein are true and correct of my own personal knowledge.

2.  "I have reviewed one hundred (100) patient files for Accident & Injury Pain Centers, Inc. ('A&I') which were presented to me as the files examined by the Plaintiffs' designated expert, William Timberlake, D.C.

3.  "Treatment of adults involved in motor vehicle accidents by a chiropractor is within the scope of practice in Texas, and is in accordance with state laws and rules and regulations as established by the Texas Board of Chiropractic Examiners (TBCE).

---

4.    "In my experience, it is not unusual for individuals involved in motor vehicle accidents or work related injuries to have subjective complaints.

5.    "The treatment of patients on consecutive days is within the generally accepted standards of care in the treatment of injuries incurred from motor vehicle accidents in the acute phase. The use of multiple modalities per visit is based upon the clinical finding and the therapeutic outcome expected with the modality choices. In the 100 cases I reviewed, the election of each modality was therapeutically appropriate and medically indicated.

6.    "A&I meticulously documented all patient encounters, beginning with the initial office visit through the last date of treatment. Daily record encounters are documented, utilizing a record keeping system and format. The patient protocols established by A&I provide for the collection and documentation of sufficient patient data to include history, examination findings and diagnoses, to substantiate that the services provided by A&I are not only justified, but usual, reasonable, customary and medically necessary.

7.    "Of the 100 files reviewed, MRIs were prescribed in 57 of the cases. There was sufficient documentation to support these 57 studies as reasonable and medically necessary. X-rays do not show problems in soft tissues such as nerves or vertebral discs and the MRI results in greater patient reassurance. The investigation of such acute and chronic pain is less clear cut without the use of an MRI which has replaced the CT scan as the standard in the evaluation of cervical, thoracic and lumbar disc complaints.

8.    "My review of the files indicated the diagnostic procedure of MRIs was actually underutilized based on basic proper patient management in traumatic injuries.

9.    "In my review of the cases in which the patient was referred for medical evaluation or consultation, the documentation supports the medical necessity for such referral. Such were often based on the need for prescription medication. All files in which referrals were made contain a referral form that was dated and signed by the patient and was with the express consent of the patient.

10.   "Additionally, the documentation supported the frequency of treatment as being reasonable and medically necessary for the appropriate case management of traumatic injuries resulting from motor vehicle accidents and for the prevention of post-traumatic sequelae. Further, the frequency of treatment visits is dependent upon the treating doctor's discretion and clinical judgment at the time of the patient's presentation.

---

AFFIDAVIT OF KENNETH C. THOMAS, B.S., M.S., D.C.. —Page 2
J \LDJ\Receivable\allstate\affidavit - Thomas.wpd

11.  "There is no documentation in the records reviewed to support the statement that "the services rendered are designed to generate revenues for Bob Smith as opposed to billing for necessary and reasonable services."

12.  "In the cases where the MRI studies support a diagnosis of disc herniation, the patient's(s') past medical history did not reflect a pre-existence of disc herniations or disc related problems.  I am of the opinion that if the condition did not exist prior to the accident and can be demonstrated objectively following the accident, then the issue of causation is clearly and unequivocally related to the motor vehicle accident.

13.  "The aforementioned statements are based upon my education, experience and training as well as my review of the 100 case files and documentation presented to me."

Further, affiant sayeth not.

Signed this 21st day of ___June___, 2004

_____
Kenneth C. Thomas, B.S., M.S., D.C.


THE STATE OF TEXAS          §
                            §
COUNTY OF DALLAS            §


SUBSCRIBED AND SWORN TO BEFORE ME, this 21st day of ___June___, 2004.

_____
Notary Public in and for the State of Texas

AFFIDAVIT OF KENNETH C. THOMAS, B.S., M.S., D.C.. —Page 3
J:\LDJ\Receivable\allstate\affidavit - Thomas.wpd



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALLSTATE INSURANCE COMPANY, *et al.*, §
                                   §
    Plaintiffs/Petitioners,        §
vs.                                §    CIVIL ACTION NO. 3-01CV2247-N
                                   §
RECEIVABLE FINANCE COMPANY,        §
L.L.C., *et al.*,                  §
                                   §
    Defendants/Respondents.        §

## **AFFIDAVIT OF LINDY D. JONES**

THE STATE OF TEXAS    §
                   §
COUNTY OF DALLAS    §

BEFORE ME, the undersigned authority, on this date personally appeared LINDY D. JONES, who being first duly sworn on his oath, deposed and stated as follows:

"1.    My name is Lindy D. Jones. I am over eighteen (18) years of age, have never been convicted of a crime involving moral turpitude, and am competent to make this Affidavit. All statements contained in this Affidavit are true and correct and within my personal knowledge.

"2.    I am an attorney-in-charge for Defendant LOUIS SAUCEDO, D.C. in the above styled and numbered cause, and I attended the deposition of the following individual which was taken in this case (identified by deponent, date, and location):

    a.    Bruce Vest, June 3, 2004, Dallas, Texas

---

AFFIDAVIT OF LINDY D. JONES —Page 1
J \LDJ\Receivable\allstate\MSJs Affs Brfs 6-04\Affidavit of LDJ - Saucedo.wpd

"3.    True and correct copies of the following discovery items are attached as exhibits to Defendant's Motion for Summary Judgment and are incorporated herein for all purposes.  These discovery items are identified as follows:

      a.    CM17136 - CM17138

FURTHER, AFFIANT SAYETH NOT.

Signed this 21ST day of June, 2004

_____
Lindy D. Jones

THE STATE OF TEXAS          §
                          §
COUNTY OF DALLAS            §

    SUBSCRIBED AND SWORN TO before me by Lindy D. Jones, this 21ST day of June, 2004, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

My Commission Expires

_7/5/2005_____

KATHY WASH...
NOTARY PUBLIC
State of Te...
Comm. Exp. 07



```
SEL#  PROVIDER NAME                              EFFECTIVE DATE
 0001 ABE CHIROPRACTIC & HEALTH                     01/01/02
 0002 ACCIDENT & INJURY                             01/01/01
 0003 ACCIDENT & INJURY                             01/01/01
 0004 ACCIDENT & INJURY          .                  10/01/99
 0005 ACCIDENT & INJURY CENTER                      01/01/01
 0006 ACCIDENT & INJURY CENTER                      01/01/01
 0007 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
 0008 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
 0009 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
 0010 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
 0011 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
 0012 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
 0013 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
 0014 ACCIDENT & INJURY CHIROPRACTIC                10/01/99
```

ENTER SELECTION NUMBER:

PF7=BACKWARD PF8=FORWARD

CONFIDENTIAL MATERIAL – DUPLICATION OR
DISTRIBUTION RESTRICTED BY COURT ORDER
Allstate Insurance Company, et al v. Receivable
Finance Company, L.L.C., et al. Civil Action
No 3-01-CV2247-N U.S District Court For the
Northern District of Texas

CM 17136

```
SEL#  PROVIDER NAME                              EFFECTIVE DATE
0435  PETER OKOSE                                  06/01/00
0436  ORGANIZED HEALTHCARE SERVICES, INC.          07/01/00
0437  G ORTIZ                                      05/01/01
0438  G ORTIZ                                      05/01/01
0439  ORTIZ, G.M.                                  05/01/01
0440  G. M. ORTIZ, M. D.                           05/01/01
0441  G ORTIZ, M.D.                                05/01/01
0442  P. M. C. PLLC                                07/01/00
0443  P.M.C. PLLC                                  07/01/00
0444  P.M.C., PLLC                                 07/01/00
0445  PACIFIC MEDICAL CENTER                       01/01/99
0446  MARLON D. PADILLA                            07/01/00
0447  MARLON D. PADILLA                            07/01/00
0448  MARLON D. PADILLA M.D.                       10/01/99
```

ENTER SELECTION NUMBER:

PF7=BACKWARD PF8=FORWARD

CONFIDENTIAL MATERIAL – DUPLICATION OR
DISTRIBUTION RESTRICTED BY COURT ORDER
Allstate Insurance Company, et al v. Receivable
Finance Company, L.L.C., et al, Civil Action
No. 3-01-CV2247-N, U.S. District Court For the
Northern District of Texas

CM 17137

Case 3:01-cv-02247-N   Document 518   Filed 06/21/04   Page 33 of 39   PageID 4392

```
SEL#  PROVIDER NAME                                       EFFECTIVE DATE
0449  MARLON D. PADILLA, M.D.                             10/01/99
0450  PAIN & INJURY REHAB CENTER                          01/01/98
0451  PAIN AID CHIROPRATIC                                07/01/00
0452  PAIN INSTITUE OF TEXAS                              10/01/99
0453  PAIN INSTITUTE CONCORD                              10/01/99
0454  PAIN INSTITUTE OF TEXAS                             10/01/99
0455  PAIN INSTITUTE OF TEXAS                             10/01/99
0456  PAIN INSTITUTE OF TEXAS                             10/01/99
0457  PAIN-AID CHIROPRACTIC CLINIC                        07/01/00
0458  FREDDRICK SHAW, D.C. PAIN-AID CHIROPRACTIC P.C      07/01/00
0459  SHING Y, M.D. PANG                                  03/31/00
0460  PASADENA BLVD. CHIROPRACTIC                         04/01/00
0461  PEOPLE'S MEDCARE                                    01/01/99
0462  PEOPLE'S MEDICAL CLINIC                             01/01/99
```

ENTER SELECTION NUMBER:

PF7=BACKWARD PF8=FORWARD

CONFIDENTIAL MATERIAL – DUPLICATION OR
DISTRIBUTION RESTRICTED BY COURT ORDER
Allstate Insurance Company, et al v. Receivable
Finance Company, L.L.C., et al, Civil Action
No. 3-01-CV2247-N, U.S. District Court For the
Northern District of Texas

CM 17138

```
                                        B_Vest2
0001
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION
 3    ALLSTATE INSURANCE COMPANY,   *
      ET AL.                        *
 4                                  *
                                    *
      VS.                           *  CASE NO. 3-01-CV2247-N
 5                                  *
      RECEIVABLE FINANCE COMPANY,   *
 6    ET AL.                        *
 7
 8    *******************************************************
 9            VIDEOTAPED AND ORAL DEPOSITION
10                        OF
11                    BRUCE VEST
12            AS THE CORPORATE REPRESENTATIVE OF
13                ALLSTATE INSURANCE COMPANY
14    *******************************************************
15            VIDEOTAPED AND ORAL DEPOSITION of BRUCE VEST,
16    produced as a witness at the instance of the
17    Defendants, and duly sworn, was taken in the
18    above-styled and numbered cause on June 3, 2004, from
19    10:21 a.m. to 8:15 p.m., before Therese J. Casterline,
20    RMR and Certified Court Reporter in and for the State
21    of Texas, at the offices of Kassabian, Doyle &
22    Weatherford, P.C., located at Suite 650, 1521 North
23    Cooper Street, Arlington, Texas, pursuant to the
24    Federal Rules of Civil Procedure and the provisions
25    stated on the record.
0002
 1              Pursuant to information made a part of the
 2    record at the time said testimony was taken, the
 3    following includes all parties present.
 4                    A P P E A R A N C E S
 5    FOR THE PLAINTIFFS:
 6            MR. DAVID KASSABIAN
              KASSABIAN, DOYLE & WEATHERFORD, P.C.
 7            1521 North Cooper Street, Suite 650
              Arlington, Texas  76011
 8            (817) 461-8855
 9    FOR THE DEFENDANTS:
10            MR. MICHAEL E. MEARS
              ANDREWS & KURTH L.L.P.
11            1717 Main Street, Suite 3700
              Dallas, Texas  75201
12            (214) 659-4400
13            MR. CHRISTOPHER WEIL
              WEIL & PETROCCHI, PC
14            1601 Elm Street
              Suite 1900
15            Dallas, Texas 75201-2846
16            MR. JAMES D. SHIELDS
              MS. KATHERINE D. HOKE
17            SHIELDS, BRITTON & FRASER
              5401 Village Drive
18            Plano, Texas 75093
19            MR. LINDY D. JONES
              JONES, ALLEN & FUQUAY, LLP
20            8828 Greenville Avenue
              Dallas, Texas 75243
21
              MR. ROBERT H. RENNEKER
                                        Page 1
```

B_Vest2

14          Go ahead.
15          Q.  Okay.  Mr. Vest, are you familiar with the
16   chiropractors that I represent?  I want to go through
17   the names briefly if you're not.
18          A.  Yes, sir, I'm -- I'm fairly familiar with
19   them.
20          Q.  Okay.  Well, let me list them and make sure
21   you have those 13 in mind, and I'm going to give you a
22   list so in case you need to refer back to it, you can.
23               All of these are doctors of chiropractic.
24   Thomas Rhudy, Louis Saucedo, Christopher Holowiski,
25   Kenneth Lustik, Larry Parent, Mark Rayshell, Patricia
0078
1    Johnson, Carey Fabacher, Tayana Stefanovic, Ramesh
2    Sanghani, Chad Blackmon, Reza Assadollahi, and Kyle
3    Campbell.
4               Can we have this agreement that if I refer
5    to the chiropractors I represent or the chiropractors,
6    we're referring to those 13 individuals?
7          A.  Yes, sir.
8          Q.  Okay.  I'm going to give you this list so in
9    case you need to look at it and figure if that's
10   someone that's within the list, you can have that
11   available.
12         A.  Thank you.
13              MR. KASSABIAN:  Go ahead and would you
14   mark it as an exhibit since he'll be referring to it?
15              MR. JONES:  No.  You can mark it when I
16   pass the witness.
17              MR. KASSABIAN:  Okay.  We'd ask that it
18   marked an exhibit at the -- at the break.
19              (Exhibit Number 6 marked.)
20         Q.  And as far as when I make reference to
21   Allstate, can we also have the agreement that we're
22   referring to the plaintiffs in this case so I don't
23   have to name all the individual parties?
24         A.  With the exception of the -- the Encompass
25   parties.  I can't speak for them.
0079
1          Q.  Okay.  If -- if you need to limit your
2    response in any way for Encompass or anything else,
3    you're certainly welcome to.
4          A.  All right.  Thank you.
5          Q.  Okay.  Are you the person that's most
6    knowledgeable about the facts in this case concerning
7    these chiropractors' involvement?
8          A.  I believe so, yes, sir.
9          Q.  You mentioned earlier when Mr. Shields
10   questioned you about Richard Wong, Bryan Hanson, Ed
11   Moran, and corporate counsel.  Is the information for
12   those individuals -- did it come from you or other
13   counsel?
14              MR. KASSABIAN:  Objection as to form,
15   misstatement of the prior testimony.
16         A.  And what information are we talking about?
17         Q.  About this case.  In other words, do they have
18   independent knowledge, or is it something sort of
19   derivative of what you have been able to determine?
20         A.  Generally speaking, the information that would
21   have gone up to Richard would have come from me.
22         Q.  And would the same be true of Bryan Hanson?
23         A.  I can only assume that that to be the case,
24   but once it left Richard's hands, I'm not sure where it

Page 33

```
                              B_Vest2
25  went.
0080
1        Q.  But are you the sole source of information
2   that you're aware of for this case for Richard?
3                MR. KASSABIAN:  Objection as to form
4   and -- go ahead.
5        A.  I think so.  I don't know that Richard had any
6   independent knowledge.
7        Q.  What about Mr. Moran; did he have any
8   independent knowledge, other than through you or these
9   other two gentlemen?
10       A.  I don't believe so.
11       Q.  And I take it you don't know the source of the
12  information for the corporate counsel of Allstate,
13  other than through you?
14       A.  I -- I don't believe they had any independent
15  knowledge.
16       Q.  As far as the chiropractors, this list of
17  chiropractors that I represent, are you aware of any
18  acts they took in this -- well, let me back up and
19  start over.
20               The chiropractors that I represent, are
21  you aware of whether or not the acts that you're
22  complaining of in the -- the complaint arose in their
23  capacity as an employee of Accident & Injury or in some
24  other capacity?
25               MR. KASSABIAN:  Objection as to form.
0081
1        A.  Well, their acts would have been as employees
2   and -- and -- and chiropractors.  As -- I don't believe
3   that any of the chiropractors -- as far as I know, none
4   of chiropractors were acting on their own, if that's --
5   that they -- they weren't loose cannons or it wasn't a
6   lone wolf operation.
7        Q.  Okay.  So it -- it's the position of Allstate
8   in this matter that the chiropractors, what they were
9   doing was that -- in their capacity as an employee of
10  Accident & Injury and at Accident & Injury's direction?
11               MR. KASSABIAN:  Objection as to form.
12               And do not disclose information received
13  from counsel.
14       A.  Again, I don't believe that any -- as far as I
15  know, that the chiropractors weren't acting as -- as
16  lone wolves or loose cannons, that they were doing so
17  at the direction of -- of Bob Smith and -- and Steve
18  Smith and Accident & Injury Chiropractic.
19       Q.  Okay.  And again, you're saying doing these
20  acts.  You're talking about treating the patients as
21  employees of Accident & Injury?
22       A.  Treating the patients as --
23       Q.  while the chiropractors were employees of
24  Accident & Injury?
25       A.  Yeah, as far as I know, that they weren't --
0082
1   they weren't treating employees on their own -- or, I
2   mean, that's -- they weren't treating patients on their
3   own.
4        Q.  And as far as their compensation, you've
5   been -- I believe that most of the chiropractors',
6   individual chiropractors' deposition -- I know those 13
7   have not all been deposed.  Are you familiar enough
8   with salaries to know whether or not they had a
9   reasonable salary for their employment with Accident &
                              Page 34
```

B_Vest2

```
15        A.  Yes, sir, I do agree with that.
16        Q.  So if I understand Allstate's allegations
17   correctly, what you're saying is that some of the
18   chiropractic treatment was not medically necessary?
19             MR. KASSABIAN:  Objection as to form.
20        A.  Yes.
21        Q.  And some of the MRIs prescribed are done --
22   and actually done were not medically necessary?
23        A.  Yes.
24             MR. KASSABIAN:  Objection as to form.
25        Q.  And upon what do you form that conclusion?
0124
 1        A.  Well, based upon -- well, I'll start out
 2   speaking from an adjuster's standpoint, what the
 3   adjusters saw, that the adjusters saw an inordinate
 4   amount of MRIs being recommended and -- and prescribed
 5   at the get-go, which, from their experience, it was
 6   premature, too early, within what Dr. Christy said was
 7   the window -- what we found out later on what
 8   Dr. Christy said was the window of opportunity, that
 9   the -- the MIS were -- were being ordered before
10   conservative chiropractic treatment was allowed to take
11   place.
12             The same is true for the -- the same is
13   true for the referrals done to the medical doctors.
14   They're done too soon, before the conservative
15   chiropractic care is being given the opportunity to --
16   to take place.
17             And to be honest with you, I've forgotten
18   your question, so I'm not sure I'm through with my
19   answer.  Could we -- do you remember your question?
20             MR. JONES:  Well, I've got to object as
21   being nonresponsive, because I don't think it had much
22   to do with my question anyway.  But let's go back and
23   try again.
24             MR. KASSABIAN:  Objection, sidebar.
25             Go ahead.
0125
 1             MR. JONES:  And again, don't interrupt me,
 2   Mr. Kassabian.  I don't interrupt you.
 3             MR. KASSABIAN:  I think that's side --
 4             MR. JONES:  Why do you constantly have to
 5   be rude and interrupt me?
 6             MR. KASSABIAN:  I think that the sidebar
 7   was relating to the prior statements.  I felt it
 8   necessary to go ahead and object at that time.
 9             Please go ahead, sir.
10        Q.  Again, I asked what your basis was, I believe,
11   for saying that the treatment and/or the prescribing
12   and performance of MRIs was not medically necessary.
13        A.  Right.
14        Q.  And you broke it down by telling me about the
15   adjusters.
16        A.  Yes, and the perception the adjusters have,
17   and that -- that conclusion the adjuster has is also
18   based upon the peer reviews that we would conduct,
19   independent peer reviews that we would conduct
20   that -- that would conclude that much of the care,
21   the -- the chiropractic care, the referrals to the MRI
22   facilities and the doctors and everything, was
23   unreasonable and unnecessary.
24             So very much a core of our -- our
25   complaint has to do with those issues, abusive
                         Page 52
```

B_Vest2

0126
1  treatment and patterns of treatment.
2        Q.  Okay.  So what you're saying is your peer
3  review doctors had a difference of opinion from the
4  Accident & Injury doctors; is that correct?
5              MR. KASSABIAN:  Objection as to form.
6        A.  In -- in -- in most instances, the peer
7  reviews that I read, that they took exception to a
8  great deal of the treatment that took place.
9        Q.  And so there was a difference of opinion
10 between your peer review doctors and Accident & Injury
11 peer review doctors of chiropractic?
12       A.  Yes.
13       Q.  Okay.  And as far as the medical training of
14 the adjusters, did they have any?
15       A.  Well, adjuster, part of their job requirement
16 is to make these kind of determinations.  If they're
17 licensed adjusters, they're handling casualty claims.
18 The nature of their job is to do just that, determine
19 what -- really determine what our insured -- because
20 most of these are third-party cases, determine what our
21 insured is legally responsible for.  And I -- I don't
22 think you have to be a medical professional in order to
23 do that, any more than the people who sit on a jury and
24 have to make the same determination.  And when I
25 handled the claims like this, and that's kind of the

0127
1  position I put myself in, as a prospective juror, what
2  I would think about this based upon my experience and
3  what I knew about it, all the facts involved.
4              MR. JONES:  Okay.  So as far as -- I think
5  my -- and I have to object to nonresponsive as far as
6  my question.
7        Q.  I think my question was, do the -- not whether
8  they need it or not, but do the adjusters have medical
9  training?
10       A.  No, they -- for the most part, they don't.
11 There are -- there are some who are nurses.  We do have
12 nurses that just happen to be adjusters.  But generally
13 speaking -- generally speaking, the answer to that is
14 no.
15       Q.  And do you have any medical training?
16       A.  No, sir.
17       Q.  But it's your position that an adjuster or you
18 can decide what's medically necessary for a patient?
19       A.  With the -- the tools that they have at their
20 disposal in the -- in the -- the -- in the context of
21 the claim, yes.
22       Q.  And the tools would include Colossus and MBRS?
23       A.  Those are some of them.
24       Q.  And what are the other ones?
25       A.  Well, IMEs -- or -- we don't do IMEs very

0128
1  often.  But peer reviews would be a tool that you would
2  use.  And then the -- just the knowledge of what a tort
3  case is worth.  I mean, that's what claims adjusters
4  do.  They're handling these things in order to avoid
5  going to trial, but you have to know what -- what a
6  jury is going to put on a -- on a -- on a claim, and
7  that's how you have to think about these things.
8        Q.  And so that's what the adjusters do, including
9  all these Accident & Injury cases, is they adjust them,
10 right?

Page 53