

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, Et Al., Plaintiffs | § § § § | |
| vs. | § § | Civil Action No. 3-01CV2247-N |
| RECEIVABLE FINANCE COMPANY, L.L.C, Et. Al. Defendants | § § § § | |

# APPENDIX TO PLAINTIFFS' MOTION FOR LEAVE TO FILE SURREPLY, TO RESPOND TO NEW, IMPROPER REQUEST FOR RELIEF MADE IN CHIROPRACTOR DEFENDANTS' REPLY

COME NOW the Plaintiffs and file this Appendix to their *Plaintiffs' Motion for Leave to File Surreply, to Respond to New, Improper Request for Relief Made in Chiropractor Defendants' Reply.*

| Exhibit | Document | Page Numbers |
|---|---|---|
| A | Affidavit of Dr. Tayana Stefanovic, D.C. | 1-14 |

Respectfully submitted;

*[signature]*

DAVID KASSABIAN
TEXAS STATE BAR NO. 11105600
BRET WEATHERFORD
TEXAS STATE BAR NO. 20998800

KASSABIAN, DOYLE &
    WEATHERFORD, P.C.
1521 North Cooper Street
Suite 650, LB 21
Arlington, TX 76011
(817) 460-5099 (Local)
(817) 461-8855 (Metro)
(817) 274-9863 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing Appendix has been served on the following by certified mail, return receipt requested, this 3rd day of August 2004.

*[signature]*

Mr. Rick Disney
Douglas, Wuester & Disney, P.C.
Fort Worth Club Tower, Penthouse I-C
777 Taylor Street
Fort Worth, TX 76102-4919

Mr. Michael Mears
Andrews & Kurth, L.L.P.
1717 Main Street, Suite 3700
Dallas, TX 75201

Mr. James D. Shields
Shields, Britton & Fraser
5401 Village Creek Drive
Plano, TX 75093

Mr. Richard Young
Glast, Phillips & Murrey, P.C.
2200 One Galleria Tower
13355 Noel Rd., LB 48
Dallas, TX 75240-6657

Mr. Lindy Jones
Jones, Allen & Fuquay, L.L.P
8828 Greenville Avenue
Dallas, TX 75243

Mr. Robert Renneker
1412 Main Street
Suite 210
Dallas, TX 75202

Mr. Chris Weil
Weil & Petrocchi, P.C.
1601 Elm Street, Suite 1900
Dallas, Texas 75201-2846

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, Et. Al., Plaintiffs | § § § § | |
| vs. | § | Civil Action No. 3-01-CV2247-N |
| RECEIVABLE FINANCE COMPANY, L.L.C, Et. Al. Defendants | § § § § | |

## AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C.

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF COLLIN | § |

BEFORE ME, the undersigned authority, personally appeared Tayana Stefanovic, who being by me duly sworn, deposed and said:

1. "My name is Tayana Stefanovic, I am over 18 years of age, of sound mind, and capable of making this affidavit. I have personal knowledge the facts stated in this affidavit, and the facts stated herein are true and correct.

2. "I am a Chiropractor, licensed to practice chiropractic in the State of Texas. I graduated from Parker College of Chiropractic, Dallas, Texas, in 1999.

3. "In October 1999, I began employment with Accident & Injury Pain Centers, Inc. ("A&I") as an Associate Doctor of Chiropractic. Robert Smith owns A&I. Dr. Thomas Rhudy is A&I's Chief of Staff. Dr. Louis Saucedo is the Assistant Chief of Staff.

4. Initially, I was assigned to the Wynnewood Village A&I Clinic. Mark Rayshell, D.C., was, and is, Clinic Director of this clinic. Subsequently, I was assigned to the North Dallas A&I clinic. Cary Fabacher, D.C., was, and is, the Clinic Director of this clinic. During this time, I learned A&I procedures. Patients' x-rays were routinely referred to Lone Star Radiology for a second read, and patients from those A&I clinics were referred to White Rock Open Air MRI and to a particular set of medical or osteopathic doctors. I understood that A&I clinics in other parts of the Dallas/Fort Worth Metroplex referred patients to North Texas Open Air MRI. As I had just graduated from

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 1

chiropractic school, and had no experience with the operation of other clinics, I did not question this pattern of referrals at the time.

5. In early 2000, I was appointed Clinic Director of the A&I Plano clinic.

6. At the end of the first day of a patient's treatment, the patient's file was copied. The next day, a courier took the copy to A&I's corporate office, and an initial narrative report was generated. "CA" sheets were completed each day. These sheets listed the number of new patients seen, how many were attorney referrals, how many were workers' compensation patients, how many were walk-ins, and how many were referred to attorneys (and to which attorneys). The sheets were faxed at the end of the day to Robert Smith (at his private fax number), Dr. Ken Theppote, and Dr. Louis Saucedo. Robert Smith would reference these sheets at Clinic Director meetings.

7. Only three passive treatment modalities were generally utilized at the A&I clinics – hot/cold packs, electrical stimulation, and intersegmental traction (which consists of a patient laying on a roller table). The Plano clinic did not have an ultrasound machine when I first arrived at the clinic. It later received a machine, and a new flexion/distraction table, after an attorney whose firm referred patients to A&I, and who was also personally receiving complementary treatment at the Plano clinic and desired ultrasound treatment, made a request to the A&I corporate office. However, I rarely was able to utilize ultrasound due to time constraints and the lack of training of the clinic staff. Ultrasound requires 'one on one' interaction with the patient. On the occasions I used ultrasound, I scheduled the patients at off-hours in order to utilize the treatment. The machine and table were later removed from the Plano clinic, after Steve Smith called and asked if the attorney was still coming in for treatment (the attorney had stopped).

8. Kondos & Kondos was the largest referrer of patients to the Plano clinic. Unrepresented patients who came to the clinic were directed to an attorney. A&I policy was to get unrepresented patients signed up with an attorney the day they arrived at the clinic. At times, Dr. Theppote would call the clinic, and advise the office manager the next certain number of patients should be referred to a particular attorney. Likewise, Steve Smith sometimes called the clinic to direct referrals to a particular attorney. At times, when an unrepresented patient came to the clinic, the office manager would contact Dr. Theppote or Steve Smith, and they would in turn contact an attorney. Attorneys' offices commonly faxed contracts to the clinic for patients to sign, although this practice ceased after I learned I had been joined as a party in this lawsuit.

9. On one occasion, a family of three came to my clinic for consultation. I did not initiate treatment, and I gave them a list of attorneys they could contact. The next day, Dr. Saucedo called me and criticized me for not initiating treatment. Dr. Saucedo told me I should not have given the patients an option, that I should have initiated treatment, and I should have referred the patients to Kondos & Kondos. Steve Smith made a similar call to the clinic, stating the patients should have been referred to Kondos & Kondos. A&I corporate counsel Raphael de la Garza came to the Plano clinic and advised me Robert Smith was angry over the way I had handled these patients.

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 2

10. On another occasion, a Personal Injury Protection (PIP) patient refused to obtain an attorney. I was called several times by Dr. Rhudy, Steve Smith, and Tina Cheshire. All three inquired as to why the patient did not have an attorney.

11. During most of my employment at A&I, Steve Smith acted as a liaison between A&I and attorneys. If an attorney had an issue in regard to A&I treatment, they would often call Steve Smith. Steve Smith would talk to Dr. Rhudy, and Dr. Rhudy and/or Dr. Saucedo would then contact the clinics. I understood paralegals from the Jim Adler and Ben Abbott law offices would call Steve Smith to request further diagnostic tests be conducted on patients. Although Steve Smith usually routed the requests through Dr. Rhudy or Dr. Saucedo, on one occasion I recall Steve Smith called my clinic directly, in regard to a client of attorney Tim O'Hare.

12. After I began at A&I, clients of the Ben Abbott law office began producing documents called an "Admission Ticket" when they first came to the clinic. I understand an Abbott office signup person checked off a patient's complaints. A&I chiropractors would then note their findings on the admission ticket. Dr. Saucedo would call the chiropractors if their findings on the Admission Ticket did not match the Abbott office employee's. I considered the "Admission Tickets" to be an effort by the attorney to dictate treatment. After an Admission Ticket was found in a patient file, Dr. Saucedo instructed the Clinic Directors to return the Admission Tickets to him, and not to place the Admission Tickets in patient files.

13. I do not recall ever seeing a HCFA Form 1500 for patients treating at the Plano clinic, until I saw one when reviewing files for this lawsuit. I rarely, if ever, saw itemized billing statements for the patients at the Plano clinic.

14. Prior to 2003, there were weekly meetings attended by the Clinic Directors and office managers. Robert Smith, Dr. Rhudy, and Dr. Saucedo attended all, or nearly all, the meetings. Steve Smith also attended most of the meetings. MRI referrals were encouraged. Dr. Rhudy would often advise the Clinic Directors that a new study showed the importance of MRIs. Once DFW CT Scan was opened, CT scans were similarly encouraged, and Dr. Rhudy would reference studies concerning CT scans. As noted previously, I was a new chiropractor when I arrived at A&I. A&I presented the routine referral for MRIs, medical doctor consultations, etc., as reasonable and necessary care. Dr. Rhudy also advised that '98000' series CPT codes were not appropriate codes to use, due to the nature of A&I's practice. Over time, as I became more experienced and went to outside seminars, read professional journals and papers, etc., I came to conclude that there were different notions of "necessary care" that did not always coincide with A&I's standard of practice.

15. MRI statistics and new patient statistics were often discussed at the meetings. Robert Smith routinely berated Clinic Directors who had low patient numbers, making comments such as he was paying them for nothing, their numbers were low because of bad attitudes or morale, and that they were replaceable. Robert Smith also made comments in regard to the Clinic Directors needing to train Associate Chiropractors to do 'better exams.'

16. It was common knowledge among the Clinic Directors that Robert Smith owned A&I, North Texas Open Air MRI, White Rock Open Air MRI, Rehab 2112, Lone Star Radiology,

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 3


Initials

(3)

Metroplex Diagnostics, and DFW CT Scan. I discussed the issue with Dr. Fabacher. The MRI facilities were represented at Clinic Director meetings as being 'state of the art,' and the Clinic Directors were asked why they would ever refer a patient to another MRI facility, when North Texas and White Rock could see patients quickly. Dr. Souder, a Metroplex Diagnostics employee at the time, and Rehab 2112 personnel would sometimes speak at the Clinic Director meetings. We were told at one meeting that DFW CT Scan would be opening by the Wynnewood Village A&I clinic.

17. At one meeting, we were informed by A&I corporate counsel Robert Kubicki that, if we were asked the identity of the owner of A&I or any of the other facilities, we could not say we knew who the owner was, since we had never seen corporate documents identifying the owner. I was noticed for deposition in a State court case, which was ultimately cancelled and did not occur. I was told that Attorney Lindy Jones would represent me at the deposition. During preparation for the deposition, Mr. Kubicki and Mr. Jones advised me that I could not state that I knew the identity of the owner of A&I and other facilities, since I had never seen the corporate documents.

18. I understood Lone Star Radiology was located at A&I's corporate office. I saw Dr. Kenneth Lustik (who had been my instructor at Parker College) at the corporate office during Clinic Director meetings.

19. It was also A&I policy for the office managers to have patients sign PIP forms, allowing A&I to make claims on the patient's PIP benefits. Steve Smith often presented statistics on how each clinic was rated as far as obtaining patient signatures on these forms. Robert Smith and Steve Smith often criticized office managers of clinics with low ratings concerning the number of patients signing these forms. At times, there were conflicts between A&I and attorneys in regard to who was entitled to the PIP proceeds. Patients were often surprised and angry to learn that A&I was making claims on their PIP. I told my office manager to explain to the patients the effect of signing the forms, or I would explain it to the patients myself.

20. Multiple MRIs were often ordered for A&I patients. However, some attorneys began to complain that too many MRIs were being done, particularly in cases with low property damage, and they could not settle the cases. I knew this because attorneys' paralegals would call to complain. I assumed attorneys called A&I as well, because a 'two MRI' rule was then implemented. If more than two MRIs were recommended, documentation was to be sent to the Medical Review Board through Dr. Rhudy. It was common knowledge that Dr. Rhudy turned the requests over to Steve Smith, and Steve Smith would call the attorney's office to see if they approved of the MRIs. I only followed this procedure twice. Later, the rule was modified so that "stat" MRIs, and certain other MRIs (such as knee MRIs) did not count against the two MRI limit.

21. A&I did not encourage referrals for MRI of 'PIP only' patients, when the patients did not appear to have the potential to make a liability claim through an attorney.

22. Dr. Souder came to my clinic on one occasion to look through files for patients on which to conduct NCV studies for Metroplex Diagnostics. I told her that she did not have permission to review my patients' files, and if there was a need for a NCV test referral, it was my responsibility to

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 4


Initials

4

do so. A subsequent Metroplex Diagnostics employee, Dr. Steele, advised me Dr. Rhudy told her that she had to conduct at least ten NCV studies a day, and she had to go to the various A&I clinics to look for possible candidates.

23. Prior to the opening of DFW CT Scan, I had referred patients on occasion to Clear Sky MRI and North Texas Imaging for CT scans, both of which I believed were not affiliated with A&I or Robert Smith. However, such referrals had to be arranged through Sandra Ventura, of White Rock Open Air MRI.

24. The x-ray machine at the Plano A&I Clinic was old, and I would sometimes refer large patients to a non-A&I facility for x-rays. Also, I began giving patients who had been previously x-rayed, such as at a hospital emergency department, the option of picking up those x-rays and bringing them to the clinic rather than being x-rayed again. Dr. Rhudy criticized me for this action. Dr. Rhudy claimed the emergency department x-rays were not taken the same way as A&I's, and the patients should have x-rays at the clinic.

25. Medical doctors (MDs and DOs) would come to the A&I clinics to perform consultation examinations. A&I wanted the patients referred to these medical doctors, two of whom were Dr Marlon Padilla, M.D. and Dr. James Laughlin, D.O. I observed that Dr. Padilla's examinations of patients were very brief. Also, Dr. Padilla would recommend multiple MRIs of patients, and Clinic Directors would sometimes have to justify why their recommendations were lower. On one occasion, I discovered Dr. Padilla going through files at my office, without my permission. Patients also complained that Dr. Laughlin's examinations were brief. On one occasion, I contacted Dr. Laughlin with a complaint. Dr. Laughlin told me that he did not need to tell me anything, and if I had a problem I needed to address the matter with the "corporate" office, since he worked for them and not for me. I then complained of Dr. Laughlin to Mr. de la Garza. He had me sign a statement or affidavit in regard to Dr. Laughlin. At one Clinic Director meeting, the Clinic Directors were instructed not to refer patients to Dr. Laughlin, although we were not told why. However, subsequently, Clinic Directors were again directed to refer patients to Dr. Laughlin.

26. I was joined as a Defendant in this lawsuit in January 2003. I was advised that Attorney Lindy Jones would represent me, and A&I would pay my attorneys fees. Attorney Jones' office forwarded me Plaintiffs' written discovery. Subsequently, in conversations with Mr. Jones' paralegal, it appeared the proposed answers to the discovery were not consistent with the answers I had in front of me and had provided to Mr. Jones. Mr. Jones then came on the line and told me something to the effect that Bob Smith was not paying him to waste time listening to my complaints about the interrogatory answers. Mr. Jones also advised me that, for legal reasons, this was how the responses needed to be answered. At the time (around summer 2003) I was undergoing martial difficulties (I subsequently divorced) and I did not have the funds to hire my own attorney However, I began to believe that Mr. Jones was not truly representing my best interests.

27. In late July, 2003 I forwarded the Plaintiffs' attorney, Mr. Kassabian, a package of documents anonymously. The documents included memos from Dr. Rhudy, Dr. Saucedo, Dr. Crocoll, and Robert Kubicki to Accident & Injury personnel, concerning matters such as medical and diagnostic referrals and how to handle inquiries about facility ownership. The package also

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 5



included several "Admission Tickets." I felt these documents were consistent with the types of allegations made by the Plaintiffs, and requested in discovery. I sent the documents because I believed it was the right course of action to take, in view of Plaintiffs' discovery requests. I hoped that exposing this information would provide a way out of this lawsuit. I did not know if the documents had been produced, and I did not feel I could discuss these issues with Mr. Jones without repercussions. I provided my then husband's pager number, so that the Plaintiff's attorney could contact him, and he could contact me.

28. Subsequently, Lindy Jones and Raphael de la Garza confronted me with the documents I had forwarded to Mr. Kassabian's office. They told me they knew I sent the documents. I did not admit that I had sent the documents. Later, I had a family emergency and told Dr. Saucedo that I would have to leave the clinic early. As soon as I got home, Dr. Saucedo called to tell me that he and Mr. Smith had discussed it, and they had decided that I should take a paid vacation. Dr. Rhudy later called me and said they were faxing a form to the Lewisville A&I clinic for me to sign, to transfer the care of my patients. I had never been asked to sign such a form previously when taking vacation time.

29. I was off work for a week. I went to the Plano clinic to pick up some papers, and discovered my key would not open the door. Dr. Saucedo subsequently told me that they had a problem with a former employee, and had changed the locks while I was on leave. I requested a meeting with Robert Smith, which was arranged. I met with Robert Smith and Lindy Jones. They had a stack of documents with various allegations against me. (I had been told that Dr. Rhudy, Dr. Saucedo, and James Hamilton, head of the workers' compensation department, had been to the Plano clinic and had reviewed all my files). Also, Mr. Jones criticized me for referring patients to Dr. Douglas Wood, D.O., and told me I was not to refer patients to Dr. Wood. Robert Smith was present at the time Mr. Jones made these statements. I told them that I stood behind my treatment of patients and they needed to make a decision – either put me back to work or terminate me.

30. Mr. Smith told me that Dr. Rhudy and Dr. Saucedo did not want me to return, but that he (Smith) thought I was a good doctor, and that I could return to any A&I clinic I wanted as an Associate Doctor. I selected the North Dallas clinic directed by Dr. Cary Fabacher. I believe I was demoted from Clinic Director because they knew I sent the documents to Mr. Kassabian, and did not want me to have continued access to documents. My salary was not decreased. I was also told that, in the future, I might be reinstated as a Clinic Director. I was instructed not to go to, or contact, the Plano A&I clinic.

31. I was deposed in this lawsuit on October 17, 2003. Prior to the deposition, I met with Attorneys Lindy Jones and Michael Mears. They instructed me that I should answer "I don't remember" if asked certain questions, such as whether I had ever seen particular memos or if an exact quote had been made to me, unless I had a specific recollection of the event. I was again instructed that I could not state I knew who owned the facilities to which A&I patients were referred, prior to September 2003 (when A&I provided a list of co-owned entities as part of a new Workers Compensation law), unless I had seen corporate documents setting forth the owners. I recall they told me that the other doctors said they gave patients the Yellow Pages if the patient wanted a lawyer, and concluded they wanted me to give a similar answer. I answered questions on

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 6 

these issues in my deposition accordingly. I am not a lawyer, and based on the instructions that I really could not state that I 'knew' who the owner was unless I had seen corporate documents, I answered that I did not know the facility owners prior to September 2003. Had I not received such instructions, based on my own observations, I would have answered that I knew Robert Smith owned the facilities since at least the year 2000.

32. A number of people attended the deposition, including Robert Smith. I felt intimidated by the presence of these persons.

33. During the deposition, the Plaintiffs' attorney showed me a copy of an affidavit executed by Dr. Jeffrey Crocoll, D.C. I had not been told that Dr. Crocoll had signed an affidavit, and had not seen the affidavit prior to the deposition. No one advised me of who was being deposed in the case, or of detrimental testimony that was given against A&I and other Defendants.

34. After my deposition, I sent a letter to Robert Smith, requesting that I be reinstated as Clinic Director. In mid-November 2003, after a meeting with Dr. Rhudy and Dr. Saucedo, I again became the Clinic Director of the Plano A&I clinic. However, thereafter I was excluded from the Senior Clinic Director meetings, which other Defendants attended.

35. By 2003, I had started to refer some patients to providers and facilities not related to A&I. In March 2004, the Clinic Directors received a memo from Dr. Rhudy, advising they had to seek authority to refer any patients to outside facilities. On another occasion, I referred a Lozano law office patient to Metroplex Orthopedics (which has no relationship with Accident & Injury), rather than to Dr. Laughlin. Dr. Theppote contacted me, and asked why I sent the patient to Metroplex Orthopedics instead of Dr. Laughlin. He also advised that the Lozano office would not send a Letter of Protection for the referral. Dr. Theppote also advised me that I should call Dr. Rhudy or Dr. Saucedo for the "list" of facilities to which patients could be referred. Subsequently, Dr. Rhudy sent me a memo stating I was interfering with the lawyer/client relationship.

36. I was not given a copy of my deposition transcript for review. I wanted to review my testimony and make corrections to the transcript. After I learned that other Clinic Directors received copies of their deposition transcripts, I became concerned. I contacted Lindy Jones and Robert Kubicki on several occasions, requesting a copy of my deposition transcript, but they did not return the calls. Around early May 2004, I sent a letter to Mr. Jones, requesting a copy of my deposition, my fee agreement letter with him, and a copy of the professional malpractice policy under which I was covered at A&I. After I sent the letter, Mr. Jones called me. Mr. Jones inquired why I needed a copy of my deposition. Mr. Jones also told me that the deposition was voluminous, and it would be very expensive to run me a copy. He finally told me he could give me a disc containing the deposition, and again asked me if I really felt I needed it. I had to pay a service to have a copy of my deposition copied from the disc. Mr. Jones told me I would have to address my request for the malpractice insurance information to A&I. I contacted Robert Kubicki in regard to the matter. Mr. Kubicki also questioned why I wanted the document, and told me I would not understand the terminology in the document, but ultimately provided me with a copy of the document.

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 7 

37. Around the same time, I discovered that Robert Smith had been deposed. No one had advised me Robert Smith's deposition was to be taken. I sent another letter to Mr. Jones, requesting a copy of Robert Smith's deposition transcript. Mr. Jones called me, and inquired why I wanted a copy of the transcript. He also told me the deposition was extremely confidential. I advised Mr. Jones I was concerned what Robert Smith might have said concerning the operation of A&I and any references to me. I eventually was provided with a copy of Robert Smith's deposition transcript. I reviewed Robert Smith's deposition. I did not believe he was truthful in his statements that he was unaware of certain events occurring at A&I, or who certain people were and what they did. His positions were in contrast to my own observations of Robert Smith's level of involvement and 'micro' management of A&I.

38. Also around this time, I decided that I would no longer refer patients to facilities owned by Robert Smith. As noted previously, I started referring some patients to providers and facilities not related to A&I the prior year. I had become frustrated with some A&I related providers. In particular, I believed many of the MRI evaluations by Dr. Kenneth Lustik were of poor quality, and had to be re-read. In one instance, Dr. Lustik's report failed to note that the patient had previous shoulder surgery. I also had a number of patient complaints concerning Dr. James Laughlin, D.O. The patients advised the examinations were brief, and Dr. Laughlin would tell patients he had already reviewed their files and therefore did not have to conduct an extensive examination. I began to refer some patients to Metroplex Orthopedics, and to Plano Medical Imaging for MRIs. These providers would treat patients under Letters of Protection. Also, Plano Medical Imaging was close to the Plano A&I clinic, and promptly returned reports.

39. Around the time of these events, I was called to the A&I corporate office to review files the subject of this lawsuit, in regard to a summary judgment motion. Dr. Saucedo told me to review the files generally for upcoding, reasonableness of care, etc. Dr. Saucedo could give no clear guidance on exactly what I was to look for.

40. On the afternoon of Friday, June 18, 2004, Lindy Jones faxed me a copy of an affidavit to sign, and a draft motion for summary judgment. I had not participated in the preparation of the affidavit. Around the same time, a paralegal at Mr. Jones' office called me, to advise the affidavit was being faxed and that a courier was in route to my clinic to pick up the signed copy. I advised the paralegal I was busy seeing patients, and I would review the affidavit over the weekend. The paralegal advised me that they needed the signed affidavit Monday morning, to file with the summary judgment motion.

42. I reviewed the affidavit sent to me by Lindy Jones. A copy of the affidavit is attached as Exhibit 1. The affidavit contained a number of false statements. For example:

   a. Paragraph 5 included a statement that I reviewed HCFA 1500 forms and saw no upcoding in them, and the "form codes" were authorized by me. The HCFA 1500 forms and billings were generated at the A&I corporate office, and I did not know what was included in these documents.

   b. Paragraph 7 stated that the chief of staff (Dr. Rhudy) and the assistant chief of staff (Dr. Saucedo) did not interfere in my treatment of patients. As noted herein, these

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 8



   persons, as well as Dr. Ken Theppote and Robert and Steve Smith, often attempted to interfere with, or to dictate, my decision-making, or threaten to override my decisions.

 c. Paragraph 9 stated that I was free to refer patients to any facility I choose, but that I normally used entities that I later discovered were owned by A&I. As noted herein, it was common knowledge that Robert Smith owned facilities such as White Rock Open Air MRI and Lone Star Radiology. As also noted herein, I was criticized for referring patients to non-A&I related facilities, and was instructed not to make such referrals.

43. On the morning of Monday, June 21, 2004, the paralegal from Lindy Jones office called me and asked if I had signed the affidavit. I told the paralegal I would not sign the affidavit. The paralegal asked me to speak with Attorney Jones on the matter, and I advised her I did not wish to do so. About a half-hour later, Mr. Jones called me. Mr. Jones yelled at me, called me paranoid and hostile, and made statements such as 'what's your problem.' He asked me to identify the particular paragraphs of the proposed affidavits I had a problem with, and I told him I had a problem pretty much with all of them, and did not feel comfortable signing the affidavit. I thought that if I was specific, he would report back to A&I. Mr. Jones continued to argue with me, and finally I told him I had patients to see and hung up.

44. When I arrived at the office on Tuesday, I was told Dr. Saucedo would be coming to the clinic. I called Robert Smith, and left a voice mail message that I did not want a repeat of what had happened in 2003, and that if he had any problems with me he should come and talk with me himself. Dr. Saucedo arrived after noon. He expressed anger at me for calling Robert Smith, and made comments such as 'who do you think you are.' He continued to yell at me for approximately half an hour. Around the time Dr. Saucedo left my office, Robert Smith and Lindy Jones arrived. Robert Smith also yelled at me, and asked why I hung up on him. Since I had not hung up on Mr. Smith, but on Mr. Jones the previous day, I assumed that he had been listening in during the prior day's call. Finally, Mr. Smith became more conciliatory, complemented my skills, and asked me what I needed or what he could do for me, such as more money or time off.

45. After Mr. Smith left the room, Mr. Jones began to yell at me because I had not signed the affidavit. He said something to the effect that I was going against everything they were trying to do, and that I was the only chiropractor who had not signed an affidavit. However, later in the conversation, he said that Dr. Rhudy and Dr. Lustik also had not signed their affidavits.

46. Patients had started to arrive at the clinic during the time Robert Smith and Lindy Jones were in my office. Dr. Saucedo began seeing these patients. Among the patients he saw were two patients (a father and son) I had already referred for MRIs to Plano Medical Imaging. The MRIs were scheduled for the following Monday. Without advising or conferring with me, Dr. Saucedo redirected these patients to White Rock Open Air MRI. When I discovered the change, I contacted the father and explained the situation. He told me he wanted to follow my advice. Dr. Saucedo had not completed a referral form for the patients to go to White Rock Open Air MRI, and called my office manager later the same day and asked her to complete a referral form on his behalf. Still later

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. - PAGE 9



that day, Sandra Ventura at White Rock Open Air MRI called the clinic concerning the referral forms, which she had expected to receive.

47. The next morning (June 23, 2004), Dr. Saucedo called me and complained of the rescheduling of the patients to Plano Medical Imaging. Dr. Saucedo stated that the patient reported an increase in pain, had been treating for two weeks, and should have already had a MRI. I asked him why he had interfered with my treatment plan. I also told Saucedo that his, Dr. Rhudy's, and Robert Smith's interference with my professional judgment was a reason I did not sign the summary judgment affidavit. I checked the treatment notes in the patient's file, and there was no notation about the patient reporting an increase in pain.

48. About an hour later, Lindy Jones called me. He again accused me of being hostile and paranoid. Mr. Jones also advised me Dr. Saucedo was not trying to interfere with my decision-making. The call sounded as if it was a conference call, and I asked if anyone else was on the line. Mr. Jones stated that he could tape the call, and I told him he could do so if he wanted to. Mr. Jones repeated his complaint that I was working against everything the rest of the Defendants were trying to accomplish. Mr. Jones also told me that he had the right to share whatever I told him with other Defendants in the lawsuit. I reminded him that he had previously told me that our conversations would be confidential. He asked me if I was calling him a liar, and I responded I was. Mr. Jones then advised me that he would be withdrawing from representing me in the lawsuit. I asked Mr. Jones to put that in writing and send it to me. After that conversation, I considered my attorney-client relationship with Mr. Jones to be ended. I have not heard from Mr. Jones, or received anything from him, since.

49. On Thursday, June 24, 2004, Dr. Rhudy and Dr. Saucedo came to the Plano clinic. I complained to Dr. Rhudy of Dr. Saucedo's actions in rerouting my patients to White Rock Open Air MRI and requesting my office manager to document his referrals. Dr. Rhudy agreed what Dr. Saucedo did was inappropriate, and Dr. Saucedo did not have a right to interfere in my treatment of patients. Dr. Saucedo asserted that he did not interfere with my judgment. Dr. Saucedo also demanded I compose a list of the times I claimed he interfered in my decision-making. When I told him I would not provide such a list, Dr. Saucedo said he would talk to his attorney (I assumed Mr. Jones), and the attorney would make me give him a list. I recall telling Dr. Saucedo that Mr. Jones was no longer my attorney.

50. On Saturday, June 26, 2004, I had a walk-in patient for whom I did a consultation only, and who I did not believe was a candidate for chiropractic care at that time. I did not charge the patient. The following Monday, Dr. Ken Theppote called my office manager, inquiring why I had not initiated treatment on that patient. Later that day, I noticed my office door was closed. When I opened it, I saw Dr. Rhudy in my office, looking through my papers. I also noticed Robert Kubicki in my office. I told Dr. Rhudy I wanted the door to remain open. I left and continued to treat patients. When I returned to my office later, I also noticed Vince Jeter was there. Dr. Rhudy advised me that my services were no longer needed and I was terminated. Mr. Jeter then asked me to sign a document, which I refused to do. I was told to gather my personal belongings, and I was then escorted out of the clinic.

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 10



51.     On Wednesday, June 28, 2004, I went to the Accident & Injury corporate office to pick up my final paycheck. Mr. Jeter again asked me to sign a document. The document stated that I had returned all Accident & Injury memos and documents in my possession. I signed the document under duress, since I was told I would not receive my check unless I signed.

52.     Lindy Jones never advised me that Plaintiffs had designated him as a fact witness in this case.

"Further, affiant sayeth not."

SIGNED this 10 day of July, 2004.

_____
Dr. Tayana Stefanovic, D.C.

SUBSCRIBED AND SWORN TO BEFORE ME this 10 day of July, 2004 by a person authorized to administer oaths in Texas.

_____
Notary Public, State of Texas

ROBERT H. PIKE
NOTARY PUBLIC
STATE OF TEXAS
My Comm Expires 7/14/2007

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. – PAGE 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, *et al.*, | § § | |
| Plaintiffs/Petitioners, | § § | |
| vs. | § § | CIVIL ACTION NO. 3-01CV2247-N |
| RECEIVABLE FINANCE COMPANY, L.L.C., *et al.*, | § § § | |
| Defendants/Respondents. | § | |

## AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C.

THE STATE OF TEXAS        §
                          §
COUNTY OF DALLAS          §

    BEFORE ME, the undersigned notary public in and for the said county and state, on this day personally appeared DR. TAYANA STEFANOVIC, who after being duly sworn, did upon oath state the following:

1. "My name is TAYANA STEFANOVIC, D.C. I am over the age of eighteen (18) years, am fully competent to testify to the matters stated in this affidavit. I have not been convicted of a crime. The facts stated herein are true and correct of my own personal knowledge.

2. "I have read Defendant Stefanovic's Motion for Summary Judgment and Brief In Support of Motion For Summary Judgment and every factual statement therein is true and correct.

3. "I am a licensed chiropractor in good standing with the State of Texas and have been so for 5 years. My resume is attached as Exhibit 'A' to this affidavit and describes my education and experience.

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. —Page 1
J:\L\D\Receivable\allstate\MSJs Aff Brfs 6-04\Stefanovic Aff.wpd

**EXHIBIT 1**

4.  "I am an employee of Accident & Injury Pain Centers, Inc. ('A&I') and have been so employed for 5 years. I currently serve as a clinic director at the Plano A&I Clinic. Exhibit B attached hereto is a true and correct copy of my Employment Agreement with A&I.

5.  "I have reviewed all the files of patients to whom I rendered and /or supervised treatment. Such treatment was based on the patient history, the patient complaints regarding any injuries, my physical examinations and observations and training. My review of each of these files confirms that all such treatment was medically necessary and was rendered on the dates set forth in the file. Further, my review of each such file confirms there was no 'up-coding' to increase the cost of care. There was no up-coding of HCFA-1500 forms and all such form codes for treatment were authorized by me. All such diagnostic referrals were medically necessary.

6.  "As a clinic director, I am familiar with the policies and procedures of A&I. I am also aware of A&I's zero tolerance for fraud. I did not participate in, witness or become aware of any unreasonable care or billing at the A&I clinic where I served as director.

7.  "I was subject to the supervision of the chief and assistant chief of staff, but they never interfered in patient treatment that I found to be medically necessary. No lay person ever influenced or directed treatment of my patients nor requested I order diagnostic testing without a finding of medical necessity.

8.  "I only ordered diagnostic testing such as x-rays, magnetic resonance imaging and CT scans when I determined such items were medically necessary to treat my patients based on the aforementioned factors including patient history, the patient complaints regarding injuries and my physical examination.

9.  "I was free to refer patients to any facility I choose for such diagnostic testing but normally used entities that I later discovered were owned by A&I. My referrals were based on medical necessity, but also on quality of service, convenience and the fact that the testing could be done without pre-payment.

10. "All medical treatments rendered by me were reasonable and necessary for each patient, and was rendered on the dates set forth on the billing statements.

11. "I am a salaried employee of A&I. I do not receive any bonus, stipend or additional compensation or incentive for the referral of patients or for the ordering of any diagnostic testing. My only compensation or benefit I receive from A&I or any of the Defendants is my salary paid by A&I. I do not and have not received any compensation from any other Defendants in this case."

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. —Page 2
J:\LDA\Receivable\alkamia\MSJs Affs §rts s-04\Stefanovic Aff.wpd

Further, affiant sayeth not.

Signed this _____ day of June, 2004

_____
TAYANA STEFANOVIC, D.C.

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

SUBSCRIBED AND SWORN TO BEFORE ME, this _____ day of June, 2004.

_____
Notary Public in and for the State of Texas

AFFIDAVIT OF DR. TAYANA STEFANOVIC, D.C. —Page 3
F:\LDN\Recovable\allstate\MSJs Aff's Brfs 6-04\Stefanovic Aff.wpd