REVISED October 11, 2007

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2007

Charles R. Fulbruge III
Clerk

No. 05-10265

3:01CV2247-N

FILED
OCT 17 2007
CLERK, U.S. DISTRICT COURT
Deputy

ALLSTATE INSURANCE CO; ET AL

Plaintiffs

ALLSTATE INSURANCE CO; ALLSTATE INDEMNITY CO; ALLSTATE
PROPERTY & CASUALTY INSURANCE CO; BOSTON OLD COLONY
INSURANCE CO; GLENS FALLS INSURANCE CO

Plaintiffs - Appellees

versus

RECEIVABLE FINANCE COMPANY LLC; ET AL

Defendants

ACCIDENT & INJURY PAIN CENTERS INC, doing business as
Accident & Injury Chiropractic; RECEIVABLE FINANCE COMPANY
LLC; ROBERT SMITH; LONE STAR RADIOLOGY MANAGEMENT LLC;
WHITE ROCK OPEN  AIR MRI LLC, doing business as White Rock
Open MRI; NORTH TEXAS OPEN AIR MRI LLC, doing business as
North Texas Open MRI, doing business as Harris County MRI,
doing business as Bexar County MRI; REHAB 2112  LLC;
METROPLEX PAIN CENTER INC, doing business as Lone Star
Radiology; LACIDEM MANAGEMENT; STEVEN SMITH; TINA CHESHIRE;
JAMES LAUGHLIN, DO; DEE L MARTINEZ, MD; THOMAS RHUDY, DC;
LOUIS SAUCEDO, DC; KENNETH LUSTIK, DC; MARK RAYSHELL, DC;
LARRY PARENT, DC; CHRISTOPHER HOLOWISKI, DC; CAREY FABACHER,
DC; PATRICIA JOHNSON, DC; GHOLAMREZA ASSADOLAHI, DC; KYLE
CAMPBELL, DC; CHAD BLACKMON, DC; RAMESH SANGHANI, DC;
MARLON D PADILLA, MD PA; MARLON PADILLA, MD

Defendants - Appellants

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before GARWOOD, DENNIS, and OWEN, Circuit Judges.

GARWOOD, Circuit Judge:

This appeal results from a jury verdict rendered in favor of plaintiffs-appellees Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company (collectively, "Allstate"),[1] Boston Old Colony Insurance Company, and The Glens Falls Insurance Company (collectively, "Encompass"[2]). The jury awarded Allstate $2,750,000.00 and Encompass $95,000.00 in damages for fraud committed by defendant-appellant Accident & Injury Pain Centers Inc. (A&I). Twenty-six other defendants were determined to be jointly and severally liable for these amounts as co-conspirators in the fraud. Exemplary damages adjudged severally against each of the twenty-seven defendants totaled $3,058,300.00. The district

---

[1] Allstate Insurance Company is the parent company and owns 100% of the stock of Allstate Property & Casualty Insurance Company and Allstate Indemnity Company. The Allstate Corporation is in turn the parent and 100% owner of Allstate Insurance Company.

[2] CNA personal lines owns both Boston Old Colony Insurance Company and The Glens Fall Insurance Company.

court entered an amended final judgment on the jury's verdict
that totaled $6,195,204.80.  This amount included reduced
prejudgment interest awards of $282,157.54 to Allstate and
$9,747.26 to Encompass, amounts for which all defendants were
adjudged jointly and severally liable.  The district court also
denied the defendants' post-trial and post-verdict motions for
judgment as a matter of law.

Because we find the evidence insufficient to support either
the jury verdict on fraud or the damages award, we reverse and
render judgment for the defendants-appellants.

## FACTS AND PROCEEDINGS BELOW

At issue in this case are over 1,800 claim files held by
insurers Allstate and Encompass,[3] most of which represent "third
party" claims—claims against an Allstate or Encompass liability
insured brought by a person allegedly injured in an automobile
accident.  In relation to most of the claim files at issue,
Allstate or Encompass paid money in settlements on behalf of, or
in respect to judgments against, one of their insureds.  The
instant case covers claims made from January 1999 onwards and

---

[3]Initially, Allstate identified over 2,800 claim files that
involved treatment provided by A&I or its affiliates from 1999
onwards.  Subsequently, Allstate narrowed these files down to
over 1,800.  A&I's brief states that the final number of files at
issue was 1,867, but Allstate claims that the final number was
1,844.  This discrepancy does not affect our analysis.

brought by claimants who had been treated by defendants–appellants A&I and its affiliates.

A&I is a Texas-based group of chiropractic clinics that specialize in treating patients who have suffered trauma in automobile accidents or through on-the-job injuries. Defendant–appellant Robert Smith (Smith), a layperson, owns A&I, which at its largest consisted of twenty clinics. The other defendants–appellants in this case—at least some of which were also established by Smith—are in some way associated with A&I and include chiropractors, A&I employees, physicians, and diagnostic entities. They are: Metroplex Pain Center, Inc. (d/b/a Lone Star Radiology); White Rock Open Air MRI, L.L.C. (d/b/a White Rock Open Air MRI); North Texas Open Air MRI, L.L.C. (d/b/a North Texas Open Air MRI, Harris County MRI, Bexar County MRI); Rehab 2112, L.L.C.; Receivable Finance Company, L.L.C. (RFC); Thomas Rhudy, D.C.; Louis Saucedo, D.C.; Kenneth Lustik, D.C.; Mark Rayshell, D.C.; Larry Parent, D.C.; Christopher Holowiski, D.C.; Carey Fabacher, D.C.; Patricia Johnson, D.C.; Kyle Campbell, D.C.; Ramesh Sanghani, D.C.; Robert Smith; Steven Smith; Tina Cheshire; Lone Star Radiology Management, L.L.C.; Lacidem Management; James Laughlin, D.O.; Marlon D. Padilla, M.D., P.A.; Marlon Padilla, M.D.; and Dee M. Martinez, M.D.

A&I and its affiliates often treat patients who do not have

health insurance, and consequently they frequently rely on "letters of protection" given to them by an uninsured patient's personal injury attorney, who, almost always, has referred the patient to them.  These letters assure A&I and its affiliates treating the patient that if the patient's attorney achieves a recovery on the patient's personal injury claim, recovered funds will be used to pay for the patient's incurred medical expenses.

When A&I and its affiliates treat a patient for whom they have received a personal injury attorney's letter of protection, A&I's corporate office drafts a final narrative report for the patient, based on a template the chiropractor fills out. According to A&I, the chiropractor is able to review, edit, and electronically sign the report before it is issued.  Also according to A&I, A&I then sends the patient's medical file, including the final narrative, to the patient's attorney, who in turn usually forwards the file to the insurance carrier of the person against whom the patient is making a claim.  If the insurer—such as Allstate or Encompass—settles or otherwise resolves a claim on behalf of its insured, the insurer pays the funds in a lump sum jointly to the attorney and claimant-patient; insurers, including Allstate and Encompass, generally do not pay A&I or its affiliates directly.

The fraud claims in this case do not relate to staged (or

nonexistent) accidents (or to claimants who had not been patients at A&I or the other defendants) or the like, but rather relate to A&I's reports of and patient billings for allegedly grossly and knowingly unnecessary and excessive chiropractic and/or medical diagnoses, treatments, procedures, services, consultations and the like, including Xrays and MRIs and similar items.

Leading up to Allstate's institution of this action, and sometime between March and May 2000, Allstate's Special Investigative Unit (SIU) analyst Bruce Vest (Vest) placed A&I on "provider on hold" status throughout Texas and designated this status retroactive for treatment provided by A&I from October 1, 1999, onwards.  As a result of A&I's provider-on-hold status, whenever an Allstate adjuster entered a bill associated with A&I's tax identification number, Allstate's computer system would instruct the adjuster to contact Allstate's SIU.  Adjusters, however, whose job was described at trial as "to investigate, evaluate, and settle a claim," could nevertheless authorize payment to A&I.

On November 9, 2001, over a year after Allstate labeled A&I a "provider on hold," Allstate brought this suit against RFC, Marlon D. Padilla, M.D., P.A. (Padilla P.A.), and Advanced

Medical Systems and Solutions, PLLC (Advanced Medical).[4]  In its

original complaint, Allstate sought declaratory relief,

requesting the district court to declare that: RFC was engaged in

the unauthorized corporate practice of medicine and the

unauthorized employment of medical and osteopathic physicians;

that any contracts between RFC and such physicians were illegal

and void as a matter of law and public policy; that Allstate need

not pay any amount billed by or through RFC regarding any medical

services fee; and that all medical services previously billed

through RFC were billed in violation of the Texas Medical

Practices Act.  RFC, Advanced Medical, and Padilla P.A. responded

by asserting that Allstate lacked standing to bring the

declaratory relief suit, but the district court denied their Rule

12(b)(6) motion to dismiss in February 2002.  The initial three

defendants subsequently filed answers in March 2002.

In November 2002, Allstate and Encompass together filed an

Amended Motion to Amend Complaint for Declaratory Relief; in

January 2003, the district court granted the motion, and Allstate

and Encompass filed their First Amended Complaint the same day.

In their First Amended Complaint, Allstate and Encompass

---

[4]Advanced Medical is no longer a party to this suit.  On
September 14, 2004, just before the start of trial, the district
court granted Advanced Medical's motion for summary judgment.

named as defendants the appellants now before this court.[5]   The
amended complaint also added several requests for relief to those
requests included in Allstate's original complaint.   Allstate and
Encompass added damages claims for common law fraud and
conspiracy; for relief for unjust enrichment; for prejudgment and
postjudgment interest; and for punitive damages.   Further, the
plaintiffs asked the district court to declare that: (1) various
defendants constituted a joint business enterprise; (2) RFC, A&I,
and Smith were engaged in the unauthorized corporate practice of
medicine and the unauthorized employment of medical and
osteopathic physicians; (3) any contracts or agreements between

---

[5]Some of those named as defendants in the First Amended
Complaint are no longer involved in this action.   Specifically,
in July 2003, the district court granted the
plaintiffs–appellees' motion to dismiss Douglas Wood, D.O.
without prejudice as a party defendant.   Similarly, in January
2004, the district court granted a motion to dismiss Jeffrey
Crocoll, D.C., without prejudice.   And in August 2004, the
district court granted a motion to dismiss Tayana Stefanovic,
D.C., without prejudice.   In September 2004, the district court
granted Advanced Medical's motion for summary judgment and also
granted judgment as a matter of law for defendant Mohammad
Borghee in regards to the actual fraud claim against him.   At the
close of appellees' case, the district court granted Borghee's
motion for directed verdict, and on September 30, 2004, the
district court ordered that Allstate and Encompass take nothing
on their claims for fraud against Borghee.   Finally, the district
court granted defendant BS Limousine's motion for directed
verdict.   None of these rulings has been appealed.
Defendants Gholamreza Assadolahi and Chad Blackmon entered
into post-judgment settlement agreements with Allstate and
Encompass.

8

RFC, A&I, and Smith and such physicians were illegal and void as a matter of law and public policy; (4) Allstate and Encompass need not pay any amount billed by or through RFC in regards to any fee for medical services; (5) Allstate and Encompass were entitled to reimbursement for all medical services previously billed through RFC in violation of the Texas Medical Practices Act; (6) all medical services billed by or on behalf of A&I, Metroplex Pain, Lone Star Radiology, North Texas Open Air MRI, White Rock Open Air MRI, or Rehab 2112, as well as by any medical or osteopathic doctor for services billed through RFC, were "void due to those entities and persons violations of the Texas Occupations Code, and due to the fraudulent nature of the bills"; and (7) Allstate and Encompass need not pay, and were entitled to reimbursement for previous payments on, any amount billed by or through A&I, RFC, Metroplex Pain, Lone Star Radiology, North Texas Open Air MRI, White Rock Open Air MRI, or Rehab 2112, as well as by any medical or osteopathic doctor for services billed through RFC.

In June 2004, the district court issued an order denying the plaintiffs' motion for leave to file a second amended complaint.

The district court allocated three weeks for trial, which began in September 2004.  Each side had thirty-seven and one-half hours of presentation before the jury.  At the close of the

9

insurance companies' case-in-chief, the district court granted the defendants' motion for summary judgment on damages "on any measure other than disgorgement." After all the parties rested, the district court stated that it would limit the direct fraud issue to A&I. Also at that time, the district court granted judgment as a matter of law in favor of the defendants on all of Allstate's and Encompass's declaratory relief requests and on all of their statutory and regulatory claims. The court also then granted the defendants' motion for judgment as a matter of law on Allstate's and Encompass's unjust enrichment claim.

Consequently, the district court submitted to the jury questions on fraud and conspiracy to commit fraud, single business enterprise, and waiver. The jury returned a verdict finding that A&I committed fraud against Allstate and Encompass, that the remaining defendants conspired to commit fraud, that certain defendants operated as a single business enterprise, and that Allstate and Encompass had not waived their claims. It awarded Allstate and Encompass a total of $2,845,000.00 in damages and $3,058,300.00 in exemplary damages. Defendants subsequently filed renewed motions for judgment as a matter of law, for judgment notwithstanding the verdict, for new trial, and

to modify the judgment.[6]

In February 2005, the district court entered an amended
final judgment totaling $6,195,204.80 and an order denying most
of the defendants-appellants' post-judgment motions, but granting
motions to modify the judgment by reducing the prejudgment
interest awarded.[7]   The court's amended final judgment reflected

---

[6]Fifteen post-trial and post-judgment motions were timely
filed with the district court: (1) motion for judgment
notwithstanding the verdict (J.N.O.V.) by Padilla, M.D.,
Martinez, M.D., and Padilla P.A.;   (2) motion for J.N.O.V. by
Defendants; (3) renewed motions for judgment as a matter of law
by Chiropractic Defendants; (4) renewed motions for judgment as a
matter of law by Steven Smith and Tina Cheshire; (5) motion for
judgment as a matter of law by Kenneth Lustik, D.C.; (6) motion
for judgment as a matter of law by James Laughlin, D.O.; (7)
supplemental motion for J.N.O.V. by Padilla, M.D., Martinez,
M.D., and Padilla P.A.; (8) renewed motion for judgment as a
matter of law and alternate motion for new trial by Robert M.
Smith and Diagnostic Entities; (9) motion for new trial or in the
alternative to alter or amend the judgment by A&I; (10) post-
judgment renewed motion for judgment as a matter of law by A&I
and RFC; (11) post-judgment renewed motion for judgment as a
matter of law by Stephen Smith and Tina Cheshire; (12) motion for
new trial and alternative motion to amend judgment by Robert
Smith, Stephen Smith, Tina Cheshire, RFC, Lone Star, White Rock,
North Texas, Rehab 2112, Metroplex, and Lacidem; (13) motion for
new trial and alternative motion to amend judgment by Padilla,
M.D., Martinez, M.D., and Padilla P.A.; (14) motions for new
trial and to reurge renewed motion for judgment as a matter of
law by Chiropractic Defendants; and (15) motion for leave to file
a surreply to Robert Smith's and Diagnostic Entities' Reply to
Response to Renewed Motion for Judgment as a Matter of Law.

[7]In its order, the district court amended the prejudgment
interest to reflect a later accrual date (the date A&I was added
as a defendant).  Also in its order, and in regards to the
defendants' other motions, the district court dismissed the
relevancy of the "intra-corporate conspiracy rule"—which dictates
that an agent cannot conspire with its principal—by reasoning

11

the prejudgment interest reduction and decreed that:   (1)
appellee Allstate recover $2,750,000.00 from A&I for A&I's fraud
against Allstate; (2) appellee Encompass recover $95,000.00 from
A&I for A&I's fraud against Encompass; and that (3) all
defendants–appellants are jointly and severally liable with A&I
as co-conspirators in the fraud.   Allstate and Encompass were
further awarded exemplary damages,[8] prejudgment interest,[9] and

---

that conspiracy's two-or-more-persons requirement was satisfied
because at least some of the defendants were not A&I agents.   The
court also noted that the A&I agents could be held personally
liable even though their actions also constituted A&I's acts.
Further, the court explained that the jury was properly
instructed on damages and declined to adjust the post-judgment
interest awarded. Also, the district court denied as moot the
motion for leave to file a surreply to Robert Smith's and
Diagnostic Entities' Reply to Response to Renewed Motion for
Judgment as a Matter of Law because the district court denied all
the post-trial motions—with the exception of the motion to amend
the judgment as to prejudgment interest.

[8]Allstate was awarded the following exemplary damages:
$950,000 from Robert Smith; $725,000 from Steven Smith; $290,000
each from Marlon Padilla and Marlon Padilla, MD, PA; $120,000
from Thomas Rhudy; $82,000 from Louis Saucedo; $47,000 each from
RFC, Lone Star, White Rock, North Texas, Metroplex, Lacidem, and
A&I; $38,000 each from James Laughlin and Dee Martinez; $23,000
each from Mark Rayshell and Christopher Holowiski; $9,000 from
Tina Cheshire; $7,000 from Kenneth Lustik; $90 each from Rehab
2112, Larry Parent, Carey Fabacher, Patricia Johnson, Gholamreza
Assadolahi, Kyle Campbell, Chad Blackmon, and Ramesh Sanghani.
Encompass was awarded: $50,000 from Robert Smith; $25,000 from
Steven Smith; $10,000 each from Marlon Padilla and Marlon
Padilla, MD, PA; $5,000 from Thomas Rhudy; $3,000 each from Louis
Saucedo,  RFC, Lone Star, White Rock, North Texas, Metroplex,
Lacidem, and A&I; $2,000 each from Mark Rayshell,  Christopher
Holowiski, James Laughlin, and Dee Martinez; $1,000 from Tina
Cheshire; $500 from Kenneth Lustik; $10 each from Rehab 2112,

12

postjudgment interest.   Court costs were taxed against the
defendants.

A&I and the other defendants-appellants have timely
appealed.

## STANDARD OF REVIEW

"A motion for judgment as a matter of law (previously,
motion for directed verdict or J.N.O.V.) in an action tried by
jury is a challenge to the legal sufficiency of the evidence
supporting the jury's verdict."  *Hiltgen v. Sumrall*, 47 F.3d 695,
699 (5th Cir. 1995).   The district court's denial of such a
motion is reviewed *de novo*.   *Pineda v. United Parcel Serv., Inc.*,
360 F.3d 483, 486 (5th Cir. 2004).   "A motion for judgment as a
matter of law should be granted if 'there is no legally
sufficient evidentiary basis for a reasonable jury to find for a
party.'"  *Id.* (quoting FED. R. CIV. P. 50(a)).   A court should
grant a post-judgment motion for judgment as a matter of law only
when "'the facts and inferences point so strongly in favor of the
movant that a rational jury could not reach a contrary verdict.'"
*Id.* (quoting *Thomas v. Texas Dep't of Criminal Justice*, 220 F.3d

---

Larry Parent, Carey Fabacher, Patricia Johnson, Gholamreza
Assadolahi, Kyle Campbell, Chad Blackmon, and Ramesh Sanghani.

[9]The district court ordered that Allstate recover
$282,157.54 and Encompass $9,747.26 as prejudgment interest
jointly and severally from the defendants.

389, 392 (5th Cir. 2000).  "[W]hen evaluating the sufficiency of the evidence, we view all evidence and draw all reasonable inferences in the light most favorable to the verdict." *Id*.  But we will not sustain a jury verdict based only on a "'mere scintilla' of evidence." *Brady v. Houston Independent School District*, 113 F.3d 1419, 1422 (5th Cir. 1997).  "Although we draw inferences favorable to the verdict, such inferences must be reasonable and may not rest upon speculation and conjecture only." *Id*.

### DISCUSSION

The district court's jurisdiction was based on diversity of citizenship under 28 U.S.C. § 1332.  We have jurisdiction of this appeal under 28 U.S.C. § 1291.  The governing substantive law is that of Texas.

We limit our discussion to two issues raised by A&I on appeal: Texas common law fraud's reliance element and the damages award.[10]  Specifically, A&I argues that the record does not

---

[10]The other defendants-appellants' briefs either echo A&I's arguments on reliance and damages, or adopt and incorporate them. *See* FED. R. APP. P. 28(i).  We do not address any of defendants-appellants' alternative arguments.  For example, A&I also argues, *inter alia*, that Allstate and Encompass failed to prove any intentional misrepresentation, and defendants-appellants Thomas Rhudy, D.C.; Louis Saucedo, D.C.; Kenneth Lustik, D.C.; Mark Rayshell, D.C.; Larry Parent, D.C.; Christopher Holowiski, D.C.; Carey Fabacher, D.C.; Patricia Johnson, D.C.; Kyle Campbell, D.C.; and Ramesh Sanghani, D.C.

support the jury's finding that Allstate and Encompass *actually
relied* on any A&I representation.[11]   Further, A&I asserts that

the damages award should not be affirmed because it was based on

an improper damages measure–disgorgement of revenue–and because

it was not limited to revenue that A&I obtained by fraud.   For

the reasons stated below, we reverse.

### A.   *Texas Common Law Fraud's Reliance Element*

In Texas, the elements of common law fraud are:

"(1) that a material representation was made; (2) the
representation was false; (3) when the representation was made,
the speaker knew it was false or made it recklessly without any
knowledge of the truth and as a positive assertion; (4) the
speaker made the representation with the intent that the other
party should act upon it; (5) the party acted in reliance on the
representation; and (6) the party thereby suffered injury."   *In
re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001).

Before we can sustain the jury's verdict in this case, we must

determine whether the record reflects sufficient evidence

supporting *each* of the above elements of Texas common law fraud.

*See Sw. Ref. Co. v. Bernal*, 22 S.W.3d 425, 438 (Tex. 2000) ("The

plaintiff must prove, and the defendant must be given the

---

(collectively, "Chiropractic Defendants") contend further, among
other things, that the jury's finding of conspiracy should be set
aside because, since the Chiropractic Defendants were A&I agents
or employees, they could not, as a matter of law, conspire with
A&I.

[11]A&I also asserts that if Allstate and Encompass did
establish actual reliance, it was neither justifiable nor
detrimental.   We do not discuss these contentions since we find
the issue of actual reliance dispositive.

opportunity to contest, every element of a [tort] claim."). The record must reflect that Allstate and Encompass pleaded and proved that the insurers *actually relied* on an A&I misrepresentation. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (to prevail on fraud claim, the plaintiff "must prove that . . . [it] actually and justifiably relied upon the representation"); *see also Rowntree v. Rice*, 426 S.W.2d 890, 893 (Tex. App.—San Antonio 1968, writ ref'd n.r.e.) ("[P]laintiff in a fraud suit must plead and prove on the merits that he was ignorant of the falsity of defendant's representations and in fact relied on same . . . ."). A lack of sufficient evidence showing reliance will necessarily be fatal to the fraud claim.[12] *See, e.g., Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 930 (Tex. 1996)(rendering take-nothing judgment on fraud claim where plaintiff "did not present any evidence that she relied . . . on any representation made"). Absent such evidence, it is not the defendant's burden to *disprove* reliance.

After oral argument, this court requested the parties to submit additional briefing related to the sufficiency of evidence

---

[12]Indeed, the necessity of showing reliance is one reason why a fraud claim is barred where the plaintiff had actual knowledge of the falsity of a representation. *See Koral Indus., Inc. v. Sec.-Conn. Life Ins. Co.*, 788 S.W.2d 136, 146 (Tex. App.—Dallas 1990, writ denied).

of actual reliance and the damages calculation.  After reviewing

these briefs as well as those originally submitted by the

parties, and after conducting our own, independent examination of

the record, we conclude that the evidence does not suffice to

show that any Allstate or Encompass adjuster, or other agent or

employee making, directing or approving any payment made on any

of the claims in question, *actually* relied on an A&I

misrepresentation.  The evidence does not support the jury's

verdict on direct fraud.

There is no evidence that Allstate or Encompass made any

payment to (or received any request for payment or receipt or

release from) A&I (or any of the other defendants), or that any

payment by Allstate (or Encompass) in respect to any of the

claims involved was other than one lump sum amount to the

claimant-insured (and his or her attorney) without any breakdown

or designation other than as covering any and all claimant's

claims respecting the accident and without any specific mention

of or allocation of amounts to medical expenses; nor is there any

evidence of any such allocation or breakdown being reflected on

Allstate (or Encompass) records or the like.

It is shown that with respect to all the some 1800 claims at

issue, Allstate paid the claimants a total of $11,414,963.44 and

Encompass paid the claimants a total of $444,455.69, that out of

all these payments not less than $3,000,000 was eventually paid

by the claimants (or their respective attorneys) to defendants,

and that almost 90% of the files had medical records which

included *some* excessive or improper charges by defendants.

However, there is no showing that any of the files contained

medical records from defendants in which *all* (or any particular

fraction) of the charges shown were improper.  There is no

showing on an individual claim basis either of the total amount

of the claim, or of the total amount paid thereon by Allstate (or

Encompass), or of the particular amount of any property damage,

lost earnings or earning capacity, pain and suffering or bodily

impairment, or medical expense for service rendered by defendants

or by others, being claimed or reflected in the file.  Nor is

there any such showing for the 1800 some claims as a whole

(except that the total medical expenses claimed included *at least*

$3,000,000 which eventually went to defendants, and the total

claims were *at least* some $11,414,963.44 to Allstate and

$444,455.69 to Encompass).  Except for the fact of payment, there

is no evidence as to Allstate's (or Encompass's) liability

evaluation (e.g., was the insured at fault; was the claimant at

fault; how clear or disputed were these matters) on any specific

claim or group of claims.  There is no showing of how many of

these claims were disposed of by judgment, or after trial, or by

settlement after suit and before trial, or by settlement before suit.

Some reliance-related evidence was introduced, but this evidence skirted the central issue of whether any Allstate or Encompass adjuster (or other such agent) paid money to resolve a claim of a patient treated by the defendants-appellants because the adjuster in fact believed and relied on A&I's representations as reflected in the medical file furnished the attorney for the claimant and by that attorney to Allstate or Encompass.  For example, plaintiffs introduced evidence that it would be *reasonable* for an insurer to rely upon bills and documents received from a plaintiff's attorney: On examination of Dr. Louis Saucedo, a chiropractor and a defendant-appellant in this case, Allstate's attorney asked, "Sir, do you believe it would be reasonable for the insurance carriers such as Allstate to rely upon bills and documentations that they receive from the plaintiff's attorney so long as a complete package was forwarded that they received from your company?"  Dr. Saucedo answered, "If they review the records and not just the billing statements, yes, it would be reasonable."  Whether reliance by Allstate or Encompass would have been reasonable, however, is a distinct

19

inquiry from whether reliance existed at all.[13]

Other reliance-related evidence was sparse and unspecific. Another Allstate employee and SIU analyst, Joe Rocha (Rocha), who testified at trial as Encompass's corporate representative, was asked whether there was any indication in the files at issue that "claim representatives were relying upon the billings and medicals being submitted?"  Rocha responded, "Yes, there was."  Yet Rocha did not personally adjust (or otherwise take any action concerning settlement or disposition of) any of the files involved in this suit.  A third Allstate employee, assistant vice president Edward Joseph Moran (Moran) testified, "[O]bviously if we paid the claims, we relied on the representations of the defendants."  When pressed on his rationale, Moran replied simply, "We paid the claim." Finally, Moran elaborated, stating: "I know that if we paid claims, you know, because we either couldn't prove the fraud or because of the way Texas law is, you know, in terms of, you know, having to pay claims timely, you know, I believe that we would still be able to recoup that if we proved that the claims were fraudulent."

---

[13]Further, this court has previously indicated that a plaintiff asserting a fraud claim under Texas common law need not prove that his or her reliance was reasonable.  *See Martin v. Mbank El Paso, N.A.*, 947 F.2d 1278, 1280 (5th Cir. 1991) ("Texas case law does not require a plaintiff to show the reasonableness of its reliance on a misrepresentation to prove fraud.  Rather, Texas courts simply demand proof that the 'party acted in reliance upon the [false] representation.'" (quoting *Eagle Prop.s, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990))).

Finally, while Allstate's SIU analyst Vest testified that Allstate employees "rely on . . . the diagnosis codes" submitted by A&I, and stated, "We certainly rely on getting accurate information from whatever the source is, be it the doctors or the chiropractors, the clinics," his comments related only to the information Allstate inputs into its medical billing review system (MBRS), a computer tool.

Allstate and Encompass did not call to testify any adjuster (or other similar employee or agent) who actually adjusted or paid (or was in any way actually involved in the handling or paying of) any claim in the 1,800-plus claim files at issue.  Indeed, rather than making a serious attempt to prove actual reliance, Allstate and Encompass emphasized the fact that the insurance companies had no practical or feasible alternative to paying on the claim files. Allstate's counsel, in his opening statement, described the insurance companies' predicament:

> "[F]rankly, you could, you could actually see the development of this pattern.  I mean, nobody knows over a period of time, but after months, then years, and you start to see and say, I'm seeing the same thing over and over again, I'm seeing the same referrals, I'm seeing the same pattern of treatment, that Allstate adjusters that see this much, yeah, they were suspicious; yeah, they were saying things to the attorneys which oftentimes resulted in threats back against them from Accident & Injury for business disparagement.
> But the problem is and where they perpetuate this fraud is it really doesn't matter what you, the Allstate adjuster, thinks.  And I put this as a -- as a person

behind sound-proof glass banging on the wall because if these claims are not resolved, these third-party liability claims in which an Allstate insured has caused an accident unfortunately, probably at -- at fault, didn't mean it, but they are going to have a claim pursued against them, and ultimately if the claim doesn't settle, be filed into lawsuit by these attorneys. . . .

. . .

. . .

. . .

. . . And, as I say, the Allstate person in the background banging on the glass, but you've got to see the whole picture, what the Allstate people are relying upon and we know they are going to do is, regardless of what happens, they are going to carry this fraud over into the state courthouse and they are going to give untruthful testimony. And they do rely upon that. And the insureds going to have to come down and sit through trial as a defendant; the insurance is going to lose that income and be through that inconvenience; litigation costs are going to be associated with that; and, most importantly, which is Allstate's obligation to protect its insured, could be subjected to an excess judgment."[14]

In their closing argument as well, the insurance companies emphasized their lack of alternatives to paying on claims:

"In regard to . . . I think whether they were relied upon and acted upon, obviously if there is an alternative on these build-ups, these claims would not be paid. They make an issue, it seems like, well, you just don't pay these claims. This is a situation where there are many parties involved and many responsibilities.

First of all, until Mr. Vest really started to develop this information by mid 2000 and then continuing forward, there was no knowledge and there was large payments, as Mr. Vest said, you know, reliance on -- on those -- that build-up of that package. The driver on these personal injury claims is that amount of the -- the

---

[14]Obviously referring to what has long been commonly known as the liability insurer's "Stowers" duty. *See Stowers Furniture Co. v. Am. Idemn. Co.*, 15 S.W.2d 544 (Tex. Com. App. 1929; holding approved).

-- the medical specials that can be generated, that were
being generated through these packages.

     Actually, with the Encompass entities, it wasn't
even known until Mr. Rocha really got involved and -- and
talked to Mr. Vest in 2001.

     But even after that time -- so there -- there's no
question about the reliance. . . .

     First, they have no argument that there was no
reliance before the investigation was conducted in 2000.
. . .

     What we relied upon once we learned, . . . is you
don't know the whole picture, you're just seeing this
much, you think this person needed this treatment and
these MRIs; you know, this -- this 10- or $12,000, you
don't see it all because this evidence can't come in, and
they come down and -- and misrepresent that."

Moreover, on appeal, insurers Allstate and Encompass continue
to focus on their lack of an alternative to paying to resolve the
claim files at issue.   In the subsection of their main brief
discussing actual reliance, Allstate and Encompass fail to provide
any citation to the record that would support its assertion that
Allstate "relied on the A&I representations as to the amount
claimed, and which would be asserted in litigation . . . ."
Rather, the only related proposition for which the insurers
provided record citations is its assertion that "[a]ppellants had
no practical alternative to relying on the chiropractic claims in
the short run."   For this proposition, the insurance companies cite
to the testimony of SIU analyst Vest, who made clear that
Allstate's "primary obligation" is to its insureds.   Vest
elaborated:

> "[T]he problem for our insureds is that in Texas, many of
> our policy owners only have $20,000 over $40,000
> coverage.  If they are presented -- if we're presented
> with meds to the tune of $12,000, then the demand from
> the plaintiff attorney is going to quite often far exceed
> the amount of coverage within the policy.  Then the
> adjusters in the claims department is forced with a
> dilemma.  Either fight it and risk a -- risk going to
> trial and then risk exposing our insurer to an excess
> verdict, that means excess over their policy limits, in
> which they would personally be liable for it.
> So we're always conscious of that.  Our first responsibility
> is to -- to protect our policyholder."

Allstate also cites the portion of Vest's testimony where he
stated, "We settle these cases because we see that it's in our best
interests of our insureds to do so."  Similarly, Vest testified,
"We're settling these cases because it's in the best interests of
our insureds and that all parties apparently are agreeing to it
because the attorney is agreeing to it."  Finally, the insurers
cite to Rocha's testimony that there was some indication that claim
representatives were relying on submitted billings, but as
discussed above, Rocha himself never participated in the adjustment
of any of the claims in the 1,800-plus files at issue.

Further, other testimony at trial tended to *negate* the idea
that Allstate or Encompass adjusters relied on A&I representations.
SIU analyst Vest, who became Allstate's SIU analyst for Northern
Texas (where the vast majority of the underlying claims arose and
the defendants' challenged conduct occurred) in January 2000,
testified that upon taking charge of the Northern Texas area, he

"visited with some folks in a meeting . . . and the question was raised, what are our - - what's causing us the most problems and concerns." Vest stated that the "first time [he] heard A&I mentioned was at that meeting," *id.*, and that, in relation to A&I, "Initially, it was brought to my attention that we were seeing a lot in the way of excessive treatment, pattern of treatment that -- repetitive modalities, extensive billing, and heavy use of diagnostics, and just a repeated use of the -- the same modalities." Further, Vest testified that Allstate's designation of A&I as a "provider on hold" meant that:

> "[T]he bills as they came in that were associated with a tax identification numbers for a particular provider would be flagged when the bills were input into our computer system. And . . . and flagged means that it would draw attention to the adjuster or processor who was inputting the bills, and then they would be given directions as to what to do regarding whatever flag it was that they were seeing.
> In the case of provider on hold, their instructions were to contact the Special Investigative Unit or contact me."

Vest stated that he put A&I on provider-on-hold status "in and around May of 2000," but that he made the status retroactive to October 1, 1999, in order "to capture claims as they came into [the Allstate] system that would go back to that date."[15] Vest stated that he wanted "to get claims to begin coming into SIU so that we

---

[15]As noted *supra*, this case includes some unspecified number of claims going back to January 1999.

could begin our investigation and see what was going on." Vest
described the provider-on-hold designation's significance for the
claims adjuster:

> "The significance to the claims adjuster out in the
> field, not in SIU, was that SIU was looking at this
> particular provider and it would simply flag, be a red
> flag or a flag for the adjuster who is handling the claim
> at the time they are inputting bills to either look at
> the narrative and -- and contact SIU or -- that or they
> could take it upon themselves and simply override the --
> the code and -- and issue payment."

Alternatively, Vest noted that the claims adjuster "could notify
SIU and then override [the code] and continue the adjusting
process." This testimony suggests that Allstate was at least
suspicious of A&I's billings, and may even imply that Allstate in
fact did *not* rely on any A&I representation.

In order to succeed on their Texas common law fraud claim,
Allstate and Encompass needed to present legally sufficient
evidence of *actual* reliance. *See, e.g., Brittan Commc'ns Int'l
Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 906 (5th Cir. 2002); *Fla.
Dep't of Ins. v. Chase Bank of Tex. Nat'l Assoc.*, 274 F.3d 924,
934-35 (5th Cir. 2001) ("Under Texas law, reliance is an element of
fraud or misrepresentation."); *Roberts v. United N.M. Bank at
Roswell*, 14 F.3d 1076, 1078 (5th Cir. 1994). But the insurance
companies failed to do so. For example, they could have, but did
not, introduce the testimony of adjusters (or other similar agent

or employee) who in fact worked on some significant number of the 1,800-plus claim files at issue, to say that they relied on the medical claims submitted in deciding to settle a claim.[16]

We are sympathetic with the no-alternative position that Allstate and Encompass frequently emphasized throughout trial. We are also deeply shocked and saddened at the dishonest practices of many of the defendants as reflected by the evidence, as well, apparently, as of the lawyers with whom they worked. But it remains this court's responsibility to require those plaintiffs bringing a Texas common law fraud claim under diversity of citizenship jurisdiction to prove the elements of common law fraud as the state of Texas has determined them. It is not within our discretion to create a new Texas cause of action – perhaps some

---

[16]Moreover, an undetermined portion of the claims in question were paid on *judgments*, and there is no evidence as to how such judgments were obtained. As to settlements, we also note that there are a whole host of reasons – *other* than reliance on reports from the adverse party's doctors, that might lead a party to settle, viz:

> "[S]everal factors other than reliance on the truth of an opponent's allegations may influence a party's ultimate decision to settle disputed claims in a lawsuit, including the nature of the liability facts, the nature of the damages alleged, the number of parties involved, the perceived propensity of a jury in the forum to return a significant damage award, the level of skill of opposing counsel, the quality of the appearance of the fact witnesses and parties, and the costs associated with continued discovery, trial preparation, and trial itself." *Atlantic Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 277 (Tex. App.–Houston [1st Dist.] 2004, pet. denied).

blend of extortion and fraud.  It is up to the Texas courts, or legislature, to address that.  *See Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 314 (5th Cir. 1998) ("'We have long followed the principle that we will not create innovative theories of recovery or defense under local law, but will rather merely apply it as it currently exists.'" (quoting *Johnson v. Sawyer,* 47 F.3d 716, 729 (5th Cir. 1995)(en banc)(internal quotation marks omitted)).

On the evidence that was introduced at trial, a reasonable jury could not have found that Allstate actually relied on any misrepresentation by A&I.  As such, the district court should not have submitted the Texas common law fraud claim to the jury.  *See Love v. King,* 784 F.2d 708, 710 (5th Cir. 1986) ("A mere scintilla of evidence is insufficient to present a question for the jury.").

### B.  *Damages*

Even if we were to accept Allstate and Encompass's contention that the evidence was sufficient to support the jury's verdict on fraud, we would still be unable to affirm the district court's judgment.  The evidence does not support the damages award.

We begin our analysis of the damages award by noting that A&I's challenge against the award is two-fold: first, A&I asserts that the measure of damages employed—disgorgement—is inappropriate for a Texas common law fraud action and, second, that the damages award was not properly limited to what A&I obtained as a result of

fraud—it was based on evidence impermissibly mixing medically necessary and unnecessary services, and improperly included amounts paid pursuant to judgments as well as amounts paid to entities other than A&I that were not A&I's alter egos. We agree that it is questionable whether disgorgement is an appropriate measure of damages in an action alleging Texas common law fraud.[17] *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998) ("Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received." (internal citations omitted)). *But see Robertson v. ADJ P'ship, Ltd.*, 204 S.W.3d 484, 494–95 (Tex. App.—Beaumont 2006, pet. struck) (noting that "disgorgement of profits has long been recognized as an appropriate remedy for fraud and for breach of fiduciary duty," but then stating that "[t]he measure of damages for fraud may either consist of the difference between the value paid and the value received (out-of-pocket) or the difference between the value parted

---

[17]Moreover, it is dubious that disgorgement was an appropriate damages measure in *this* case since Allstate and Encompass also received benefits from the settlements that were involved in many of the 1,800-plus claim files at issue, and neither insurer was required to relinquish such benefits.

with and the value received (benefit-of-the-bargain)"). We assume,
however, *arguendo* only, that the disgorgement damages measure was
proper, and we find that, because there was no evidence introduced
regarding *what* the defendants-appellants obtained through fraud as
opposed to their legitimate provision of health care, the amount of
the award could only be based on mere conjecture or speculation.
Thus, it cannot be sustained.

Question number four submitted to the jury called for it to
answer "in dollars and cents for damages, if any, for . . .
disgorgement of revenue obtained by A&I by . . . fraud."[18] The jury

---

[18]Question number four read in its entirety:
"QUESTION NO. 4:
    What sum of money, if any, if paid now in cash,
would fairly and reasonably compensate Plaintiffs for
their damages, if any, that were proximately caused by
such fraud?
    Consider the element of damages listed below and
none other. In answering questions about damages,
answer each question separately.  Do not increase or
reduce the amount in one answer because of your answer
to any other question about damages.  Do not speculate
about what any party's ultimate recovery may or may not
be.  Any recovery will be determined by the court when
it applies the law to your answers at the time of
judgment.  Do not include interest on any damages you
may find.
    Answer separately in dollars and cents for
damages, if any, for—
    a.  disgorgement of revenue obtained by A&I by
such fraud
Answer:
a.    Allstate
_____
b.    Encompass
_____

answered by awarding Allstate $2,750,000.00 and Encompass $95,000.00 in damages for fraud committed by A&I, for a total of $2,845,000.00.

"Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993). Because disgorgement is meant to be remedial and not punitive, it is limited to "property causally related to the wrongdoing" at issue. *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Accordingly, the party seeking disgorgement must distinguish between that which has been legally and illegally obtained. *Id*. In actions brought by the SEC involving a securities violation, "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Id*. However, "in a private action, the party seeking

---

INSTRUCTIONS FOR QUESTION NO. 4:
    "Proximate cause" means that cause which, in a natural and continuous sequence produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.
    'Disgorgement' means the act of giving up something (such as money wrongfully obtained) on demand or by legal compulsion."

31

monetary compensation may have a greater burden to prove its claim to the amount requested." *Id.* at 1232 n.24.  Still, in the instant case we need not determine whether a more onerous burden of proof should be used since we find that Allstate and Encompass have not satisfied the lower burden-of-proof threshold of providing a reasonable approximation of what the defendants-appellants illegally obtained.

Allstate and Encompass state in their brief that, in the 1,800-plus claim files at issue in this case, Allstate paid $11,414,963.44 and Encompass paid $444,455.69 in settlements.  This information, alone, does not indicate what amount the defendants actually received from such settlements.  As both A&I's brief and the brief of Allstate and Encompass acknowledge, plaintiff's exhibit 907 tabulated the revenue obtained by the various defendants in the claim files at issue, and this amount was at least $3,000,000.00.  Allstate and Encompass point to the fact that the jury's total damages award, $2,845,000.00, was less than the amount defendants acknowledged they had received from the insurers for the contested claim files.  However, the jury's verdict still needed to be supported by evidence showing that defendants obtained this money by fraud; there is no evidence demonstrating what portion of the revenue obtained was a result of improper billing.

Allstate and Encompass imply in their main brief on appeal

that the evidence they presented concerning a representative sample of claim files supports the jury's damages calculation. Specifically, they point out that they retained a statistical expert to select a representative sample of the 1,800-plus claim files at issue; she selected 104 files.  Another expert, Dr. Timberlake, reviewed the 104-file representative sample to assess whether the medical treatment given in the files was necessary.  He concluded that "93 had problems that did not require mandatory treatment."

However, while the representative sample selected by the statistician may have been a proper method for evaluating some aspects of the claim files at issue in this case, nevertheless, as Allstate and Encompass admitted at oral argument, the sample was not intended to be representative of damages.  Thus, even assuming the accuracy of exhibit 907's indication that the defendants received about $3,000,000.00 from the 1,800-plus claim files at issue, the 104-file representative sample does not illuminate what amount of the $3,000,000.00 was paid as a result of A&I's fraud. In other words, even if we assume as Dr. Timberlake's testimony suggests, that roughly 89.42% of the claim files at issue involved some fraudulent billing,[19] there is no evidence that the remaining 10.58% did not account for a higher percentage of the total dollar

---

[19]93 is approximately 89.42% of 104.

amount obtained by the various defendants.

An additional problem with relying on the representative sample and Dr. Timberlake's testimony for the purpose of damages is that there is *no* evidence that of the 104 files in the representative sample, 93 had *no* medically necessary claims.  For example, even assuming that Dr. Timberlake was correct in stating that in some cases, a second MRI was unnecessary, this does not necessarily mean that the first MRI was *also* unnecessary.  At least some of the amount that defendants might have ultimately obtained in cases involving, for example, two or more MRIs may *not* be the result of fraudulent billing.  So, the evidence does not show the total amount of A&I fraudulent billing in the some 1800 files at issue.

Even if we knew that amount, however, we would not know how much of that fraudulent billing was paid by Allstate (or Encompass) to the claimant.  For example, a claim file in which the A&I records showed $10,000 expenses, *all* of which were fraudulently excessive, might have extremely weak liability, and have settled for $3,000, so no more than $3,000 could be considered as proceeds of fraud received by A&I.  And, if Allstate and Encompass settled some of the 1,800-plus claims at issue due entirely to factors other than any reliance on A&I's representations (and the amounts claimed exceeded the amounts paid by as much as the amount of

34

fraudulent billing on the claimant's A&I records), then the amount from those files that eventually found its way to the defendants cannot properly be included in the damages calculation.

## CONCLUSION

The jury verdict for fraud is unsustainable as plaintiffs-appellees Allstate and Encompass failed to introduce sufficient evidence of actual reliance on an A&I representation. Because A&I cannot be held liable for fraud, the remaining defendants-appellants cannot be held liable for conspiracy to commit fraud. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable."). Further, even if this court could otherwise uphold the verdict for fraud and conspiracy to commit fraud, the damages award was based on conjecture and speculation as to what amount the defendants obtained through A&I's fraud, and therefore it, too, cannot be sustained. We conclude that "further proceedings are unwarranted because [Allstate and Encompass] ha[ve] had a full and fair opportunity to present the case." *Weisgram v. Marley Co.*, 120 S.Ct. 1011, 1015 (2000). We reverse and render judgment for the

defendants-appellants.[20]

REVERSED.

---

[20]All pending undisposed of motions are hereby denied or dismissed as moot.